**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| **William A. Randolph, Inc., an Illinois corporation,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No.** |
| **D & BR Building Systems, Inc., a Texas corporation,** | ) ) ) | |
| **Defendant.** | ) ) ) | |

```
FILED: APRIL 21, 2008
08CV2257      JH
JUDGE GOTTSCHALL
MAGISTRATE JUDGE SCHENKIER
```

## COMPLAINT

Plaintiff, William A. Randolph, Inc., an Illinois corporation ("Randolph") by and through it attorneys, complains of Defendant D & BR Building Systems, Inc., a Texas corporation ("D & BR"), as follows:

## INTRODUCTION

1.     This case involves the construction of buildings for a Wal-Mart Supercenter and a Wal-Mart Sam's Club in Janesville, Wisconsin (the "Projects"). Randolph was the general contractor and entered into two subcontracts with D & BR to complete the structural steel installation on the Projects.  D & BR's work, however, was rife with problems, including without limitation its failure to provide sufficient skilled workman, materials, and equipment, its failure to complete the work promptly and according to the Projects' schedules, interference with work on the job site, and work stoppages.  As a result of these problems, Randolph served D & BR with notices of default under the subcontracts.  D & BR failed to cure its violations, and Randolph terminated the subcontracts.

2.     Randolph was required to hire other subcontractors to repair and complete D & BR's work and as a result has incurred substantial damages.  D & BR has refused to pay Randolph for its damages despite its demands, and therefore Randolph seeks relief from this Court.

## PARTIES, JURISDICTION, AND VENUE

3.     Plaintiff, William A. Randolph, Inc., is an Illinois corporation with its principal place of business located in Gurnee, Illinois.

4.     Defendant, D & BR Building Systems, Inc., is a Texas corporation, with its principal place of business in Edgewood, Texas.

5.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 exclusive of interest and costs, and there is complete diversity between the parties.

6.     Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## ADDITIONAL BACKGROUND ALLEGATIONS

7.     Randolph was the general contractor for the construction of a Wal-Mart Supercenter and a Wal-Mart Sam's Club store in Janesville, Wisconsin.  A true and correct copy of the contract without schedules or exhibits between Randolph and Wal-Mart Stores, Inc., dated November 15, 2005 (the "Master Contract") is attached hereto as Exhibit A.

8.     Randolph entered into a Subcontract Agreement with D & BR on or about March 10, 2006, under which D & BR was to be paid $115,000 to complete the structural steel installation on the Wal-Mart Supercenter portion of the Projects (the "Wal-Mart

Subcontract").  A true and correct copy of the Wal-Mart Subcontract is attached hereto as Exhibit B.

9.      Randolph entered into an additional Subcontract Agreement with D & BR on or about April 5, 2006, under which D & BR was to be paid $140,000 to complete the structural steel installation on the Wal-Mart Sam's Club portion of the Projects (the "Sam's Club Subcontract", and referred to collectively with the Wal-Mart Subcontract as the "Subcontracts").  A true and correct copy of the Sam's Club Subcontract is attached hereto as Exhibit C.

10.     Pursuant to the terms of the Subcontracts, D & BR was to, *inter alia*, "provide the unloading of owner supplied materials and perform the steel erection of the main building structure" for the Projects.

11.     Randolph and D & BR entered into several approved change orders during the course of work on the Projects, increasing the total amount of the Subcontracts to approximately $197,300 for the Sam's Club Subcontract, and to approximately $256,000 for the Wal-Mart Subcontract.

12.     D & BR provided Randolph with a warranty of its work.  Pursuant to the terms of the Subcontracts, the "Subcontractor also warrants that all work under this Agreement will be of good quality, free from faults and defects, and in conformance with the Contract Papers."  (See Ex. B & C, § 15).

13.     Although D & BR installed portions of the structural steel components for the Projects, its work on the Projects was plagued with trouble, including its failure to provide sufficient skilled workman, materials, and equipment, its failure to complete the

work promptly and according to the Projects' schedules, interference with work on the job site, and work stoppages.

14.     Randolph experienced significant delays as a result of D & BR's actions and omissions.  D& BR failed to perform its work in accordance with the Subcontracts. Despite Randolph's requests, D & BR failed to repair its defective work resulting in significant delays, disruptions, and other schedule and job impacts.

15.     On multiple occasions D & BR refused to follow Randolph's directions and caused delays to other subcontractors and the overall job schedule.  In addition, D & BR employees left the job site on several occasions without communicating their location to Randolph.

16.     Because of the deficiencies in D & BR's performance, and pursuant to the requirements of the Subcontracts, Randolph sent D & BR notices of defaults in its performance under both Subcontracts on June 21, 2006.  (True and correct copies of the notices are attached hereto as Exhibits D and E, respectively.)  The notices listed several defaults, and provided D & BR with 48 hours in which to cure its deficiencies, pursuant to Section 13 of the Subcontracts.

17.     D & BR did not cure its defaults.  As a result, Randolph terminated both Subcontracts through letters to D & BR dated June 27, 2006.  (True and correct copies of the termination letters are attached hereto as Exhibits F and G, respectively.)

18.     While D & BR was still on the job site, Wal-Mart's representative for steel compliance, Maxim Technologies ("Maxim"), documented a number of serious deficiencies in D & BR's work on the steel structure installation, including bent and missing anchor bolts, cut diagonal braces, columns that were out of plumb, and bracing

plates that were cut and moved.  Maxim representatives observed D & BR employees pushing and hammering on columns to move them into position in order to attach steel being erected.

19.     The full scope of D & BR's inadequate work, however, did not become known to Randolph until after Randolph's termination of the Subcontracts.  Maxim found and documented numerous examples of poor welding, bent and otherwise damaged joists, girders that were welded instead of bolted, and bolts that were too short and did not meet specifications.  Overall, Maxim found that most of the bolts throughout the buildings had loose nuts or no nuts at all, and Randolph estimates that 75% of the bolts D & BR installed were loose.  D & BR also had "tack welded" large pieces of refrigeration equipment onto the buildings' roofs, instead of welding the equipment according to specifications, creating a significant safety hazard.

20.     Randolph was forced to hire other subcontractors to finish or replace D & BR's work on the Projects.

21.     Randolph also incurred expenses in the transition from D & BR, including lost time and labor.  Randolph spent weeks examining D & BR's work, bringing the new subcontractors onto the job site, and relocating structural components left on site by D & BR.

22.     Pursuant to the terms contained in Section 13 of each Subcontract, Randolph is entitled to provide the labor, equipment, and materials to complete the work under the Subcontract, and deduct its costs, including all charges, expenses, losses, costs, damages, and attorneys' fees, from any amount purportedly due to D & BR under the

Subcontract. If such costs and expenses exceed the amount owing to D & BR, Randolph is entitled to charge D & BR for the difference under the Subcontract.

23. Randolph paid D & BR approximately $184,095 of the contract amount of $256,000 for its work under the Wal-Mart Subcontract. Randolph incurred costs and expenses in completing the work under the Wal-Mart Subcontract in the amount of approximately $123,920.25, leaving Randolph with an unpaid balance of at least $52,015.25.

24. Randolph paid D & BR approximately $163,557 of the contract amount of $197,300 for its work under the Sam's Club Subcontract. Randolph incurred costs and expenses in completing the work under the Sam's Club Subcontract in the amount of approximately $109,417.13, leaving Randolph with an unpaid balance of at least $75,674.13.

25. Randolph has made demands upon D & BR for payment of the amounts Randolph is owed under the Subcontracts, but D & BR has refused to pay. In total, Randolph is owed at least $127,689.38 by D & BR.

26. Pursuant to Section 13 of each Subcontract, Randolph is entitled to seek its attorneys' fees incurred as a result of D & BR's failure to perform its obligations.

<u>**Count I**</u>
**Breach of Contract**
**(Wal-Mart Subcontract)**

27. Randolph restates and incorporates the allegations contained in Paragraphs 1 – 26 as if fully stated herein.

28. The Wal-Mart Subcontract was a valid and enforceable contract.

29. Randolph performed its obligations under the Wal-Mart Subcontract.

30.    For the reasons stated above, D & BR failed to perform its obligations under the Wal-Mart Subcontract.  D & BR's defaults included its failure to provide sufficient skilled workman, materials, and equipment, its failure to complete the work promptly and according to schedule, interfering with work on the job site, and work stoppages.

31.    Randolph notified D & BR of its defaults, and gave D & BR an opportunity to cure.  D & BR's failure to cure its defaults constituted a material breach of its obligations under the Wal-Mart Subcontract.

32.    Randolph was forced to hire other subcontractors to complete or replace D & BR's faulty and defective work under the Wal-Mart Subcontract.  In doing so, Randolph has suffered damages in the amount of at least $52,015.25.  Pursuant to the terms of the Wal-Mart Subcontract, Randolph is entitled to collect at least this amount from D & BR.

33.    Randolph has requested that D & BR pay the amount owed to it.  Despite Randolph's requests, and D & BR's obligations under the Wal-Mart Subcontract, D & BR has refused to pay the $52,015.25 it owes Randolph.

WHEREFORE, for the reasons stated above, plaintiff William A. Randolph, Inc., respectfully requests that this Court enter a judgment in its favor and against defendant D & BR Building Systems, Inc., in the amount of $52,015.25 plus costs and attorneys' fees, and grant such further relief as is just and appropriate.

## Count II
## Breach of Contract
### (Sam's Club Subcontract)

34.     Randolph restates and incorporates the allegations contained in Paragraphs 1-26 as if fully stated herein.

35.     The Sam's Club Subcontract was a valid and enforceable contract.

36.     Randolph performed its obligations under the Sam's Club Subcontract.

37.     For the reasons stated above, D & BR failed to perform its obligations under the Sam's Club Subcontract.  D & BR's defaults included its failure to provide sufficient skilled workman, materials, and equipment, its failure to complete the work promptly and according to schedule, interference with work on the job site, and work stoppages.

38.     Randolph notified D & BR of its defaults, and gave D & BR an opportunity to cure.  D & BR's failure to cure its defaults constituted a material breach of its obligations under the Sam's Club Subcontract.

39.     Randolph was forced to hire other subcontractors to complete or replace D & BR's faulty and defective work under the Sam's Club Subcontract.  In doing so, Randolph has suffered damages in the amount of at least $75,674.13.  Pursuant to the terms of the Sam's Club Subcontract, Randolph is entitled to collect at least this amount from D & BR.

40.     Randolph has requested that D & BR pay the amount owed to it.  Despite Randolph's requests, and D & BR's obligations under the Sam's Club Subcontract, D & BR has refused to pay the $75,674.13 it owes Randolph.

WHEREFORE, for the reasons stated above, plaintiff William A. Randolph, Inc., respectfully requests that this Court enter a judgment in its favor and against defendant D & BR Building Systems, Inc., in the amount of $75,674.13 plus costs and attorneys' fees, and grant such further relief as is just and appropriate.

**Jury Demand**

Pursuant to its rights guaranteed by the Seventh Amendment to the United States Constitution, William A. Randolph, Inc., hereby demands a trial by jury with respect to the claims asserted in the Complaint.

Respectfully submitted,

**WILLIAM A. RANDOLPH, INC.**, an Illinois corporation

By:_____/s/ Marc. S. Porter_____
    One of Its Attorneys

Marc S. Porter #3125509
Jeff D. Harris #3121786
Michael T. Graham #6280124
Figliulo & Silverman, P.C.
10 S. LaSalle Street
Suite 3600
Chicago, Illinois 60603
(312) 251-4600

# WAL-MART ®

WAL-MART STORES, INC.  *  2001 SE. 10TH STREET  *  BENTONVILLE, AR 72716-0550  479-273-8361

CONTRACT EXECUTION PROCEDURES

**RECEIVED**

**DATE:** NOVEMBER 15, 2005

JAN 0 5 2006

**TO:** WILLIAM A. RANDOLPH INCORPORATED
ERIC P. HANDLEY     08CV2257
JUDGE GOTTSCHALL

WM. A. RANDOLPH, INC.

**FROM:** KELLI POINTER
CONTRACT ADMINISTRATOR MAGISTRATE JUDGE SCHENKIER

**SUBJECT:** INSTRUCTIONS FOR CONTRACT WAL-MART COMBO PROJECT
#1305-01 WAL-MART SUPERCENTER JANESVILLE, WISCONSIN
#4840-00 WAL-MART SAM'S CLUB JANESVILLE, WISCONSIN

If the Contractor fails to meet any of the following dates, Wal-Mart shall, except to the extent otherwise required pursuant to applicable law, have the right to obtain the items on behalf of Contractor to withhold any and all payments of the Contract Sum and to terminate the Contract immediately.

Contractor hereby acknowledges, agrees and covenants that, if Contractor is awarded the Contract to perform the Work and Contractor begins performing any of the Work before receiving a fully executed copy of the Contract that has been signed by duly authorized officers of Contractor and Wal-Mart, then commencing performance of the Work shall serve as, and shall be deemed to constitute, Contractor's acceptance of, and agreement to be bound by, the terms and conditions of the Contract Documents included in the Invitation to Bid to the same extent and with the same effect as though such documents had been fully executed, and Contractor shall fully comply with the terms and conditions thereof. In such an event, once the Contractor has received a fully executed copy of the Contract that has been signed by duly authorized officers of Contractor and Wal-Mart, the terms and conditions of the Contract Documents, as executed by the parties, shall supersede this provision and shall govern the performance of the Work and the obligations of the parties with respect thereto, and the effective date of the fully executed and delivered Contract shall be the date on which Contractor was awarded the Contract by telephone notification.

## ENCLOSURES FOR STORMWATER:

- Under separate cover: Storm Water Video per Section 8.G.1.c. of the Special Conditions (enclosed) to be viewed at the pre-construction meeting with the superintendents of the Contractor and excavation subcontractor(s) prior to starting construction.

- Under separate cover: Wal-Mart Storm Water Hotline Poster per 8.K of the Special Conditions: The Contractor shall post the Storm Water Hotline Poster in a conspicuous place in the construction office of the Project.

- Contractor's SWPPP is intended to be a guideline to assist the Contractor organizes the SWPPP in a tabbed 3-ring binder in the job trailer.

## PAYMENT INSTRUCTIONS:

- When applying for payment, send the original and ONE (1) copy of the Application for Payment, any change orders and all other documentation required under the Contract Documents to the attention of the Contract Administrator named above. All applicable items on the payment form are to be filled out completely when applying for payment.

CHANGE ORDER INSTRUCTIONS:

- All Change Orders submitted for processing throughout the course of the Project should be to the attention of the Contract Administrator.

- Change Orders can only be submitted for payment after they have been signed and approved by an authorized officer of Wal-Mart. Yellow copies must be enclosed with the corresponding application for payment.

INVOICE INSTRUCTIONS:

- All miscellaneous invoices submitted to Wal-Mart for payment/processing throughout the course of the Project should be to the attention of the Contract Administrator named above.

CONTRACTOR ACTION ITEMS:

**Remit by email, scan and send, to the Contract Administrator within 24 hours of award of Contract:**

- Certificate(s) of insurance, including general liabilities, automobile liabilities, workers' compensation and builders risk, in accordance with the Contract Documents, naming Wal-Mart as additional insured with the store number and location mentioned

- Performance and Payment Bonds (Bonds must be on Wal-Mart form from Spec Book)

- Construction Project Billing Format (Budget Summary)

**Remit via the Store Bidding System within 48 hours of award of Contract:**

- CSI Breakdown

**Remit by mail to the Contract Administrator within two (2) business days of receipt of Contract:**

- Return all four (4) copies of the signed, sealed and witnessed Contract to Wal-Mart Contract Administration, by mail within two (2) business days of receipt. Upon complete execution of the Contract by Wal-Mart, one executed Contract copy will be returned to your office within five (5) business days of receipt.

**Remit by email, scan and send, to the Contract Administrator within nine (9) days of award:**

- Site Pre-construction Meeting Certification form, completed, per section 8.G.1 of the Special Conditions.

**Remit by mail to the Contract Administrator within eight (8) weeks of receipt of Contract:**

- Original Performance and Payment Bonds (with county recordation stamp)

**If the Contractor fails to meet any of these dates, Wal-Mart shall, except to the extent otherwise required pursuant to applicable law, have the right to withhold any and all payments of the Contract Sum and to terminate the Contract immediately.**

# CONSTRUCTION AGREEMENT BETWEEN OWNER AND CONTRACTOR

(Construction Contract)

The basis of payment per this Contract is a **STIPULATED SUM.**

This AGREEMENT (the "Contract") is made as of the 15th day of November in the year of Two Thousand Five between the Owner and the Contractor, each of which is identified below. The effective date of this Contract shall be the date upon which the Project which is the subject of this Contract is awarded to Contractor by telephone notification. Contractor hereby agrees that, should it begin performance of Work under this Contract prior to receipt of a fully executed copy of this Contract, such Work and the obligations of the parties with respect thereto shall be governed by the Contract Documents included in the Invitation to Bid from Owner to Contractor (the "Invitation to Bid"). In such event, once the Contractor has received a fully executed copy of the Contract that has been signed by duly authorized officers of Contractor and Wal-Mart, the terms and conditions of the Contract Documents, as executed by the parties, shall supersede this provision and shall govern the performance of the Work and the obligations of the parties with respect thereto, and the effective date of the fully executed and delivered Contract shall be the date upon which Contractor was awarded the Project which is the subject of this Contract by telephone notification.

The Project is

Wal-Mart Supercenter
Store # 1305-01 Janesville, Wisconsin
Job # J525
Site/Address # 201305
Purchase Order # 1854146

Wal-Mart Sam's Club
Store # 4840-00 Janesville, Wisconsin
Job # J1539
Site/Address # 104840
Purchase Order # 1854136

The Owner is:

Wal-Mart Stores, Inc.
Department 8702
2001 S.E. 10th Street
Bentonville, Arkansas 72716-0550

The Contractor is:

William A. Randolph Incorporated
820 Lakeside Drive Suite 3
Gurnee, Illinois 60031
Phone: 847-856-0123
JDE Address # 2658786
Vendor # 785530

The Architect is

Raymond Harris and Associates

The Engineer is

ARC Design Resources

NOW THEREFORE, in consideration of the mutual promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Owner and Contractor agree as set forth in the following pages:

## ARTICLE 1

### THE CONTRACT DOCUMENTS

1.1     The documents that shall govern the Contractor's obligations shall consist of:

(a)     this Contract

(b)     the Contract Execution Procedures attached hereto

(c)     all Applications and Certificates for Payment (each an "Application for Payment") submitted by Contractor to Owner and all other miscellaneous accounting forms which may be provided by Owner to Contractor from time to time in connection herewith

(d)     the General Conditions of the Contract for Construction (1997 Edition AIA Document A201-1997 General Conditions of the Contract) attached hereto as Exhibit A (the "General Conditions")

(e)     the Supplementary Conditions attached hereto as Exhibit B (the "Supplementary Conditions")

(f)     the Special Conditions attached hereto as Exhibit C (the "Special Conditions" and, collectively with the General Conditions and Supplementary Conditions, the "Conditions")

(g)     the Specifications issued by the Architect and attached hereto as Exhibit D (the "Specifications") and

(h)     the Architectural Plans issued by the Architect and attached hereto as Exhibit E (the "Architectural Plans")

(i)     the Site and Grading Plans issued by the Engineer Exhibit F (the "Site and Grading Plans" and, collectively with the Architectural Plans, the "Plans", and references to the Drawings in the Contract Documents shall be deemed to include the Plans)

Sheets:

1.1.1   Architectural Plans issued by the Architect:

1305-01 Supercenter Sheets

| Sheet Number | Original Issue Date | Last Revision as of Out To Bid Date |
|---|---|---|
| C1 | 1/11/2005 | 10/5/2005 |
| N1 | 1/11/2005 | 6/24/2005 |
| SP1 | 1/11/2005 | 10/5/2005 |
| SP2 | 1/11/2005 | 10/5/2005 |
| SP2.1 | 1/11/2005 | 10/5/2005 |

| | | |
|---|---|---|
| SP2.2 | 1/11/2005 | 3/25/2005 |
| A1 | 1/11/2005 | 6/24/2005 |
| A1.1 | 1/11/2005 | |
| A2 | 1/11/2005 | 10/5/2005 |
| A2.1 | 1/11/2005 | |
| A2.2 | 1/11/2005 | |
| A2.3 | 1/11/2005 | 10/5/2005 |
| A3 | 1/11/2005 | 10/5/2005 |
| A3.1 | 1/11/2005 | 10/5/2005 |
| A3.2 | 1/11/2005 | 10/5/2005 |
| A3.3 | 1/11/2005 | 10/5/2005 |
| A3.4 | 1/11/2005 | 10/5/2005 |
| A3.5 | 1/11/2005 | 10/5/2005 |
| A3.6 | 1/11/2005 | 10/5/2005 |
| A3.7 | 1/11/2005 | 10/5/2005 |
| A4 | 1/11/2005 | 10/5/2005 |
| A4.1 | 1/11/2005 | 10/5/2005 |
| A4.2 | 1/11/2005 | 10/5/2005 |
| A5 | 1/11/2005 | 10/5/2005 |
| A5.1 | 1/11/2005 | 10/5/2005 |
| A5.2 | 1/11/2005 | 6/24/2005 |
| A5.3 | 1/11/2005 | 10/5/2005 |
| A5.4 | 1/11/2005 | 10/5/2005 |
| A5.5 | 1/11/2005 | 3/25/2005 |
| A5.6 | 1/11/2005 | 10/5/2005 |
| A6 | 1/11/2005 | 10/5/2005 |
| A6.1 | 1/11/2005 | 3/25/2005 |
| A6.2 | 1/11/2005 | |
| A7 | 1/11/2005 | |
| A8 | 1/11/2005 | 10/5/2005 |
| A8.1 | 1/11/2005 | 10/5/2005 |
| A8.2 | 1/11/2005 | 10/5/2005 |
| A9 | 1/11/2005 | |
| A9.1 | 1/11/2005 | |
| AC1 | 1/11/2005 | 6/24/2005 |
| AC1.1 | 1/11/2005 | |
| AC1.2 | 1/11/2005 | |
| AC2 | 1/11/2005 | 6/24/2005 |
| AC2.1 | 1/11/2005 | |
| GC1 | 1/11/2005 | 10/5/2005 |
| GC2 | 1/11/2005 | 10/5/2005 |
| GC2.1 | 1/11/2005 | 10/5/2005 |
| GC2.2 | 1/11/2005 | 10/5/2005 |
| GC3 | 1/11/2005 | 10/5/2005 |
| GC3.1 | 1/11/2005 | 10/5/2005 |
| GC3.2 | 1/11/2005 | 10/5/2005 |
| GC4 | 1/11/2005 | 10/5/2005 |
| GC4.1 | 1/11/2005 | 3/25/2005 |
| GC5 | 1/11/2005 | |
| GC5.1 | 1/11/2005 | |



#4840-00 and 1305-01 Janesville, Wisconsin Contract (v19)

| | | |
|---|---|---|
| PH1 | 1/11/2005 | 10/5/2005 |
| PH1.1 | 1/11/2005 | 10/5/2005 |
| SB1 | 1/11/2005 | 2/16/2005 |
| GA1 | 1/11/2005 | 6/24/2005 |
| GA1.1 | 1/11/2005 | 3/25/2005 |
| GA2 | 1/11/2005 | 6/24/2005 |
| GA2.1 | 1/11/2005 | 6/24/2005 |
| GA3 | 1/11/2005 | 6/24/2005 |
| GA4 | 1/11/2005 | 6/24/2005 |
| GA4.1 | 1/11/2005 | 6/24/2005 |
| GA5 | 1/11/2005 | 6/24/2005 |
| S0 | 1/11/2005 | 10/5/2005 |
| S1 | 1/11/2005 | 6/24/2005 |
| S1.1 | 1/11/2005 | 6/24/2005 |
| S2 | 1/11/2005 | 3/25/2005 |
| S2.1 | 1/11/2005 | |
| S3 | 1/11/2005 | 6/24/2005 |
| S4 | 1/11/2005 | 3/25/2005 |
| S4.1 | 1/11/2005 | 6/24/2005 |
| S4.2 | 1/11/2005 | 3/25/2005 |
| S4.3 | 1/11/2005 | 3/25/2005 |
| S5 | 1/11/2005 | |
| S5.1 | 1/11/2005 | 3/25/2005 |
| S6 | 1/11/2005 | 6/24/2005 |
| S6.1 | 1/11/2005 | 6/24/2005 |
| S6.2 | 1/11/2005 | 6/24/2005 |
| S7 | 1/11/2005 | 10/5/2005 |
| S7.1 | 1/11/2005 | 6/24/2005 |
| S7.2 | 1/11/2005 | 10/5/2005 |
| S8 | 1/11/2005 | 10/5/2005 |
| S8.1 | 1/11/2005 | 10/5/2005 |
| S8.2 | 1/11/2005 | |
| S9 | 1/11/2005 | 10/5/2005 |
| S10 | 1/11/2005 | 3/25/2005 |
| S10.1 | 1/11/2005 | 10/5/2005 |
| S11 | 1/11/2005 | 3/25/2005 |
| FP1 | 1/11/2005 | 6/24/2005 |
| FP2 | 1/11/2005 | 6/24/2005 |
| FP2.1 | 1/11/2005 | 6/24/2005 |
| FP2.2 | 1/11/2005 | 6/24/2005 |
| FP2.3 | 1/11/2005 | 6/24/2005 |
| FP2.4 | 1/11/2005 | 6/24/2005 |
| FP2.5 | 1/11/2005 | 6/24/2005 |
| FP3 | 1/11/2005 | 6/24/2005 |
| FP3.1 | 1/11/2005 | |
| FP4 | 1/11/2005 | 6/24/2005 |
| P1 | 1/11/2005 | 6/24/2005 |
| P2 | 1/11/2005 | 2/16/2005 |
| P3 | 1/11/2005 | 6/24/2005 |
| P4 | 1/11/2005 | 6/24/2005 |



#4840-00 and 1305-01 Janesville, Wisconsin Contract (v19)

| M1 | 1/11/2005 | 6/24/2005 |
|----|-----------|-----------|
| M2 | 1/11/2005 | 6/24/2005 |
| M3 | 1/11/2005 | 10/5/2005 |
| MP1 | 1/11/2005 | 6/24/2005 |
| MP2 | 1/11/2005 | 6/24/2005 |
| GP1 | 1/11/2005 | 6/24/2005 |
| GP2 | 1/11/2005 | 6/24/2005 |
| GP3 | 1/11/2005 | 6/24/2005 |
| GP4 | 1/11/2005 | 6/24/2005 |
| GP5 | 1/11/2005 | |
| GP6 | 1/11/2005 | 6/24/2005 |
| GM1 | 1/11/2005 | 10/5/2005 |
| GM2 | 1/11/2005 | 10/5/2005 |
| R1 | 1/11/2005 | 6/24/2005 |
| R2 | 1/11/2005 | 3/25/2005 |
| R3 | 1/11/2005 | 6/24/2005 |
| R4 | 1/11/2005 | 6/24/2005 |
| R5 | 1/11/2005 | 6/24/2005 |
| E1 | 1/11/2005 | 6/24/2005 |
| E1.1 | 1/11/2005 | 6/24/2005 |
| E1.2 | 1/11/2005 | 6/24/2005 |
| E2 | 1/11/2005 | 3/25/2005 |
| E2.1 | 1/11/2005 | |
| E2.2 | 1/11/2005 | 6/24/2005 |
| E2.3 | 1/11/2005 | 6/24/2005 |
| E2.4 | 1/11/2005 | 6/24/2005 |
| E3 | 1/11/2005 | 6/24/2005 |
| E4 | 1/11/2005 | 6/24/2005 |
| E4.1 | 1/11/2005 | 6/24/2005 |
| E4.2 | 1/11/2005 | 6/24/2005 |
| E4.3 | 1/11/2005 | 6/24/2005 |
| E5 | 1/11/2005 | 6/24/2005 |
| EM1 | 1/11/2005 | 6/24/2005 |
| REM1 | 1/11/2005 | 6/24/2005 |
| RE1 | 1/11/2005 | 6/24/2005 |
| RE1.1 | 1/11/2005 | 6/24/2005 |
| GE1 | 1/11/2005 | 6/24/2005 |
| GE2 | 1/11/2005 | 6/24/2005 |

4840-00 Sam's Club Sheets

| Sheet Number | Original Issue Date | Last Revision as of Out To Bid Date |
|--------------|---------------------|-------------------------------------|
| C1 | 18-Nov-05 | 1-Jul-05 |
| N1 | 16-Nov-05 | |
| SP1 | 11-Jan-05 | 1-Jul-05 |
| SP2 | 11-Jan-05 | 1-Jul-05 |
| SP2.1 | 11-Jan-05 | 1-Jul-05 |
| SP2.2 | 11-Jan-05 | 1-Jul-05 |

#4840-00 and 1305-01 Janesville, Wisconsin Contract (v19)

| | | |
|---|---|---|
| A1 | 11-Jan-05 | 1-Jul-05 |
| A2 | 11-Jan-05 | 30-Sep-05 |
| A2.1 | 11-Jan-05 | 30-Sep-05 |
| A3 | 11-Jan-05 | 1-Jul-05 |
| A3.1 | 11-Jan-05 | 1-Jul-05 |
| A3.2 | 11-Jan-05 | 1-Jul-05 |
| A3.3 | 11-Jan-05 | 20-Jun-05 |
| A4 | 11-Jan-05 | 30-Sep-05 |
| A4.1 | 11-Jan-05 | 1-Jul-05 |
| A4.2 | 11-Jan-05 | 20-Jun-05 |
| A5 | 11-Jan-05 | 1-Jul-05 |
| A5.1 | 11-Jan-05 | 1-Jul-05 |
| A5.2 | 11-Jan-05 | 1-Jul-05 |
| A6 | 11-Jan-05 | 1-Jul-05 |
| A6.1 | 11-Jan-05 | |
| A6.2 | 11-Jan-05 | 1-Jul-05 |
| A7 | 11-Jan-05 | 1-Jul-05 |
| A8 | 11-Jan-05 | 1-Jul-05 |
| A8.1 | 11-Jan-05 | 1-Jul-05 |
| A8.2 | 11-Jan-05 | 1-Jul-05 |
| A9 | 11-Jan-05 | 20-Jun-05 |
| A9.1 | 11-Jan-05 | 1-Jul-05 |
| AC1 | 11-Jan-05 | 1-Jul-05 |
| PH1 | 11-Jan-05 | 1-Jul-05 |
| SB1 | 11-Jan-05 | 1-Jul-05 |
| GA1 | 11-Jan-05 | 1-Jul-05 |
| GA2 | 11-Jan-05 | 1-Jul-05 |
| GA3 | 11-Jan-05 | 1-Jul-05 |
| GA4 | 11-Jan-05 | 20-Jun-05 |
| GA4.1 | 11-Jan-05 | |
| GA5 | 11-Jan-05 | 20-Jun-05 |
| S0 | 11-Jan-05 | 1-Jul-05 |
| S1 | 11-Jan-05 | 30-Sep-05 |
| S1.1 | 11-Jan-05 | 1-Jul-05 |
| S2 | 11-Jan-05 | |
| S2.1 | 11-Jan-05 | |
| S2.2 | 11-Jan-05 | 1-Jul-05 |
| S3 | 11-Jan-05 | 30-Sep-05 |
| S4 | 11-Jan-05 | 20-Jun-05 |
| S4.1 | 11-Jan-05 | 20-Jun-05 |
| S4.2 | 11-Jan-05 | 1-Jul-05 |
| S4.3 | 11-Jan-05 | 1-Jul-05 |
| S5 | 11-Jan-05 | |
| S5.1 | 11-Jan-05 | 1-Jul-05 |
| S5.2 | 11-Jan-05 | 30-Sep-05 |
| S5.3 | 11-Jan-05 | 30-Sep-05 |
| S6 | 11-Jan-05 | 1-Jul-05 |
| S6.1 | 11-Jan-05 | 30-Sep-05 |
| S6.2 | 11-Jan-05 | 1-Jul-05 |
| S6.3 | 11-Jan-05 | 30-Sep-05 |

#4840-00 and 1305-01 Janesville, Wisconsin Contract (v19)

| | | |
|---|---|---|
| S7 | 11-Jan-05 | 1-Jul-05 |
| S8 | 11-Jan-05 | 1-Jul-05 |
| S8.1 | 11-Jan-05 | 20-Jun-05 |
| FP1 | 11-Jan-05 | 1-Jul-05 |
| FP2 | 11-Jan-05 | 1-Jul-05 |
| FP2.1 | 11-Jan-05 | 1-Jul-05 |
| FP2.2 | 11-Jan-05 | 1-Jul-05 |
| FP2.3 | 11-Jan-05 | 1-Jul-05 |
| FP2.4 | 11-Jan-05 | 1-Jul-05 |
| FP2.5 | 11-Jan-05 | 1-Jul-05 |
| FP2.6 | 11-Jan-05 | |
| FP2.7 | 11-Jan-05 | |
| FP3 | 11-Jan-05 | 1-Jul-05 |
| FP3.1 | 11-Jan-05 | 1-Jul-05 |
| FP3.2 | 11-Jan-05 | 1-Jul-05 |
| P1 | 11-Jan-05 | 1-Jul-05 |
| P2 | 11-Jan-05 | 20-Jun-05 |
| P3 | 11-Jan-05 | 20-Jun-05 |
| P4 | 11-Jan-05 | 20-Jun-05 |
| P5 | 11-Jan-05 | 20-Jun-05 |
| M1 | 11-Jan-05 | 30-Sep-05 |
| M2 | 11-Jan-05 | 30-Sep-05 |
| M3 | 11-Jan-05 | |
| M4 | 11-Jan-05 | 30-Sep-05 |
| MP1 | 11-Jan-05 | 30-Sep-05 |
| MP2 | 11-Jan-05 | 20-Jun-05 |
| GP1 | 11-Jan-05 | 1-Jul-05 |
| GP2 | 11-Jan-05 | 1-Jul-05 |
| GP3 | 11-Jan-05 | 1-Jul-05 |
| GM1 | 11-Jan-05 | 20-Jun-05 |
| R1 | 11-Jan-05 | 1-Jul-05 |
| R2 | 11-Jan-05 | 20-Jun-05 |
| R2.1 | 11-Jan-05 | 20-Jun-05 |
| R3 | 11-Jan-05 | 20-Jun-05 |
| E1 | 11-Jan-05 | 20-Jun-05 |
| E1.1 | 11-Jan-05 | 1-Jul-05 |
| E1.2 | 11-Jan-05 | 20-Jun-05 |
| E2 | 11-Jan-05 | 30-Sep-05 |
| E2.1 | 11-Jan-05 | 20-Jun-05 |
| E2.2 | 11-Jan-05 | 1-Jul-05 |
| E2.3 | 11-Jan-05 | 30-Sep-05 |
| E3 | 11-Jan-05 | |
| E4 | 11-Jan-05 | 30-Sep-05 |
| E4.1 | 11-Jan-05 | 20-Jun-05 |
| E4.2 | 11-Jan-05 | 30-Sep-05 |
| E5 | 11-Jan-05 | 20-Jun-05 |
| EM1 | 11-Jan-05 | 30-Sep-05 |
| REM1 | 11-Jan-05 | 1-Jul-05 |
| RE1 | 11-Jan-05 | 1-Jul-05 |
| RE1.1 | 11-Jan-05 | 20-Jun-05 |

#4840-00 and 1305-01 Janesville, Wisconsin Contract (v19)

1.1.2   Site and Grading Plans issued by the Engineer:

| Sheet Number | Original Issue Date | Last Revision as of Out To Bid Date |
|---|---|---|
| CI | 11/1/2004 | 10/3/2005 |
| V1 | 2/4/2003 | 10/3/2005 |
| V2 | 2/4/2003 | 10/3/2005 |
| V3 | 2/4/2003 | 10/3/2005 |
| C2 | 4/22/2003 | 10/3/2005 |
| C3 | 3/30/2005 | 10/3/2005 |
| C4 | 3/30/2005 | 10/3/2005 |
| C5 | 3/30/2005 | 10/3/2005 |
| C6 | 3/30/2005 | 10/3/2005 |
| C7 | 3/30/2005 | 10/3/2005 |
| C8 | 3/30/2005 | 10/3/2005 |
| C9 | 3/30/2005 | 10/3/2005 |
| C10 | 1/20/2003 | 10/3/2005 |
| C11 | 1/20/2003 | 10/3/2005 |
| C12 | 1/20/2003 | 10/3/2005 |
| C13 | 12/20/2003 | 10/3/2005 |
| C14 | 6/13/2005 | 10/3/2005 |
| C15 | 6/13/2005 | 10/3/2005 |
| C16 | 11/1/2004 | 10/3/2005 |
| C17 | 11/1/2004 | 10/3/2005 |
| C18 | 7/15/2004 | 10/3/2005 |
| C19 | 6/13/2005 | 10/3/2005 |
| C20 | 1/20/2003 | 10/3/2005 |
| C21 | 1/20/2003 | 10/3/2005 |
| C22 | 1/20/2003 | 10/3/2005 |
| C23 | 1/20/2003 | 10/3/2005 |
| C24 | 6/13/2005 | 10/3/2005 |
| C25 | 6/13/2005 | 10/3/2005 |
| C26 | 6/13/2005 | 10/3/2005 |
| C27 | 6/13/2005 | 10/3/2005 |
| C28 | 6/13/2005 | 10/3/2005 |
| C29 | 6/13/2005 | 10/3/2005 |
| C30 | 6/13/2005 | 10/3/2005 |
| C31 | 6/13/2005 | 10/3/2005 |
| C32 | 6/13/2005 | 10/3/2005 |
| C33 | 1/11/2005 | 10/3/2005 |

(j)     the Bid Form dated October 28, 2005 executed by Contractor and submitted to Owner (the "Bid Form")

(k)     the following Addenda issued by Owner, Architect or Engineer:

       Number One dated October 12, 2005, issued by the Architect.
       Number Two dated October 13, 2005, issued by the Civil Engineer.
       Number Three dated October 20, 2005, issued by the Architect.
       Number Four dated October 21, 2005, issued by the Architect.
       Number Five dated October 24, 2005, issued by the Architect.
       Number Six dated October 24, 2005, issued by the Architect.
       Number Seven dated October 25, 2005, issued by the Engineer.

(l)     Exhibit G and Attachment 1 hereto

(m)    the Performance Bond(s) and Labor and Material Payment Bond(s) provided by Contractor to Owner pursuant to the Contract Documents

(n)    all Modifications issued after the execution of this Contract (all items identified in clauses (a) through (n) are collectively referred to as the "Contract Documents"). All of the Contract Documents are hereby incorporated by reference into, and made a part of, this Contract, and, unless otherwise expressly set forth herein, all references to the Contract shall be deemed to refer to all of the Contract Documents.

1.2    This Contract and all of the terms, conditions and obligations of the Contract Documents shall become effective as of the date on which Contractor was awarded the Project by telephone notification.

1.3    In the event of any conflict among the Contract Documents, the Contract Documents shall govern in the following order:

(a)    First, this Contract (including Exhibit G) (and including Attachment one for California only) shall govern over all other Contract Documents, provided that, in the event that any terms and conditions of this Contract are modified by the provisions of Exhibit G hereto, this Contract, as modified by Exhibit G, shall govern;

(b)    Second, the Special Conditions shall govern over all other Contract Documents not identified in paragraph (a) above;

(c)    Third, the Supplementary Conditions shall govern over all other Contract Documents not identified in paragraphs (a) or (b) above;

(d)    Fourth, the General Conditions shall govern over all other Contract Documents not identified in paragraphs (a) through (c) above;

(e)    Fifth, the Specifications shall govern over all other Contract Documents not identified in paragraphs (a) through (d) above; and

(f)    Sixth, the Plans shall govern over all other Contract Documents not identified in paragraphs (a) through (e) above.

## ARTICLE 2

### DEFINITIONS

2.1    The following terms used in this Contract shall have the meanings set forth below (unless otherwise expressly provided herein):

(a)    "Architect" shall have the meaning set forth in Subparagraph 4.1.1 of the General Conditions (as modified by the Supplementary Conditions) and is identified in the heading.

(b)    "Contract" shall have the meaning set forth in the heading and Section 1.1.

(c)    "Contract Completion Date" shall have the meaning set forth in Section 4.2.3.

(d)    "Contract Documents" shall have the meaning set forth in Section 1.1.

(e)    "Contract Substantial Completion Date" shall have the meaning set forth in Section 4.1.

(f)    "Contract Sum" shall have the meaning set forth in Section 5.1.

(g)    "Contractor" shall have the meaning set forth in the heading.

(h)    "Damages" shall mean any and all lawsuits, claims, actions, injuries, damages (including, but not limited to, punitive, consequential and exemplary damages), losses, fines, penalties, sanctions, deficiencies, judgments, awards, costs, expenses (including, without limitation, reasonable fees, disbursements, and costs of attorneys, accountants, experts and investigators), settlement payments, liabilities, remediation expenses, corrective action costs, and other obligations, including, without limitation, property damages and bodily or personal injuries, illnesses and deaths (whether or not such injury is physically manifest, or emotional in nature without any attendant physical manifestation of such injury), and in each case regardless of whether such matters are groundless, fraudulent or false.

(i)    "Engineer" shall have the meaning set forth in the heading.

(j)    "Environmental Laws" shall mean any and all laws, statutes, regulations and judicial interpretations thereof of the United States, of any state in which the construction site is located, and of any other government or quasi-government authority having jurisdiction, that relate to the prevention, abatement and elimination of pollution and/or protection of the environment, including but not limited to the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6901 et seq., the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., the Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq., the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f et seq., the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., and the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 et seq., together with any state statutes or local ordinances or other requirements serving any similar or related purposes. For purposes of this Contract, Environmental Laws shall include, but not be limited to, all laws, regulations, permits or other requirements relating to storm water, wetlands protection and asbestos abatement or notification.

(k)    "Facility" shall mean Contractor's place of business.

(l)    "Hazardous Materials" shall mean those materials, substances, wastes, pollutants or contaminants which are deemed to be hazardous, toxic or radioactive and shall include

but not be limited to those substances defined as "hazardous substances", "hazardous materials", "hazardous wastes", or other similar designations in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq., the Hazardous Materials Transportation Act 49 U.S.C. Section 1801 et seq., and any other federal, state or local governmental statutes, laws, codes, ordinances, rules, regulations and precautions, or by common law decision, including, without limitation, (i) trichloroethylene, tetrachloroethylene, perchloroethylene and other chlorinated solvents, (ii) petroleum products or byproducts, or petroleum, including crude oil or any fraction thereof, or natural gas, natural gas liquids, liquefied natural gas, synthetic gas or mixtures of synthetic gas and natural gas, (iii) asbestos and (iv) polychlorinated biphenyls.

(m)     "Lien Releases" shall mean releases and waivers of all liens, claims, security interests and encumbrances arising out of the Contract Documents and the Work.

(n)     "Owner" shall have the meaning set forth in the heading.  Owner may also be referred to herein as "Wal-Mart".

(o)     "Owner Confidential Information" shall have the meaning set forth in Section 23.13.

(p)     "Owner Indemnified Parties" shall have the meaning set forth in Section 13.1.

(q)     "Project" shall have the meaning set forth in Subparagraph 1.1.4 of the General Conditions (as modified by the Supplementary Conditions) and is described in the heading.

(r)     "Representatives" shall have the meaning set forth in Section 23.13.

(s)     "Storm Water Requirements" means the requirements of the Consent Decree entered in June 2004 between the United States and Wal-Mart Stores, Inc., which are incorporated by reference into this Contract and set forth in part in Paragraph 8 of the Special Conditions.

(t)     "Substantial Completion" shall have the meaning set forth in Section 9.8.1 of the General Conditions, as modified by the Supplementary Conditions.

(u)     "Systems" shall have the meaning set forth in Section 23.15.

(v)     "USCIS" shall have the meaning set forth in Section 19.1 (b).

(w)     "Work" shall have the meaning set forth in Section 3.1.

## ARTICLE 3

## THE WORK

3.1     The Contractor shall perform, on a non-exclusive basis, all of the work required by the Contract Documents for construction of Wal-Mart Supercenter #1305-01 and Wal-Mart Sam's Club #4840-00, Janesville, Wisconsin so that it is complete, operable and ready for its intended use (collectively, the "Work").

3.2     All Work shall be performed in strict accordance with the terms and provisions of the Contract Documents.

3.3    Contractor and Owner shall comply with the following provisions regarding changes to the Work: The process described herein regarding Preliminary Change Order Budgets ("PCOBs") is not intended to replace any Contract provision for Change Orders set forth in Article 7 of the General Conditions, Article 7 of the Supplementary Conditions, or any other provision of the Contract Documents. Except to the extent set forth in a fully executed Change Order and except for minor changes in the Work issued by Owner pursuant to the Supplementary Conditions, any work performed by Contractor which is different from or in addition to the Work described in the Contract Documents must be set forth in a Construction Change Directive (as defined in the General Conditions and Supplementary Conditions), if issued by Owner or Owner's design consultant, or a PCOB submitted by the Contractor to Owner within seven (7) days after discovery of an Unforeseen Condition (as hereinafter defined). As used herein, "Unforeseen Condition" shall mean a condition encountered at the Project site which was not reasonably discoverable prior to the deadline for submitting the Contractor's Bid Form for the Project through the exercise of due diligence by the Contractor. After a Construction Change Directive has been issued to the Contractor, the Contractor shall submit to Owner, within seven (7) working days, the PCOB for such Construction Change Directive. If Contractor fails to submit the PCOB for a Construction Change Directive within such 7-day period, Contractor will be in breach of this Contract and Wal-Mart may pursue all rights and remedies that it may have at law, in equity and under the Contract Documents. The PCOB shall reflect the changes in the scope of Work and shall be in the form set forth in Exhibit H attached hereto. The PCOB must include a short description and a cost for each of the sixteen (16) CSI divisions that are applicable. Contractor shall use "N/A" for each division that is not applicable on the PCOB. The Contractor must make every effort possible to assure that the PCOB is reasonable and within reasonable range of the final Change Order cost. The PCOB must be approved by Owner prior to the commencement or performance by Contractor of the work set forth in the PCOB and any such work performed without such Owner approval may result in non-payment. The PCOB is in no way a commitment by Owner and/or Contractor for adjustment of the Contract Sum. Contractor shall submit to Owner a final Change Order which includes all actual costs and expenses related to a PCOB, within thirty (30) days from the issuance of the PCOB. No Change Order will be accepted after said 30-day deadline, unless Owner and Contractor agree otherwise in writing. In order to be considered by Wal-Mart, the final Change Order must include a copy of the original PCOB relating to such Change Order that was approved by Wal-Mart. All Change Orders shall describe changes, modifications, alterations, deviations or additions to the Work or Contract Documents and the adjustment, if any, to the Contract Sum resulting therefrom, and shall only be effective upon the execution of the Change Order by an authorized officer of Owner and Contractor. Owner may accept or reject a Change Order in its sole discretion to the extent that it differs from the previously accepted PCOB.

## ARTICLE 4

### TIME OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

4.1    The Work shall be commenced on or before the 15th day of November, 2005, and, subject to authorized adjustments, Substantial Completion shall be achieved not later than September 4, 2006 (the "Contract Substantial Completion Date"). If Contractor commences performance of the Work before receiving a fully executed copy of this Contract signed by duly authorized officers of Contractor and Owner, then Contractor's commencement of such Work shall serve as its agreement to be bound by the terms and conditions of the Contract Documents included in the Invitation to Bid and such Contract Documents shall govern the performance of the Work and the obligations of Contractor and Owner with respect thereto. Once Contractor has received a fully executed copy of the Contract that has been signed by duly authorized officers of Owner and Contractor, the terms of the Contract Documents as executed by the parties shall supercede this provision and shall govern the performance of the Work and the obligations of the parties with respect thereto, and the fully executed and delivered Contract shall be deemed effective as of the date on which Contractor is given telephone notice of award of the Project.

(a)    Contractor shall provide all materials, equipment, supplies and personnel, and shall perform the services and labor, in each case as may be necessary or appropriate to complete the Work and as set forth in the Contract Documents. Contractor shall be responsible for protecting the Work from weather conditions so the Work can continue without interruption and the Work, the Project and the milestones listed in the Contract Documents can each be completed on or before the respective dates set forth therefor in the Contract Documents.

(b)    Contractor shall meet the milestones set forth in the Construction Period Section of the Bid Form – Invitation to Bid executed by Contractor and Owner, which is part of the Contract Documents.

4.2    Contractor acknowledges and recognizes the importance of completing the Work on or before the Contract Substantial Completion Date set forth in Section 4.1.

4.2.1    If Contractor Substantially Completes performance of the Work before the Contract Substantial Completion Date, then Owner shall pay Contractor a performance bonus equal to One Thousand Five Hundred Dollars ($1,500.00) per day for each day that Contractor Substantially Completes performance of the Work before the Contract Substantial Completion Date. Such bonus shall be payable by Owner when final payment of the Contract Sum is made to the Contractor pursuant to Article 7.

4.2.2    If Contractor does not Substantially Complete performance of the Work until after the Contract Substantial Completion Date, then Contractor and Owner acknowledge and agree that Owner will incur substantial damages and the extent of such damages would be impractical and extremely difficult to determine as of the date of this Contract. Contractor and Owner acknowledge that, as of the date of this Contract, One Thousand Dollars ($1,000.00) per day represents the parties' good faith estimate as to the actual potential damages that Owner would incur as a result of such delay. Accordingly, in the event of any delay, except for any such delay as is excused by Owner, which excusal shall be in Owner's sole discretion, Owner shall have the option to either (a) require Contractor to pay to Owner the foregoing amount for each day after the Contract Substantial Completion Date that Contractor has not Substantially Completed performance of the Work, or (b) terminate the Contract and pursue such other remedies as are permitted by the Contract Documents or as are available to Owner at law or in equity for Contractor's failure to Substantially Complete performance of the Work on or before the Contract Substantial Completion Date or for Contractor's breach of any other provision of the Contract Documents, and the provisions of this paragraph shall not be deemed to act as a waiver of the rights set forth in this clause (b). The damages described in clause (a) of this Section 4.2.2 are liquidated damages and are not intended to operate as a penalty. Any such liquidated damages payable by Contractor hereunder shall be paid to Owner on the actual date of Substantial Completion.

4.2.3    For purposes of determining treatment under Section 4.2.1 and 4.2.2 of this Contract, within five business days of completion of all final punchlist items, Contractor shall submit to Owner written notice of Contractor's proposed actual date of Substantial Completion. The actual date of Substantial Completion shall be that date agreed to by Owner and Contractor in writing (the "Contract Completion Date"), which Owner and Contractor shall use good faith efforts to agree to within ten business days after Owner's receipt of said proposal therefore from Contractor.

## ARTICLE 5

### CONTRACT SUM

5.1    The Owner shall pay the Contractor in current funds for the performance of the Work, subject to additions and deductions by Change Order as provided in the Contract Documents and to the provisions of Section 4.2 above, the sum of Twenty Million, Eight Hundred Ninety Thousand and NO/100 Dollars ($20,890,000.00) (the "Contract Sum").

5.2    The Contract Sum is determined as follows:

5.3    The alternate number as described on the Bid Form is:  not applicable

## ARTICLE 6

### PROGRESS PAYMENTS

6.1    The period of time covered by each Application for Payment shall be one calendar month, ending on the last day of each such calendar month.  To the extent permitted by applicable law, each Application for Payment shall be submitted by Contractor to Owner within ten (10) days after the end of the period to which such Application for Payment relates.

6.2    Based upon Applications for Payment and other documentation required by the Contract Documents, in each case properly submitted to the Owner by the Contractor and subject to revision and/or approval by the Owner, the Owner shall make progress payments on account of the Contract Sum to the Contractor, as provided in the Contract Documents for the period indicated on the Application for Payment as follows:

6.3    Not later than twenty-five (25) days after Owner receives the Application for Payment (unless a shorter period of time is required pursuant to applicable law) and assuming Owner has received Lien Releases executed by Contractor and, if required by Owner, all Subcontractors, Sub-subcontractors, material suppliers, materialmen and other persons or entities having the right to make a claim directly or indirectly by reason of having provided labor, materials or equipment relating to the Work, which shall be in such forms as are satisfactory to Owner in its sole discretion, and such other documentation as may be required by Owner pursuant to the Contract Documents, Wal-Mart shall pay to Contractor the portion of the Contract Sum properly allocable to labor, materials and equipment incorporated in the Work, less retainage equal to the lesser of ten percent (10%) or the maximum amount permitted by applicable law, and the portion of the Contract Sum properly allocable to materials and equipment suitably stored at the Project site or at some other location agreed upon in writing, less retainage equal to the lesser of ten percent (10%) or the maximum amount permitted by applicable law, in each case for the period covered by the Application for Payment, less the aggregate of previous payments made by the Owner to the Contractor.

## ARTICLE 7

### FINAL PAYMENT

7.1    Unless otherwise required by applicable law, final payment of the entire unpaid balance of the Contract Sum shall be made by the Owner to the Contractor at such time as (a) the Work, including all Change Orders, has been fully completed, (b) the Contract is fully performed except for the Contractor's responsibility to correct nonconforming Work during the warranty period as set forth in the General Conditions and Supplementary Conditions and to satisfy other requirements, if any, which necessarily survive final payment, (c) the unconditional Lien Releases executed by Contractor and, if required by Owner, all Subcontractors, Sub-subcontractors, material suppliers, materialmen and other persons or entities having the right to make a claim directly or indirectly by reason of having provided labor, materials or equipment relating to the

Work and all other documentation required to be submitted to Owner pursuant to the Contract Documents have been submitted to Owner, in each case in such forms as are satisfactory to Owner in its sole discretion, (d) the final Application for Payment has been approved by the Owner, and (e) the closeout documents required by the Contract Documents have been delivered by Contractor to Owner.

## ARTICLE 8

## CONDITIONS SUBSEQUENT

8.1    It is a condition subsequent of this Contract that all the items set forth in the Contract Execution Procedures attached hereto shall be complied with in the time limits as set forth therein. If Contractor fails to comply with any of the terms thereof, the Owner shall have the right to obtain those items on behalf of the Contractor, to withhold all or any portion of payments of the Contract Sum (unless otherwise required by applicable law), and/or to immediately terminate the Contract. These rights shall be in addition to any and all other remedies available to Owner pursuant to the Contract Documents, at law or in equity.

## ARTICLE 9

## QUALITY OF WORK

9.1    Contractor shall perform the Work in a professional and workman-like manner and subject to Owner's approval, which may be withheld in Owner's sole and absolute discretion. Contractor shall ensure that all of Contractor's employees and agents present a neat, clean and professional appearance and conduct themselves in a business-like manner at all times while on Owner property.

## ARTICLE 10

## INDEPENDENT CONTRACTORS

10.1    Owner and Contractor enter into this Contract and the Contract Documents as independent contractors and at arms' length. Neither Owner nor Contractor has the right, and shall not seek, to exercise any control over the other party, its employees, or its agents. Contractor shall control the methodology for performing the Work to meet Owner's specifications. Each party shall be solely responsible for hiring, firing, promoting, demoting, rates of pay, benefits, and other terms and conditions in regard to its own employees. Neither Contractor nor any of its employees or agents may be considered Owner's agents or employees for any purpose and have no authority to act or purport to act on Owner's behalf. Neither Contractor nor its employees or agents are entitled to receive any benefits, including, but not limited to, salary, vacation pay, sick leave, retirement benefits, social security, workers' compensation, health, disability, unemployment, and stock options, that Owner may provide to its employees.

## ARTICLE 11

## NON-EXCLUSIVE

11.1    Contractor shall perform the Work for Owner on a non-exclusive basis. Owner retains the right to contract with others in the business of providing construction work as Owner determines from time to time and may assign work to others at the Project site as it determines necessary. Owner makes no projections about the quantity of work which may be assigned to Contractor, and Contractor may not rely in any way on any past or perceived projections or expectations of work. Owner shall not have any responsibility or liability in connection with any act or expenditure, including expenditures for equipment, materials, supplies, hiring, or capital, by Contractor because of any actual or perceived projections or expectations as to work.

#4840-00 and 1305-01 Janesville, Wisconsin Contract (v19)

## ARTICLE 12

### CONTRACTOR'S EMPLOYEES

12.1    Contractor warrants that it shall comply with all  federal, state, and local laws, ordinances, statutes, rules, and regulations governing the employment of its workers, including, but not limited to, the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §621 et seq.; the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et seq.; the Child Labor Act, 29 U.S.C. §212 et seq.; the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.; the Economic Dislocation and Worker Adjustment Act, 29 U.S.C. §565 et seq.; the Employee Polygraph Protection Act of 1988, 29 U.S.C. §2001 et seq.; the Equal Pay Act of 1963, 29 U.S.C. §201 et seq.; the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §201 et seq.; the Family and Medical Leave Act of 1993, 29 U.S.C. §2601 et seq.; the Immigration Reform and Control Act of 1986, 8 U.S.C. §1324a et seq.; the Occupational Safety and Health Act of 1970, 29 U.S.C. §553 et seq.; the Older Worker Benefit Protection Act, 29 U.S.C. § 621 et seq.; and the Omnibus Budget Reconciliation Act of 1986, 29 U.S.C. § 623 et seq.. Contractor warrants that it shall be responsible exclusively for all compensation, salary, and any other remuneration due to individuals who perform Work under the Contract Documents.    Owner reserves the right to demand proof of performance with the warranties provided by the Contractor under the Contract Documents.  Owner shall have the right to refuse, in its sole discretion, any individual whom Contractor proposes to perform Work under the Contract Documents.  Contractor warrants that should Owner be named  as a respondent  or  defendant  in  any  administrative  or  judicial proceeding based upon an alleged violation of any federal, state or local law, regulation or ordinance arising out of the Contractor's employment of individuals performing Work under the Contract Documents, Contractor shall indemnify, defend and hold harmless Owner from any and all liability due to the Contractor's actions as set forth in Article 13.  If Contractor breaches this Section, Owner may terminate this Contract immediately, in its sole discretion.

## ARTICLE 13

### INDEMNIFICATION

13.1    Contractor shall indemnify, protect, defend and hold harmless Owner and its affiliates and its and their respective directors, stockholders, members, managers, officers, employees, agents, consultants, representatives, successors, transferees and assigns (collectively, the "Owner Indemnified Parties") from and against any and all Damages arising from, relating to or associated with any actual or alleged (i) actions or omissions of Contractor or its employees, agents, representatives, Subcontractors, or Sub-subcontractors, or any employees, agents, representatives or contractors of any of the foregoing, in connection with the performance of the Work hereunder, including, without limitation, (A) any lien, security interest, claim or encumbrance in favor of any person or entity making a claim by reason of having provided labor, materials or equipment relating to the Work, and (B) any injury, damage, harm or loss arising from, relating to or in any manner connected with the "release" or "threatened release" of Hazardous Materials, contaminants, oil or radioactive materials from any Owner premises as a result of or connected with Contractor's performance of the Work, even if not discovered or alleged until after the termination of the Contract, and/or (ii) any breach, violation or default by Contractor or its employees, agents, representatives, Subcontractors, or Sub-subcontractors, or any employees, agents, representatives or contractors of any of the foregoing, of Contractor's obligations under the Contract Documents, including, without limitation, any violation of any law, statute, ordinance, order, rule or regulation, including, without limitation, any Environmental Law, the Storm Water Requirements and those set forth in Article 12.  Contractor's obligations to indemnify and defend the Owner Indemnified Parties hereunder shall apply unless it shall be ultimately determined that the Owner Indemnified Parties are not entitled to indemnification under this Contract.  Further, in the event that it is ultimately determined by a final judicial decision from which there is no further right to appeal that

a portion of the fault is attributable to the Owner Indemnified Parties, Contractor's obligations on the indemnity will be proportional to the proportional fault of Contractor and the Owner Indemnified Parties.

13.2    If an Owner Indemnified Party has a right against a person (other than another Owner Indemnified Party or one of Owner's insurers) with respect to any Damages paid to such Owner Indemnified Party by Contractor, then Contractor, to the extent of such payment, shall be subrogated to the right of such Owner Indemnified Party.

13.3    If requested by Contractor, the Owner Indemnified Parties shall cooperate (i) in contesting any claim for Damages, which the Contractor elects to contest, or (ii) if appropriate, in making any counterclaim against the person asserting the claim, or any cross-complaint against any person; provided, that the Contractor shall reimburse the Owner Indemnified Parties for any reasonable out-of-pocket expenses incurred by them in so cooperating.

13.4    If an Owner Indemnified Party receives notice of the assertion, filing or service of any lawsuit, claim, demand, action, liability or other matter that is or may be covered by this indemnity, Owner shall promptly notify the Contractor thereof in writing; provided that no failure by Owner to give timely notice shall relieve the Contractor of liability hereunder.  Upon receipt of notice, from whatever source, of any such lawsuit, claim, demand, action, liability or other matter covered by this indemnity, the Contractor shall immediately take necessary and appropriate action to protect the Owner Indemnified Parties' interest, with counsel satisfactory to Owner; provided that, Owner at its sole and absolute discretion, retains the right to select and appoint counsel to defend any Owner Indemnified Party and/or to replace any counsel that Owner determines is unacceptable with new counsel (and the fees and expenses of such new counsel shall be payable by Contractor).  Any counsel provided by the Contractor to defend any Owner Indemnified Party shall accept, acknowledge receipt of, and conduct the defense of such Owner Indemnified Party in accordance with, Owner's Indemnity Counsel Guidelines. The Owner Indemnified Parties shall at all times have the right to direct the defense of, and to accept or reject any offer to compromise or settle, any lawsuit, claim, demand or liability asserted against them.

13.5    The indemnification obligations set forth in the Contract Documents (i) are independent of, and will not be limited by, each other or any insurance obligations in the Contract Documents (whether or not complied with) or damages or benefits payable under workers' compensation or other statutes, (ii) are not diminished or limited in any way by any insurance carried in whole or in part by Owner, which shall in all cases function in excess of these indemnification obligations, and (iii) will survive the termination of this Contract until all matters covered by this indemnity are fully and finally barred by applicable law.  The indemnification provisions in the Contract Documents shall include all applicable law affecting the validity or enforceability of those provisions, and the applicable law will operate to amend those provisions to the minimum extent necessary to bring the provisions into conformity with the applicable law.  The provisions, as modified, shall continue in full force and effect.

13.6    ALL INDEMNIFICATION OBLIGATIONS IN PARAGRAPH 13.1 OF THIS CONTRACT SHALL BE ENFORCED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW FOR THE OWNER INDEMNIFIED PARTIES' BENEFIT, REGARDLESS OF THE CAUSE(S) OR ALLEGED CAUSE(S) OF THE CLAIMS.

## ARTICLE 14

## EQUIPMENT

14.1    Contractor shall provide all necessary tools and equipment, including equipment repair and maintenance, to perform the Work in accordance with the Contract Documents. Contractor shall not use any Owner equipment in any way or for any purpose unless Owner provides advance written consent to Contractor for it to use Owner's equipment and designates in writing the equipment that Contractor may use, the times during which Contractor may use the equipment, the locations where Contractor may use the equipment, and the purposes for which Contractor may use the equipment.

## ARTICLE 15

## COMPLIANCE

15.1    Contractor shall secure, maintain and comply with all required licenses, permits and certificates relating to, or otherwise necessary or appropriate for, the performance and completion of the Work and all other activities and obligations under the Contract Documents. Contractor shall comply with any and all applicable federal, state and local laws, rules, regulations, statutes, codes, orders and ordinances, including, but not limited to (i) all Environmental Laws and (ii) those applicable to the use, generation, storage, handling, discharge, disposal and transport of Hazardous Materials; provided that, notwithstanding the foregoing, Contractor shall not cause any Hazardous Material to be used, generated, stored, handled, or disposed of on or about any Project site without the prior written consent of Owner, which consent may be withheld in the sole discretion of Owner. Without limiting the foregoing, all chemicals and other products utilized in the performance of the Work must be environmentally acceptable, as determined by Owner in its sole discretion, and such use must be permitted by and be fully compliant with all Environmental Laws. Contractor hereby covenants and agrees that the application of all chemicals and other products utilized in the performance of the Work must be performed by a licensed applicator if so required under any Environmental Law or any other law, statute, rule, regulation, code, order or ordinance. Contractor acknowledges and agrees that it is informed and aware that strict compliance with the Storm Water Requirements is required of the Contractor by Owner as a material condition of this Contract. Contractor does hereby agree, covenant, warrant and represent that it will, at all times during the performance of the Contract Documents, strictly comply with all Storm Water Requirements. Contractor shall also include requirements for such compliance in all contracts relating to the performance and completion of the Work that is the subject of the Contract Documents. Contractor shall be responsible for any and all federal, state and local taxes arising from or relating to the performance or completion of the Work, including, without limitation, all federal, state and local unemployment taxes and federal and state income and social security taxes to be withheld from wages. Owner is hereby authorized to file, on behalf of Contractor, any and all reports, returns or other documents which are required of Contractor by any governmental authority and which Contractor shall have failed to file in accordance with the provisions of this Contract. Contractor further authorizes and empowers Owner to pay on behalf of Contractor any and all taxes, fees and assessments which Contractor shall have failed to pay as required by the provisions of this Contract, together with all required penalties and interest, and Contractor shall promptly reimburse Owner therefor within ten (10) days after receiving an invoice for such amounts.

## ARTICLE 16

### NOTICES

16.1    All notices and other communications required or permitted under this Contract shall be in writing and delivered by hand, commercial courier, or certified mail, return receipt requested, to:

|  |  |
|---|---|
| If to Owner: | Wal-Mart Stores, Inc.<br>Construction Department 8702<br>2001 SE 10th Street<br>Bentonville, Arkansas 72716-0550<br>Attn: Contracts Administration |
| If to Contractor: | William A. Randolph Incorporated<br>820 Lakeside Drive Suite 3<br>Gurnee, Illinois 60031<br>Attn: Eric P. Handley<br>Phone: 847-856-0123<br>Vendor No. 785530 |

Notice shall be deemed given upon delivery by hand, upon delivery to commercial courier for next business day delivery properly addressed and prepaid, or upon placing the notice in the U.S. mails properly addressed and with sufficient postage for certified mail, return receipt requested.

## ARTICLE 17

### LIMITATION OF LIABILITY

17.1    THE CONTRACTOR AND OWNER WAIVE CLAIMS AGAINST EACH OTHER FOR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS CONTRACT. This mutual waiver includes (1) damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation and for loss of management or employee productivity or of the services of such persons; and (2) damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination of the Contract in accordance with the provisions of the Contract Documents; provided, however, that nothing contained in this Article shall be deemed to preclude (a) an award of liquidated damages, when applicable, in accordance with the requirements of the Contract Documents, (b) an award for damages for direct costs to repair third party property in accordance with the requirements of the Contract Documents, or (c) any Damages resulting from any violation by Contractor of the Environmental Laws or the Storm Water Requirements.

## ARTICLE 18

### AUDIT

18.1    Contractor shall at all time keep just and true books, records, and accounts at its Facility showing the actual costs and expenses that Contractor incurs in connection with the Work. Owner or its duly authorized representative shall have the right, during the term of this Contract and for two years after the earlier of the completion of the Work or the termination of this Contract, to enter onto Contractor's Facility to examine and audit the books, records, and accounts that pertain to this Contract. Contractor shall make all books, records and accounts available to Owner or its representative for the audit.

## ARTICLE 19

### REPRESENTATIONS AND WARRANTIES

19.1    Contractor hereby represents warrants and covenants to Owner as follows:

(a)    Contractor is a Corporation duly organized, validly existing and in good standing, under the laws of the State of Illinois. To the extent required by applicable law, Contractor has qualified as a foreign business eligible to conduct business in the state where the Work is performed and under the laws of all other jurisdictions where the nature of its business or the nature of its business or the nature or location of its assets requires such qualification.

(b)    Contractor (i) has complied, and shall at all times during the term of this Contract comply, in all respects with all immigration laws, statutes, rules, codes, orders and regulations, including, without limitation, the Immigration Reform and Control Act of 1986, as amended, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, and any successor statutes thereto, (ii) has properly maintained, and shall at all times during the term of this Contract properly maintain, all records required by the United States Citizenship and Immigration Services (the "USCIS"), including, without limitation, the completion and maintenance of the Form I-9 for each of Contractor's employees, and (iii) has responded, and shall at all times during the term of this Contract respond, in a timely fashion to any inspection requests related to such I-9 Forms. During the term of this Contract, Contractor shall, and shall cause its directors, officers, managers, agents and employees to, fully cooperate in all respects with any audit, inquiry, inspection or investigation that may be conducted by the USCIS of Contractor or any of its employees. Contractor shall immediately and in any event within two (2) hours, notify Owner's representative in writing and by in-person voice communication (not voice mail) of any unscheduled inspections, raids, investigations, inquiries, visits or audits conducted by the USCIS or any other governmental agency or authority related to environmental, immigration or employee-safety issues of Contractor, its agents, employees, Subcontractors or Sub-subcontractors. Contractor shall, on a bi-annual basis during the term of this Contract, conduct an audit of the I-9 Forms for its employees and shall promptly correct any defects or deficiencies which are identified as a result of such audit. Owner may, in its sole discretion, terminate this Contract immediately if, at any time during the term, (x) Contractor violates or is in breach of any provision of this Section 19.1(b) or (y) the USCIS determines that Contractor has not complied with any of the immigration laws, statutes, rules, codes, orders or regulations of the United States, including, without limitation, the Immigration Reform and Control Act of 1986, as amended, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, and any successor statutes thereto. Contractor shall require all Subcontractors and Sub-subcontractors to make the representations and warranties set forth in this Section 19.1.

## ARTICLE 20

### SUBCONTRACTORS AND SUB-SUBCONTRACTORS

20.1    All agreements and contracts between Contractor and its Subcontractors shall provide, and shall require the Subcontractors to cause all agreements and contracts with Sub-subcontractors to provide, that the Subcontractor or Sub-subcontractor, as the case may be, is subject to all of the terms and conditions of this Contract, except to the extent expressly stated otherwise in the Contract Documents.

## ARTICLE 21

### COMPLIANCE WITH OTHER APPLICABLE STATE LAW

21.1    If the Project site is located in any of the States set forth in Exhibit G, then Contractor and Owner shall comply with the provisions set forth therein with respect to such State. The terms and provisions of Exhibit G are hereby incorporated by reference into, and made a part of, this Contract.

## ARTICLE 22

### COMPLIANCE WITH CALIFORNIA LAW

22.1    If the Project is located within the State of California, Contractor shall complete Attachment 1 to this Contract in its entirety and both Owner and Contractor shall execute Attachment 1. The execution of Attachment 1 is required in addition to, and not in place of, the execution of this Contract by Contractor and Owner. Contractor shall comply in all respects with all of the terms, conditions and obligations in Attachment 1. The terms and provisions of Attachment 1 are hereby incorporated by reference into, and made a part of, this Contract.

## ARTICLE 23

### MISCELLANEOUS PROVISIONS

23.1    Capitalized terms used but not defined in this Contract but which are defined in the Contract Documents shall have the meanings designated in those other Contract Documents.

23.2    The Contract Documents constitute the full understanding of the parties, a complete allocation of risks between them, and a complete and exclusive statement of the terms and conditions of their agreement. All prior agreements, negotiations, dealings, and understandings, whether written or oral, regarding the subject matter of the Contract Documents, are superseded by, and merged into, the Contract Documents.

23.3    Nothing in the Contract Documents is intended, or shall be deemed, to confer any rights upon any person who is not a party to this Contract, except for the Owner Indemnified Parties as defined herein.

23.4    The Owner Construction Manager for this Project as defined in Supplementary Conditions Article 2.13 is Michael Crofts, or as otherwise notified by Owner. The Owner Construction Manager may also be referred to herein as the "Wal-Mart Construction Manager" or the "Construction Manager".

23.5    Nothing in the Contract Documents creates any relationship of trust or fiduciary relationship between Owner and Contractor. The Contract Documents do not create any obligation or relationship such as a partnership, joint venture or other similar legal relationship. Any correspondence or other reference to "partners" or other similar terms will not be deemed to alter, amend or change the independent contractor relationship between the parties unless there is a formal written agreement specifically detailing the rights, liabilities, and obligations of the parties as to a new, specifically defined legal relationship.

23.6    This Contract may be executed in one or more counterparts, all of which shall be deemed one and the same agreement and shall become effective as of the date on which Contractor was awarded the Contract by telephone notification.

23.7    The terms of the Contract Documents can only be modified or amended by a written agreement signed by Owner and Contractor.

#4840-00 and 1305-01 Janesville, Wisconsin Contract (v19)

23.8    Article and Section headings are for convenience only and may not be construed as part of the Contract Documents or as a limitation on the scope of the particular sections.

23.9    The Contract Documents shall be construed, governed, and enforced under the laws of the State in which the Project is located, without regard to the internal law of such State regarding conflicts of law. The parties mutually consent to submit to the jurisdiction of the federal and/or state courts of the State in which the Project is located. The parties shall bring any action or suit concerning the Contract Documents or related matters only in such federal or state courts. The parties shall not raise, and hereby waive, any defenses based on venue, inconvenience of forum, or lack of personal jurisdiction in any action or suit brought in accordance with this Section. **The parties acknowledge that they have read and understand this clause and agree voluntarily to its terms.**

23.10    If either party fails to give notice or enforce any right under the Contract Documents, the failure shall not constitute a waiver of the right, unless the parties reduce the waiver to writing and the waiving party signs the writing. If a party waives its right in writing, the waiver shall not constitute a waiver of any other right or of a subsequent violation of the same right. The rights and remedies of Owner hereunder are cumulative to, and not exclusive of, any rights or remedies which Owner would otherwise have in law or at equity.

23.11    If any term, covenant or condition of the Contract Documents or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of the Contract Documents, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each and every remaining term, covenant or condition of the Contract Documents shall be valid and enforced to the fullest extent permitted by law.

23.12    Owner has no obligation to provide any minimum amount of business to Contractor, and no person has authority to make any representations or promises of business to Contractor on Owner's behalf or about Owner's intentions or expectations of renewing or extending this Contract or providing any present or future business to Contractor. If Contractor makes any expenditures, investments, or commitments in reliance on any present or future business from Owner under the Contract Documents or otherwise, Contractor does so at Contractor's own risk and without any obligation whatsoever from Owner.

23.13    Contractor recognizes that it may come into possession of Owner Confidential Information (as hereinafter defined). Contractor shall hold confidential and shall not use or disclose, and will cause its employees, officers, directors, managers, partners, affiliates and other representatives (collectively, the "Representatives") to hold confidential and not use or disclose, all Owner Confidential Information, and shall only disclose the Owner Confidential Information to such of its Representatives with a "need to know" such information. As used herein, "Owner Confidential Information" means all information concerning Owner and its affiliates, subsidiaries, employees, suppliers and customers that is not available to the general public, that reasonably or logically may be considered to be confidential or proprietary, or that may reasonably be expected to do harm to Owner if divulged, in each case together with all analyses, compilations, studies, data, reports, interpretations, forecasts, documents and records, whether prepared by Contractor or others, that contain or otherwise reflect such information. At any time upon the request of Owner, and in any event upon the earlier of the completion of the Work or the termination of this Contract, Contractor shall return to Owner all such Owner Confidential Information, including, without limitation, all written and electronic copies thereof, all storage devices on which any Owner Confidential Information is stored, and all other materials containing or incorporating any Owner Confidential Information, including any and all excerpts, parts, portions, transcriptions, copies, facsimiles and reproductions of any Owner Confidential Information. In connection with performing the Work, Contractor may have access to material non-public information about Owner or its affiliates, subsidiaries, suppliers, customers or employees. Contractor

acknowledges and agrees that federal and state securities laws prohibit Contractor or its Representatives from trading in Owner's securities while in the possession of material non-public information regarding Owner. Contractor further acknowledges and agrees that information obtained while performing the Work may constitute material non-public information. Contractor irrevocably agrees that neither it nor any of its officers or directors shall trade any Owner securities during any period in which Contractor possesses material non-public information.

23.14   Contractor shall not refer to Owner or any company affiliated with Owner in any advertising or published communication without the prior written approval of Owner, which approval may be withheld in Owner's sole discretion. Contractor shall not use, or allow to be used, Owner's name, logo, trademarks, service marks, patents, copyrights or trade dress without the prior written approval of Owner, which approval may be withheld in Owner's sole discretion.

23.15   Contractor represents that it currently follows, and shall for so long as it is performing any Work under the Contract Documents continue to follow, industry best practices as a means to prevent any compromise of its information systems, computer networks, or data files ("Systems") by unauthorized users, viruses, or malicious computer programs which could in turn be propagated via computer networks, email, magnetic media or other means to Owner. In the event Contractor's systems are breached or compromised in any way, Contractor shall give Owner immediate notice of the nature and scope of the breach or compromise. Contractor shall apply appropriate internal information security practices, including, but not limited to, using appropriate firewall and anti-virus software; maintaining said countermeasures, operating systems and other applications with up-to-date virus definitions and security patches; installing and operating security mechanisms in the manner in which they were intended sufficient to ensure Owner will not be impacted nor its operations disrupted; and permitting only authorized users access to Owner Systems. Contractor shall use up-to-date anti-virus tools to remove known viruses and malware from any email message or data transmitted to Owner; prevent the transmission of attacks on Owner via the network connections with Owner and prevent unauthorized access to Owner Systems via the Contractor's networks and access codes. In accordance with all applicable law and regulations, Contractor shall safeguard confidential, protected, individually identifiable personal information (health, financial, identity) which is received, transmitted, managed, processed, etc.

23.16   In the event of any action or proceeding brought by either party against the other under the Contract Documents, the prevailing party will be entitled to recover all costs and expenses, including court costs and reasonable attorneys' fees.

23.17   The default or breach by Contractor of (or the occurrence of an event which, with the passage of time or the giving of notice or either of them would constitute a default or breach by Contractor of) any of the terms or conditions of, or obligations set forth in, (1) another contract or agreement with Owner, or any subsidiary, division or affiliate of Owner (collectively, the "Other Contracts"), which terms, conditions or obligations are similar to any of those set forth in Article 12, Article 15, or Section 19.1(b) of, or Paragraph 8 of the Special Conditions to, this Contract or that otherwise relate to environmental, immigration or employee-safety issues, shall constitute an event of default hereunder, and (2) Article 12, Article 15, or Section 19.1(b) of, or Paragraph 8 of the Special Conditions to, this Contract or any other terms or conditions of, or obligations set forth in, the Contract Documents that otherwise relate to environmental, immigration or employee-safety issues, shall constitute an event of default under the Other Contracts, and in the case of each of clauses (1) and (2), Owner shall have the right to pursue such remedies as are provided for herein or in the Other Contracts, as applicable, or at law or in equity, concurrently, cumulatively or successively against Contractor until all damages arising by reason of such default have been paid in full.

In Witness Whereof, the parties have hereto set their hands and seals effective on the day and year first above written.

WITNESS/ATTEST

WAL-MART STORES, INC.

J Robert Bray
SR Vice-President of Real Estate, Design and Construction

DATE: _____

WITNESS/ATTEST

WILLIAM A. RANDOLPH, INC.

Eric P. Handley
Vice-President

DATE: _____

Affix Corporate Seal over signature when Contractor is a Corporation

#4840-00 and 1305-01 Janesville, Wisconsin Contract (v19)

**EXHIBIT "A"**
**GENERAL CONDITIONS**

1997 Edition

AIA Document A201-1997

General Conditions of the Contract for Construction

Issued at Out To Bid

Referred as Reference and Not Attached Herein



**EXHIBIT "B"**
**SUPPLEMENTARY CONDITIONS**

Supplementary Conditions (v21)

Issued at Out To Bid



**EXHIBIT "C"**
**SPECIAL CONDITIONS**

Issued at Out To Bid



# WAL-MART®

WAL-MART STORES, INC.   •   2001 S.E. 10TH STREET   •   BENTONVILLE, AR 72716-0550   •   479-273-8141

## - - - SPECIAL CONDITIONS FOR WAL-MART STORES, INC. CONSTRUCTION - - -

Re:  #1305-01 Supercenter
#4840-00 Sam's Club
Janesville, Wisconsin

Bid Date:  October 28, 2005

186,703 Square Feet-Supercenter
139,930 Square Feet-Sam's Club

Time:  Prior to 3:00 p.m.
Central Daylight Savings Time

1.    PRE-BID MEETING:

There will be a pre-bid meeting held at the existing store, 3023 Milton Avenue, Janesville, Wisconsin (Phone: 608-754-7800) on October 19, 2005, beginning at 10:00 am (the "Pre-Bid Meeting"). The Project Manager (as defined in these Special Conditions) who would be assigned this Project, should Contractor be the successful bidder, must attend this meeting.  In addition, each general contractor who is a first time bidder of Wal-Mart projects is required to have a principal of its firm attend this meeting.  At the Contractor's discretion, the Project construction estimator (the "Project Construction Estimator") should be encouraged to attend.  This meeting is for general contractors ONLY.  This meeting is mandatory and failure to attend this meeting, as noted above, WILL RESULT in Contractor being removed from the Bid List for this Project.

The purpose of this Pre-Bid Meeting is to allow an opportunity to discuss and clarify the Project bid documents, roles and responsibilities.  Nothing said or represented at this meeting shall be deemed to modify or change the bid document requirements, unless followed by a written addendum.

2.    The Contractor is hereby instructed to prepare his/her "Base Bid" in strict accordance with the attached bid documents, and NO deviation will be accepted by the Wal-Mart Contracts Administration Office.  If the Contractor chooses to submit a voluntary alternate, it shall be in writing and emailed to the Contracts Administrator before submitting the bid.  Any voluntary alternates received on the bid date but will not be considered in the award of the Contract.  Clarifications, Qualifications or failure to complete all items on the bid form shall be cause for rejection of bid.

3.    In the event of a conflict in the bid documents, the Specifications govern over the plans and the Special Conditions govern over the Drawings and Specifications.  All questions raised by Contractor relative to the bid documents occurring during review, preparation of the bid or during the Pre-Bid Meeting shall be addressed and uploaded to the Wal-Mart Bidding Tool.  Questions received less than 72 hours before the designated bid time will not be answered.  Oral statements will not be binding to Owner or Contractor.

4.    All bids, which shall include the costs for payment and performance bonds for the subject project, shall remain binding on the Contractor for a period of 30 days after the bid date and time.  Owner reserves the right to accept any bid or bid alternate, to reject any or all bids, or to waive any informalities in bids received where such acceptance, rejections, or waiver is considered to be in the best interest of Owner.  All alternates requested on the bid form will be considered in the award of the Contract.  "Building and Appurtenances" shall include all adjacent building-related items indicated on the architectural drawings.  "Sitework and Appurtenances" shall include the preparation of the building subgrade pad and all other items of sitework.

5.    All parking lot lighting poles, anchor bolts, luminaries, lamps and required paint will be furnished by Owner and installed by the Contractor.  Light pole bases, conduit and wiring shall be furnished and installed by the Contractor. The Contractor shall coordinate delivery directly with the material supplier and provide Owner with a one-year warranty certificate.  All incurred costs for material delivery coordination, receiving, unwrapping of factory painted poles, storage, liability and warranty labor shall be included in the installation contract price.  See section 12C for further information.

Issued August 31, 2005

6.  All bids must be submitted by a Contractor licensed as a General Contractor under the General Contractors Licensing Law of the state in which the Project is located. The Contractor must submit a copy of its current general contractor's license with its bid and include its current general contractor license number for the state in which the project is located directly under the signature block of the authorized officer of the Contractor submitting the bid.

7.  The following is a list of documents that the Contractor should receive and review in preparation of a Bid Proposal.

    *   Site Development Plans prepared and issued by Arc Design Resources, Inc.. The Contractor is to verify that all plan sheets listed on the Cover Sheet index are included in all the Contractor's Bid Plan sets.
    *   Architectural Plans prepared and issued by Raymond Harris & Associates. The Contractor is to verify that all the plan sheets listed on the Cover Sheet index are included in all the Contractor's Bid Plan sets.
    *   Project Manual prepared and issued by Raymond Harris & Associates which includes the Sitework Specifications issued by Arc Design Resources, Inc. and signed by Ryan C. Swanson on October 5, 2005 and Building Specifications issued by Raymond Harris & Associates.
    *   Geotechnical Reports prepared by Braun Intertec Corporation, dated March 4, 2003 and issued by Arc Design Resources, Inc.. (The Geotechnical Report is provided for information only and not considered as a design specification.)
    *   Phase I Environmental Assessment/Asbestos Report prepared by Braun Intertec Corporation and issued by Arc Design Resources, Inc., dated January 20, 2005. (The Environmental Report referenced here is provided for information only and not considered as a design specification.)
    *   Sitework Permits:
        WPDES Notice of Intent
        WDNR Air Quality Permit
        City of Janesville Construction Permit
        City of Janesville Conditional Use Permit

The Contractor shall obtain and maintain on-site a copy of ALL required federal, state or local permits, authorizations or approvals. The procurement of any permits, authorizations or approvals not identified above, but required by the jurisdictional agencies, shall be the responsibility of the Contractor. The Contractor shall be responsible for familiarizing himself and complying with the terms and conditions of each and every permit, authorization or approval. Any fines levied by a federal, state or local regulator, or obtained through any civil or administrative action initiated by any citizen, as a result of non-compliance with any of the conditions of any permit, authorization or approval shall be the sole responsibility of the Contractor.

8.  ENVIRONMENTAL COMPLIANCE AND STORM WATER POLLUTION PREVENTION

    A.  Environmental Warranty and Representation

        1.  Contractor understands that Owner has selected Contractor, in part, because of its representations of experience in, familiarity with, and understanding of federal, state and local environmental laws, regulations, ordinances, permits and other requirements applicable to large construction projects. These requirements shall include, but not be limited to, any and all laws, statutes, regulations and judicial interpretations thereof of the United States, of any state in which the Project construction site (the "Site") is located, and of any other government or quasi-government authority having jurisdiction, that relate to the prevention, abatement and elimination of pollution and/or protection of the environment, including but not limited to the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6901 et seq., the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., the Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq., the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f et seq., the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., and the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 et seq., together with any state statutes or local ordinances or other requirements serving any similar or related purposes (the "Environmental Laws"). Contractor does hereby warrant and represent to Owner that it is fully aware of and familiar with all Environmental Laws relative and applicable to the activities to be performed by Contractor under the terms of this Contract. For purposes of this Contract, Environmental Laws shall include, but not be limited to, all laws, regulations, permits or other

requirements relating to storm water, wetlands protection and asbestos abatement or notification.

B.    Compliance with Environmental Laws

1.    Contractor is informed and aware that <u>strict</u> compliance with all Environmental Laws and with the requirements of the Consent Decree entered in June 2004 between the United States and Wal-Mart Stores, Inc. which are incorporated by reference into this Contract and set forth in part in this Paragraph 8 ("Storm Water Requirements"), is required of the Contractor by Owner as a material condition of this Contract. Contractor does hereby agree, warrant and represent that it will, at all times during the performance of this Contract, strictly comply with the Storm Water Requirements and with all applicable Environmental Laws. Contractor shall also include requirements for such compliance in all Subcontractor and Sub-subcontractor agreements on the Project that are subject of this Contract.

2.    If any requirement contained in a federal, state or local law, regulation, ordinance, permit or other regulatory requirement applicable to the Site is more stringent than any similar requirement contained in this Section 8 relating to Environmental Compliance and Storm Water Pollution Prevention, the provisions of the law, regulation, ordinance, permit or other regulatory requirement shall govern.

C.    Contractor Checklist

1.    Upon award of the Contract, the Contractor shall be contacted by the Owner contract administrator (the "Owner Contract Administrator" or the "Wal-Mart Contract Administrator") who shall review a checklist of Storm Water Requirements and issues with the Contractor, including the following:

a.    The acknowledgement of the Contractor's obligation to obtain a copy of the applicable storm water construction Permits;

b.    The requirement that Owner and its contractors shall, as required by any applicable Permit, submit a Notice of Intent or other application for permit coverage, in accordance with permit requirements for the Site;

c.    The necessity for and planning of the pre-construction meeting required by Paragraph 8.G.;

d.    The requirement that all BMPs required by the SWPPP to be installed prior to the start of construction shall have been implemented prior to the commencement of ground disturbing activities;

e.    The requirement that the Contractor certify to Owner in the form set forth at Appendix C ("Civil Engineer and Project Superintendent Certification of Site Best Management Practices") to Wal-Mart Site Specification 02370 – Erosion and Sedimentation Control (the "Wal-Mart SWPPP Spec") that appropriate storm water controls are in place prior to the commencement of ground-disturbing activity as required by Paragraph 8.H. (Inspection of BMPs Prior to Construction).

D.    Filing of Notice of Intent; Transfer of Permit; Filing Notice of Termination

1.    If the National Pollutant Discharge Elimination System ("NPDES") storm water general permit for discharges associated with construction activities (the "Permit") or other laws and regulations in effect in the state in which the construction Project is to take place allows or requires the Contractor to file for coverage under the applicable Permit through submittal of a Notice of Intent ("NOI"), Notice of Coverage ("NOC"), or through such other application to be covered by such Permit as a separate permittee or co-permittee, the Contractor agrees that it will file such application for coverage. If the Permit or other applicable laws and regulations allow or require such permit coverage to be transferred from Owner, as owner or developer of

the Project, to the Contractor, the Contractor agrees that it will accept such transfer and execute any documents necessary and required to effect the transfer of the permit coverage from Owner.

2.   The Contractor will not initiate, or allow its Subcontractors or Sub-subcontractors to initiate, or direct any Subcontractor or Sub-subcontractor to initiate ground-disturbing activities at the Site until all required storm water authorizations have been issued by the local, state and/or federal authorities, or until coverage has been obtained pursuant to any applicable Permit. The Contractor shall obtain Permit coverage, transfer any Permit and terminate Permit coverage as required by the applicable Permit.

E.   Requirements for Storm Water Professional; Annual Seminar Attendance

1.   As provided herein, individuals required to obtain the designation of storm water professional ("Storm Water Professional") shall attend and successfully complete the EPA-approved, Owner-sponsored training in storm water compliance. In addition, individuals shall attend and successfully complete any federal, state or local training program mandated by the applicable Permit. Persons required to obtain this designation shall provide documentation of their receipt of such training to Owner's Contract Administrator within the allotted time provided herein. Owner may, in its sole discretion, determine whether, in light of the documentation submitted to Owner's Contract Administrator, any individual qualifies as a Storm Water Professional. In the event Owner determines that an individual qualifies as a Storm Water Professional, the individual shall be deemed a Storm Water Professional for one year from the date of completion of the storm water compliance program or the date on which the individual was designated in writing as a Storm Water Professional. Additional training, continuing education, or other requirements of the storm water compliance training program are the responsibility of the Storm Water Professional and shall be completed in accordance with the training program requirements, but in no event less frequently than every 12 months. The Storm Water Professional shall retain a copy of documentation of successful completion of required training at the Site at all times.

2.   Prior to any ground-disturbing activities, Contractor shall provide copies of storm water compliance guidance materials appropriate for conditions at the Site and in the geographic region to each Subcontractor, Sub-subcontractor and other contractor responsible for ground-disturbing activities, including the Contractor's personnel responsible for or supervising ground-disturbing activities, site clearing and grading contractors, utility contractors, paving contractors, landscaping contractors, and others as appropriate. Guidance materials are for reference only. In the event of a conflict between such guidance materials and the SWPPP, the SWPPP shall govern and take precedence over the guidance materials.

3.   During the term of this Contract, each compliance officer ("Compliance Officer"), Project Superintendent and other individuals who are substantially involved in construction at the Site shall attend an annual seminar conducted by Owner during each year in which the Contractor conducts construction activities pursuant to this Contract.

F.   Designation of Contractor's Storm Water Professionals

1.   The Contractor shall designate its Project Manager (as hereinafter defined) as the Contractor's Compliance Officer for the Site. Contractor shall certify in writing to Owner in the form set forth at Appendix C to the Wal-Mart SWPPP Spec ("Certification of Compliance Officer and Project Superintendent Storm Water Qualification") prior to the earlier of initiation of ground-disturbing activities or December 31, 2004 that the proposed Compliance Officer: (i) is a Storm Water Professional; (ii) has at least five (5) years of construction-related experience; and (iii) is able to adequately identify and implement storm water sediment and erosion control practices and has the authority and ability to effectively instruct Contractor's employees and Subcontractors, Sub-subcontractors and any other contractors in the implementation of such practices. The "Project Manager" is defined to include any Contractor employee who (a) meets the requirements of clauses (i) through (iii) above; (b) has the authority to direct the Superintendent and other Contractor employees, Subcontractors, Sub-subcontractors and other contractors in the execution of storm water compliance responsibilities; and (c) has the authority to stop work and

remove Subcontractors, Sub-subcontractors, other contractors, or any employees of the foregoing or of Contractor for failure to comply with the Storm Water Requirements.

2.  The Contractor shall designate two Project Superintendents for the Site who shall both: (a) be responsible for overseeing activities and work at the Site; and (b) have authority to direct Contractor's employees and the Subcontractors, Sub-subcontractors and other contractors to undertake actions to comply with the Permits, the Clean Water Act, and the Storm Water Pollution Prevention Plan ("SWPPP"). Contractor shall certify in writing to Owner in the form set forth at Appendix C to the Wal-Mart SWPPP Spec ("Certification of Compliance Officer and Project Superintendent Storm Water Qualification") prior to the earlier of initiation of ground-disturbing activities or December 31, 2004 that the proposed Project Superintendents: (i) are or shall become Storm Water Professionals within 30 days of the beginning of ground-disturbing activities; (ii) have at least 5 years of construction-related experience; and (iii) are able to adequately identify and implement storm water sediment and erosion control practices and effectively instruct Contractor's employees and Subcontractors, Sub-subcontractors and other contractors in the implementation of such practices. In the event the Project Superintendents do not meet the requirements of Storm Water Professional for the first 30 days after initiation of ground-disturbing activities, then the Compliance Officer or any other Storm Water Professional is required to accompany the inspecting Project Superintendent on at least 3 daily inspections per week until the Project Superintendents achieve Storm Water Professional status. If either or both of the Project Superintendents have not met the requirements within the first 30 days after initiation of ground-disturbing activities, then any such Project Superintendent(s) shall be replaced with a qualified Storm Water Professional.

G.  Storm Water Pre-Construction Meeting:

1.  Prior to initiation of ground-disturbing activities, the Contractor shall hold a storm water pre-construction meeting at the Site and shall certify in writing to Wal-Mart Contract Administration in the form set forth at Appendix C to the Wal-Mart SWPPP Spec ("Storm Water Controls Environmental Pre-Construction Meeting Certification Form") that:

a.  The storm water pre-construction meeting was conducted by the Contractor with Subcontractors, Sub-subcontractors, and other contractors (including suppliers), and the employees of each of the foregoing, that will implement and maintain the pollutant control measures described in the SWPPP, are involved in ground-disturbing activities on the Site, or whose activities will impact or necessitate the use of Best Management Practices on the Site;

b.  The engineer who prepared the SWPPP, or any engineer retained by Owner who reviews and becomes familiar with the SWPPP ("SWPPP Engineer"), attended this meeting;

c.  The Project Superintendent and the SWPPP Engineer explained the applicable Permit requirements, the SWPPP and drawings, and other issues relating to compliance with Environmental Laws or Storm Water Requirements for the Site; and have shown the video entitled "Storm Water Pollution Prevention on Construction Sites" provided upon award of the Contract through Owner's Contract Administration; and

d.  The Project Superintendent required each attendee to sign a certification in the form set forth at Appendix C to the Wal-Mart SWPPP Spec ("Contractor Certification") that they understood the terms and conditions of the applicable Permit and SWPPP, and to complete and sign an attendance sheet reflecting the name, firm (or regulatory agency) and telephone number of each individual attending the pre-construction meeting. The Project Superintendent shall provide the attendance sheet to Owner's Contract Administration within 48 hours of the pre-construction meeting.

e.  Contractor has 1) certified the SWPPP for the Site; 2) as required by any applicable Permit, prepared, signed and submitted any Notice of Intent or other application for permit coverage, on behalf of Contractor (and, as necessary and to the extent required

by the Permit, on behalf of Owner); and 3) verified that the SWPPP is dated on or before the date of the Notice of Intent or other application for permit coverage, and that the Notice of Intent or other application for permit coverage is dated on or before the date of earth-disturbing activity (except for any earth-disturbing activity necessary or associated with the installation of BMPs at the Site).

2.  The Contractor shall, prior to any pre-construction meeting, develop an agenda and supporting documents (e.g., permits, orders, regulations, etc.) to be provided to the persons attending that ensure that all Storm Water Requirements and Environmental Laws affecting the Work to be performed at the Site are discussed and explained to the Contractor's, Subcontractors' and Sub-subcontractors' supervisors having responsibility for activities regulated by such Storm Water Requirements or Environmental Laws.

3.  The Contractor shall give adequate notice of such pre-construction meetings to Owner and all appropriate environmental agencies having jurisdiction over the Site, and offer them the opportunity to have representatives present at any such meeting. Contractor shall document invitation(s) to such agency representatives and provide to Owner upon demand.

4.  If changes to any storm water erosion or sediment control measures contained in the SWPPP or other documents required by the applicable Permit are deemed necessary by representatives of Owner, the Contractor, or the environmental agency having jurisdiction over the Site, no construction activities, grading or vegetative clearing activities will take place on those portions of the Site that may be affected by such changes until the proposed changes are made and implemented to the extent possible at that stage of construction. Any such changes shall be immediately reflected in the SWPPP and other appropriate records for the Site.

5.  If a Subcontractor, Sub-subcontractor or other contractor did not attend the storm water pre-construction meeting and begins Work (or is contracted for Work) after the pre-construction meeting has occurred, the Project Superintendent shall brief that Subcontractor, Sub-subcontractor or other contractor before the Subcontractor, Sub-subcontractor or other contractor begins Work at the Site and require the Subcontractor, Sub-subcontractor or other contractor to sign a certification as described above in Section 8.G.1.d.

6.  On or before the date of the pre-construction meeting, Contractor shall complete the "Contractor and Subcontractor List" form set forth at Appendix C to the Wal-Mart SWPPP Spec. Contractor shall amend this form at such time as any additional Subcontractor, Sub-subcontractor or other contractor begins work at the Site and assumes responsibility for any BMPs.

H.  Inspection of BMPs Prior to Construction

1.  Prior to initiation of ground-disturbing activities, except for activities associated with the installation of BMPs, the SWPPP Engineer and the Project Superintendent shall inspect the Site to determine whether the BMPs required by the SWPPP have been installed correctly and in the correct locations.

2.  The SWPPP Engineer and the Project Superintendent shall certify in the form set forth at Appendix C to the Wal-Mart SWPPP Spec ("Civil Engineer and Project Superintendent Certification of Site Best Management Practices") that the BMPs required by the SWPPP have been installed correctly and in the correct locations prior to the commencement of ground-disturbing activity, and shall deliver such certification to the Wal-Mart Storm Water Control Center (the "Wal-Mart Storm Water Control Center") on or before the date of the pre-construction meeting.

I.  Weekly Meetings

1.  The Contractor shall hold weekly meetings with persons involved in ground-disturbing activities to review the requirements of any applicable Permits, the SWPPP, the Storm Water Requirements and applicable Environmental Laws, and to address any problems that have arisen in implementing the SWPPP or maintaining BMPs. At a minimum, the Contractor shall

Issued August 31, 2005

review with those attending the weekly meeting each of the following issues: (a) the role of each Subcontractor, Sub-subcontractor, other contractor or attendee in installing or maintaining each BMP; (b) BMPs requiring maintenance or repair; (c) BMPs that are not effective; (d) any modifications to the SWPPP or to project phasing; (e) any efforts necessary to mitigate or stop any discharges or potential discharges of sediment from the construction Site; (f) coordination and accommodation between site and building construction activities to comply with the SWPPP, including a discussion of current staging areas, material storage areas, borrow or fill areas, concrete washout areas, Site entrances and exits, and temporary alteration of BMPs to accommodate building construction; (g) work planned for the upcoming week and impacts to storm water; and (h) any findings or concerns identified during any inspection of the Site conducted by a federal, state or local regulator.

2.    Contractor shall maintain a log in the form of the "Weekly Storm Water Meeting Review and Comment Form" set forth at Appendix D to the Wal-Mart SWPPP Spec of all weekly meetings and documenting the issues set forth in Paragraph 8.I.1., and indicating: (a) the date and time of the meeting; and (b) the name, title and firm name of all attendees.

J.    Availability of Plan and Permit

1.    Contractor shall ensure that the applicable Permit and SWPPP are readily available at the Site, or at a location properly designated pursuant to the applicable Permit, for review by the Owner or by any Subcontractor, Sub-subcontractor or other contractor or employee as well as any local, state, or federal inspector in accordance with any other permit, law, or regulation then in effect.

K.    Wal-Mart Storm Water Coordinator ("WMSWC") Hotline

1.    The Contractor shall post the telephone number of the Wal-Mart Director of Storm Water Compliance in a conspicuous place in the construction office of the Project authorizing all employees and Subcontractors, Sub-subcontractors and other contractors to contact the Wal-Mart Director of Storm Water Compliance with any questions or to report problems relating to sediment and erosion control at the Site. If an inspector of the U.S. EPA or a state or local environmental agency should appear at the Project to conduct an inspection, the Contractor shall call the WMSWC at 800-530-9928 and advise the WMSWC immediately upon completion of the inspection and review the inspection procedure and results as described in Section 8.M., below. A color copy of the 8 ½" x 11" placard will be sent to the Contractor immediately upon award.

L.    Borrow, Waste or Spoils, Material, Equipment and Waste Storage Sites

1.    In the event that the performance of this Contract by the Contractor requires the development and/or use of borrow, waste or spoils, material (including non-earthen material, such as block, steel, etc.), equipment or waste storage sites, the Contractor agrees that it will, prior to the development and/or use of such sites, obtain any permits or approvals necessary for the legal use of such sites or confirm that any operators of such sites have properly obtained all required permits, and will also comply with all laws, regulations and permit conditions applicable to such sites.

M.    Procedures During Storm Water Inspections by Agencies

1.    In the event a representative of the U.S. EPA or a state or local environmental agency appears at the Project to conduct an inspection of storm water compliance, the Contractor's Project Superintendent (or in the Project Superintendent's absence, any other representative of the Contractor) shall accompany the inspector during the inspection, note all areas of concern or instances of non-compliance with Storm Water Requirements or Environmental Laws noted by the inspector, and if possible, photograph or videotape those areas.

2.    Immediately upon completion of the inspection, the Project Superintendent shall contact the WMSWC by telephone and provide the WMSWC or leave a voice message with the following information: the date, the beginning and ending time of inspection, the specific name of the

inspecting agency, the names of agency inspector(s) and all persons present during inspection (this information shall also be recorded on the "Federal, State, or Local Storm Water or other Environmental Inspector Site Visit Log" provided as Appendix I of the Wal-Mart SWPPP Spec, and a brief review of the procedures and results of the inspection, and measures needed to be taken, if any, to resolve areas of concern or instances of non-compliance with Storm Water Requirements or Environmental Laws.

The Project Superintendent shall prepare a written inspection report (use "Daily Storm Water Inspection Report" form provided in Appendix D of the Wal-Mart SWPPP Spec) or other written record of areas of concern or instances of non-compliance with Storm Water Requirements or Environmental Laws, which shall be in addition to the daily, weekly and monthly inspection reports required pursuant to Section 8.N. below. The Project Superintendent shall sign this supplemental Daily Storm Water Inspection Report. The Project Superintendent will immediately fax a copy of the supplemental Daily Storm Water Inspection Report on the day of the inspection in addition to any agency inspection report provided, at such time as Contractor receives a copy of the agency inspection report, to the WMSWC.

N.     Inspections

1.     Daily Inspections – Project Superintendent. The Contractor's Project Superintendent, shall conduct an inspection of all storm water BMPs on the Site on each Business Day in which construction activity has occurred at a Site for which that Project Superintendent is responsible. For purposes of this Contract, BMPs (or Best Management Practices) shall mean schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the discharge of pollutants to waters of the United States as well as treatment requirements, operating procedures, and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage. For purposes of this Contract, Business Day shall mean any day other than a Saturday, Sunday or federal holiday.

Project Superintendents shall inspect the entire Site to:

i)     determine whether construction is being conducted in accordance with the requirements of applicable Permits and the applicable SWPPP;

ii)    observe, record, and, if necessary, improve the effectiveness of all BMPs and note any correction made or needed; and

iii)   observe, record, and, if necessary, take steps to eliminate or reduce to the extent feasible any discharges of pollutants from the Site into waters of the United States.

If authorized by the applicable Permit and by Owner, Project Superintendent may reduce the frequency of inspections to once each month if one of the following conditions are met: 1) the entire Site is temporarily stabilized at the Site for an extended period and melting conditions do not exist. Project Superintendent shall resume daily inspections as soon as the Site no longer meets the condition above for which daily inspections were suspended.

2.     The Project Superintendent shall record the results of the daily inspection in the form set forth at Appendix D to the Wal-Mart SWPPP Spec (the "Daily Inspection Report Form") and certify the information contained in the Daily Inspection Report Form by signing in the "Inspector's" signature block provided on the Form. The Daily Inspection Report Forms shall be immediately faxed to the WMSWC at 479-204-0438 and shall be retained at the Site until Project termination or completion, as applicable, and, thereafter, retained for a period of not less than 5 years. Once each week, the Project Superintendent shall transmit to Owner's Construction Manager a report in the form set forth at Appendix D to the Wal-Mart SWPPP Spec (the "Weekly Storm Water Inspection Summary" or "Weekly Report") certifying that all daily inspections have been conducted and noting any deficiencies identified during the inspection and any corrective action undertaken to correct deficiencies in BMPs at the Site.

3.   All repairs or modifications to the BMPs identified as necessary during each daily inspection shall be completed as soon as possible, but no later than 48 hours after the inspection; provided, however, that in the event such repairs or modifications cannot be completed within this time, the Contractor shall initiate the repairs within 48 hours and complete the repairs as soon as practicable. Contractor shall record such repairs and modifications in the SWPPP and on the Daily Inspection Report Form on which any observations made pursuant to Section 8.N.1.(a) to (c) are recorded.

4.   If, during the course of construction at a Site, the temporary removal or alteration of a BMP is necessary to accomplish the construction or to protect health and safety, the Project Superintendent shall note such removal or alteration on the Daily Inspection Report Form, including specific information regarding the changes made and the day and time such changes were made. Contractor shall restore the BMP as soon as practicable but in no case later than 24 hours after the completion of the activity that required the change, and shall note the restoration on the Daily Inspection Report Form, including specific information regarding the day and time at which the restoration was begun and completed. Contractor shall take all reasonable measures to prevent discharges from the Site to the waters of the United States during the time that the BMP has been altered or removed, including, but not necessarily limited to timing the removal or alteration of the BMP so that it occurs when precipitation is not forecasted and installing new or alternate BMPs outside the affected area..

5.   The Daily Inspection Report Form and the Weekly Report shall be made a part of the storm water control records at the Site, and copies of such reports shall be immediately faxed to the WMSWC at 479-204-0438.

6.   Owner and Contractor agree that any failure identified by Owner of the Contractor to accurately report conditions of BMPs on the Site, transmit the Daily Inspection Report Forms or Weekly Reports, complete repairs and modifications, record and restore altered BMPs, or record such repairs and modifications as described in Sections 8.N.1. to 8.N.5. above, shall be considered separately and apart from any alleged violations, of Storm Water Requirements or Environmental Laws identified by EPA or any federal, state or local agency or government or quasi-governmental entity during any inspection of the Site conducted by EPA or such federal, state or local agency or government or quasi-governmental entity. The Contractor agrees to indemnify, defend and hold Owner harmless from and against any Damages relating to such violations or alleged violations in accordance with or pursuant to Article 13 of the Contract to which these Special Conditions are exhibited or attached.

7.   Bi-Weekly Inspections – Compliance Officer. Contractor's Compliance Officer shall accompany the Project Superintendent on a daily inspection of the Site at least once every 2 weeks. The Compliance Officer shall review the Daily Inspection Report Forms prepared by the Project Superintendent in the days since the Compliance Officer's last inspection and ensure that all corrective action noted as necessary on the daily inspection reports has been completed as required by Section 8.N.3. Compliance Officer shall certify compliance with the requirements of this section by signing in the "Compliance Officer's" signature block provided on the Daily Inspection Report Form. In the event Compliance Officer's inspection reveals needed repairs or modifications, Compliance Officer shall initial and date the Daily Storm Water Inspection Report to indicate certification is withheld pending confirmation of corrections noted on the report. In the event Owner has authorized the Contractor to reduce the inspection frequency to once per month in accordance with the terms of Section 8.N.1., the Compliance Officer shall accompany the Project Superintendent on the monthly inspection of the Site. The Compliance Officer shall resume bi-weekly inspections as soon as the Site no longer meets the conditions set forth in Section 8.N.1.

8.   Monthly Inspections – Owner's Construction Manager. At least once each month, the Owner's Construction Manager shall accompany the Project Superintendent on a daily inspection. Prior to the inspection, Owner shall not notify the Project Superintendent or any other person of the day on which the Construction Manager will join the inspection. In addition, the Owner Construction Manager shall review the Daily Inspection Report Forms prepared since the last monthly inspection and ensure that all corrective action noted as necessary and appropriate on the Daily Inspection Report Forms has been completed as required by Section 8.N.3. The

Owner Construction Manager shall identify on the Daily Inspection Report Form changes in Owner's inspection and oversight procedures that are necessary to ensure compliance with the Storm Water Requirements or any Environmental Laws and address any pattern of deficiencies identified in the Contractor's implementation of the SWPPP or maintenance of BMPs. The Construction Manager shall certify compliance with the requirements of this section by signing in the "Construction Manager's" signature block provided on the Daily Inspection Report Form for the day on which the Construction Manager conducts the inspection. In the event Construction Manager's inspection reveals needed repairs or modifications, Construction Manager shall initial and date the Daily Inspection Report Form to indicate certification is withheld pending confirmation of corrections noted on the report. Owner may suspend its monthly inspections during any period in which Section 8.N.1. allows Owner to authorize the Project Superintendent to conduct monthly inspections rather than daily inspections. Owner shall resume its monthly inspections as soon as the Site no longer meets the condition above for which daily inspections were suspended.

9. If, during a monthly inspection, the Construction Manager determines that any BMP requires repair or that the Site is not in compliance with the Storm Water Requirements or any Environmental Law, the Construction Manager shall identify on the inspection report the actions necessary to repair the BMP or bring the Site into compliance with the Storm Water Requirements or any Environmental Laws or to address any pattern of deficiencies identified by the Construction Manager. The Project Superintendent shall certify compliance with the requirements of this Section by signing in the area provided on the Daily Inspection Report Form set forth in Appendix D to the Wal-Mart SWPPP Spec no later than 5 days after the monthly inspection, that the Contractor has taken all actions identified by the Construction Manager as necessary to repair the BMP or bring the Site into compliance with the Storm Water Requirements or any Environmental Laws or to address any pattern of deficiencies identified by the Construction Manager.

10. Final Owner Inspection

The Owner's Construction Manager shall perform an inspection of the Site at the conclusion of the construction Project to ascertain whether all areas of the Site have been stabilized in accordance with the Permit and the Site is eligible to terminate permit coverage. The Construction Manager shall sign and certify on the Daily Inspection Report Form for this inspection. The certified Daily Inspection Report Form shall be retained by the Contractor with the SWPPP. If all areas of the Site have been finally stabilized in accordance with the Permit conditions and requirements, the Contractor shall file a notice of termination of permit coverage as required by the applicable Permit. In the event there are multiple permittees for the Site, the Contractor shall prepare and transmit notices of termination to each permittee for preparation and submittal as required by the applicable Permit. If the Site has not been stabilized in accordance with the Permit, the Contractor and all other permittees shall not file notices of termination until all stabilization has been completed and the Construction Manager has repeated the final inspection of the Site and certified on the Daily Inspection Report Form that the Site is eligible to terminate Permit coverage.

O. Retention of Records by Contractor

1. The Contractor agrees that it will retain in files that are readily accessible all records required by the applicable NPDES Storm Water General Permit or other Storm Water Requirements or Environmental Laws applicable to the construction Project for a minimum of five (5) years, or for such longer time as may be required by said Permit, Storm Water Requirements or Environmental Laws. Such records shall, without limitation, include the permit, the SWPPP, all E & S control drawings, all reports of inspection of the storm water controls at the Site, all rainfall records, notices of violation or orders and responses thereto, and other documents relative to storm water controls at the Site. The Contractor shall at any time, upon request of Owner, provide Owner with copies of any or all such records at Contractor's sole expense and within seven (7) days of Owner's written request.

P.    Work Stoppage for Environmental Violations

    1.    In the event that during the performance of Work by Contractor under this Contract, Owner determines (in its sole judgment and discretion) that Contractor or a Subcontractor or Sub-subcontractor is not complying with the requirements of this Contract, or any part thereof, Owner may, to the maximum extent permitted by applicable law, require the Contractor to stop work until such noncompliance is remedied and corrected. In such event, to the maximum extent permitted by applicable law, any delay in completion of this Project that may be constitute a breach of any other provisions of this Contract shall be charged to the Contractor, in addition to any damages resulting to Owner arising from such delay, or from any violations of Storm Water Requirements or Environmental Laws pursuant to these provisions.

    2.    In addition to the right to stop work set forth in this Section, Owner shall have all of the rights and remedies available to it under the Contract Documents, including without limitation, Section 8.S. of these Special Conditions, at law or in equity.

Q.    Storm Water Compliance Audit

    1.    Contractor agrees that Owner may from time to time, in its sole discretion, retain an independent consultant (the "Audit Consultant") to conduct inspections of the Site to determine whether the Contractor has complied with the Storm Water Requirements or Environmental Laws (the "Compliance Audit"). Owner shall not be required to disclose or otherwise provide the findings or recommendations of the Audit Consultant to Contractor, and may, in its sole discretion, elect to voluntarily disclose or provide such findings or recommendations to any federal, state or local agency. Contractor hereby waives, and releases Owner and Audit Consultant from, any and all claims, liabilities, damages, causes of action, penalties or fines, whether direct, indirect or consequential, arising from or relating in any way to the Compliance Audit.

R.    Right to Take Corrective Action

    1.    In the event Owner discovers that Contractor has failed to correct any deficient BMP or to eliminate or reduce any discharge of pollutants from the Site which were identified in any Daily Inspection Report Form, observed by the Owner Construction Manager and made known in writing to Contractor or observed by an Audit Consultant retained by Owner to inspect the Site and made known in writing to Contractor, Owner may enter upon the Site 24 hours after receiving such Daily Inspection Report Form or providing such written notice, or immediately if necessary to abate an immediate or potential discharge or threat of discharge of pollutants from the Site, and take such corrective actions as may be necessary to correct such BMP or eliminate or reduce such discharge. Contractor shall reimburse Owner for any costs incurred in taking such corrective action within 10 days of receipt of written notice and demand by Owner.

S.    Owner's Remedies for Environmental Violations

    1.    Should the Contractor or any Subcontractor or Sub-subcontractor engage in an Administrative Violation (as defined below), Contractor and Owner acknowledge and agree that Owner will incur substantial damages and the extent of such damages would be impractical and extremely difficult to determine as of the date of this Contract. Contractor and Owner acknowledge that, as of the date of this Contract, the applicable Liquidated Damages Amount (as defined below) for each such Administrative Violation represents the parties' good faith estimate as to the actual potential damages that Owner would incur as a result of each such Administrative Violation. Accordingly, Contractor shall pay to Owner the foregoing amount for each such Administrative Violation. Contractor acknowledges that the Liquidated Damages Amounts are reasonable under the circumstances existing as of the date of this Contract. Such Liquidated Damages Amount shall be the sole and exclusive remedy of Owner for such Administrative Violation; provided, however, that (i) the provisions of this paragraph shall not, and shall not be construed or deemed to, limit or restrict Owner's right to terminate this Contract and/or pursue any and all other remedies that may be available under the Contract Documents, at law or in equity, for any other violation of this Contract, including, without limitation, any failure to perform an obligation the performance of which is the subject of certifications or documentation to be

submitted by Contractor to Owner, even if the failure to submit such certifications or documentation to Owner constitutes an Administrative Violation, and (ii) to the extent said Administrative Violation is the proximate result of Contractor's breach of any other provision of the Contract Documents, Owner shall, in addition to the applicable Liquidated Damages Amount for such Administrative Violation, have the rights and remedies associated with said breach, and, in the case of each of clauses (i) and (ii) of this paragraph, the provisions of this paragraph shall not be deemed to act as a waiver of the rights set forth therein. The Liquidated Damages Amounts described herein are liquidated damages and are not intended to operate as a penalty.

As used herein, "Administrative Violation" shall mean any of the breaches by Contractor set forth below. "Liquidated Damages Amount" shall mean, with respect to an Administrative Violation, the amount of liquidated damages set forth below for such Administrative Violation.

| Administrative Violation | Liquidated Damages Amount |
|---|---|
| Failure to document any weekly meeting | $1,000 per violation |
| Failure to accurately report conditions of the BMPs on the Site | $1,000 per violation |
| Failure to transmit any Daily Inspection Report Form | $1,000 per violation |
| Failure to record any altered BMPs | $1,000 per violation |
| Failure to record repairs and modifications | $1,000 per violation |

2.    If Contractor experiences three or more Administrative Violations, then in addition to the applicable Liquidated Damages Amount for such Administrative Violation and to the maximum extent permitted by applicable law, Owner shall have the right to immediately terminate the Contract for cause, effective immediately, without further obligation to the Contractor, and Owner shall have all of the rights and remedies available to it under the Contract Documents (including, without limitation, those rights and remedies set forth in Section 8.S.3.b.), at law or in equity.

3.    Except as is expressly set forth in Section 8.S.1 with respect to Administrative Violations, and in addition to any other rights that Owner may possess under the terms of this Contract and to the maximum extent permitted by applicable law, upon the violation or alleged violation (as defined herein) by Contractor or a Subcontractor or Sub-subcontractor of (i) any Storm Water Requirements or Environmental Laws, (ii) any other provision of this Section 8, or (iii) any other provision of the Contract Documents pertaining to compliance with environmental requirements, in each case which violation or alleged violation relates to or may otherwise affect the Site (regardless of whether committed on the Site or another Owner construction project on which the Contractor, Subcontractor or Sub-subcontractor is working), Owner may, as its sole election and discretion, take the following actions:

a.    Withhold payments of amounts due to the Contractor under this Contract sufficient to satisfy all claims for fines, penalties, supplemental environmental projects, or other requirements imposed by regulatory agencies or claims and demands of private parties or citizens' groups. To the maximum extent permitted by applicable law, the amount of the sums to be withheld will be determined by Owner using its best estimate and judgment of the total potential amount of such claims based upon information known to Owner at the time of such withholding. At such time that Owner is satisfied that all potential claims of regulatory agencies and private parties or citizens' groups (either asserted or potential) have been resolved, unless otherwise required by applicable law,

B.  Pavement striping shall be performed between the hours of 10:00 p.m. and 7:00 a.m.

C.  Superintendents are to have communication radios. Frequency of radios are not to be the same as those of the operations of the store.

D.  Facsimile and answering machines are to be in operation 24 hours a day.

E.  Communication meetings are to be established by the Owner Construction Manager and will determine how frequent meetings will occur. General Contractor is to distribute meeting notes to the Owner Construction Manager and Store Manager within 24 hours after the meeting.

F.  General Contractor is to keep premises clean at all times, especially in areas that would impede customer traffic or endanger the public. In the event the premises are not clean or free from debris, Owner will notify the General Contractor. The General Contractor will have 24 hours to complete the required cleanup. If General Contractor fails to comply, Owner will back charge all costs associated in removal of debris.

G.  Owner will take "Possession" of new constructed areas upon completion of those areas.

H.  General Contractor is to provide a Bonded Security Guard to maintain security to areas of the store that are operating.

I.  General Contractor is responsible for traffic control and necessary barricades that would facilitate customer traffic and ensure customer safety.

J.  Any penetration to the structure or roof deck or new openings in walls must have a fire watch during the time the work is being performed. Coordination of this work is to be communicated 24 hours in advanced to the Store Manager.

K.  Per the Contract documents the Contractor is required to submit to Owner for approval a proposed project schedule, subcontractor listing and project budget. These items shall be submitted to the Owner Contract Administrator for approval not less than 10 days after receipt of the Notice of Award from Owner and before a Contract is executed. The project schedule will adhere closely to that provided by the Owner Construction Manager at the pre-bid meeting. Prior to contract execution, the schedule will be refined in conjunction with the Store Planning Field Manager and once agreed upon will not be altered without the Owner Construction Manger's approval. Once finalized, phased completion dates will be contractually binding on the General Contractor. In the event of delays caused by Owner, consideration will be given to acceleration payments to meet the established phasing turnover dates. Time extensions, however, remain the option of the Owner Construction Manager.

L.  General Contractor to install and maintain all weather gravel road base road around expansion areas for access to work areas during entire expansion duration from start until landscape.

M.  The use of helicopter(s) to lift and/or install materials or equipment or for any other purpose is strictly prohibited.

13.  DESCRIPTION OF SITE

Project consists of a 135 prototype (LL-135L-TR) Sam's Club and 176 prototype (C-176-SGR-OR) Wal-Mart Supercenter complete with paved parking areas, curbed islands, storm and sanitary sewer services, and water main. The existing land consists of open undeveloped grassland, currently farmed by the seller. Grading for the Site includes final grading of building pads, parking areas, and detention basin. An outparcel approximately 2.06 acres in size is proposed across Deerfield Driver, opposite the Sam's Club at the coroner of Rotamer and Deerfield/Kettering. Aside from a driveway cut and utility stubs, no grading is proposed for this lot. A detention basin is proposed of the southeast corner of the parcel, which will detain stormwater runoff for the proposed Supercenter and Sam's Club. Work includes construction of a drainage ditch along the south boundary of the Site, serving both the Site as well as Deerfield drainage water.

**EXHIBIT "D"**
**SPECIFICATIONS**

Issued at Out To Bid



EXHIBIT "E"
ARCHITECTURAL PLANS

Issued at Out To Bid and Listed in Article One of This Contract

Owner shall forthwith make payment of the withheld sums to the Contractor, less any sum to which Owner may otherwise be entitled under the terms of this Contract.

b.    Terminate this Contract for cause, effective immediately, without further obligation to the Contractor, and hire other general contractors to complete the Project that is the subject of this Contract. In such event, to the maximum extent permitted by applicable law, Owner may withhold from any amounts due to the Contractor at the time of termination any amounts that it may determine, under subsection (a) above, to be adequate to secure Owner against any claims of regulatory agencies or other parties. In addition, Owner may also, to the maximum extent permitted by applicable law, assert any claims against the Contractor that Owner may have under any other provisions of this Contract or under statutory or common law, including, without limitation, any damages for increased costs of construction or completion occasioned by the change in general contractors.

The terms "violation" and "alleged violation" as used in this subsection shall include allegations, charges or determinations of violations of such Storm Water Requirements, Environmental Laws, provisions of this Section 8 or other provisions of the Contract Documents pertaining to compliance with environmental requirements by Owner or by any environmental agency with jurisdiction over the Site, or any other Owner site on which the Contractor or any Subcontractor or Sub-subcontractor is working. Such allegations, charges or determinations may be included in inspection reports, notices of violation, citations, administrative orders, letters or other written or oral communication. Those terms may also include allegations or charges of violation asserted by an individual or organization in a "citizens' suit" or advance notice thereof under any Environmental Law. It shall not be necessary for the operation of this paragraph that such allegations, charges or determinations be reviewed by any court or administrative tribunal.

9.    INDEMNITY

A.    The Contractor agrees to indemnify, defend and hold Owner harmless in accordance with and pursuant to Article 13 of the Contract to which these Special Conditions relate or are exhibited or attached.

10.    LETTERS OF CERTIFICATION AND OTHER REQUIRED SUBMITTALS

Several letters of certification and other submittals and documentation are required to be provided by Contractor pursuant to the Contract Documents. If any of those letters of certification, submittals or other documentation are false or misleading, Owner shall have the right to terminate the Contract immediately for cause in its sole discretion and shall have all rights and remedies available to it at law, in equity or under the Contract Documents, including, without limitation, Section 8.S.3.b. of these Special Conditions.

11.    SUPERVISION

A.    A minimum off four (4) Superintendents shall be provided by Contractor exclusively for this Project. No Work shall be performed under this Contract unless at least one Superintendent is present on the Site.

B.    The General Contractor will provide at the on-site job trailer the following equipment to facilitate coordination with the Owner Construction Department.

1.    Computer with E-Mail internet connection
2.    Microsoft Project version 2002 or later
3.    Microsoft Excel version 2002 or later
4.    Digital Camera with interface to required computer

**EXHIBIT "F"**

**SITE AND GRADING PLANS**

Issued at Out To Bid and Listed in Article One of This Contract



EXHIBIT "G"

COMPLIANCE WITH OTHER APPLICABLE STATE LAW

If the Project is located in any of the States set forth in this Exhibit, then Contractor and Owner shall comply with the provisions set forth therein with respect to such State.

## ARIZONA
### NOTICES TO INCLUDE ON EACH PAGE OF THE CONSTRUCTION PLANS AND SPECIFICATIONS FOR ARIZONA CONTRACTS

1.  In accordance with Section 32-1129.01(B) of the Arizona Revised Statutes, this Contract allows the Owner to require the submission of Applications for Payment in billing cycles other than thirty (30) days. Applications for Payment shall be submitted for Work performed during each calendar month within ten (10) days of the end of such calendar month.
2.  In accordance with Section 32-1129.01(C) of the Arizona Revised Statutes, this Contract allows Owner to certify and approve Applications for Payment within twenty-five (25) days after Owner receives such Applications for Payment.
3.  In accordance with Section 32-1129.01(D) of the Arizona Revised Statutes, this Contract allows the Owner to make payment within twenty-five (25) days after certification and approval of an Application for Payment.

### Notice of Alternate Billing Cycle

This Contract allows the Owner to require the submission of Applications for Payment in billing cycles other than thirty (30) days. Applications for Payment shall be submitted for Work performed during each calendar month within ten (10) days after the end of such calendar month.

### Notice of Extended Certification and Approval Period Provision

This Contract allows Owner to certify and approve Applications for Payment within twenty-five (25) days after Owner receives such Applications for Payment.

### Notice of Extended Payment Provision

This Contract allows the Owner to make payment within twenty-five (25) days after certification and approval of an Application for Payment.

## CALIFORNIA

The name and address of each lender providing construction financing to Owner for the Project, if applicable, is set forth below:

☐ Not applicable
☐ Applicable
    Lender Name:_____
    Lender Address:_____
    _____
    _____

    Lender Name:_____
    Lender Address:_____
    _____
    _____

## CONNECTICUT

1.   In accordance with Section 42-158 k of the Connecticut General Statutes, the retainage that Owner may withhold for labor, materials and equipment incorporated in the Work and for materials and equipment suitably stored at the Project site or at some other location agreed upon in writing shall not exceed seven and one-half percent (71/2%) of the estimated amount of a progress payment over the life of the Project.

2.   Pursuant to Section 2 of Connecticut Public Act No. 04-202, Contractor shall (a) pay any amounts due any Subcontractor performing Work or providing materials hereunder not later than thirty (30) days after the date the Contractor receives payment from Owner which encompasses Work performed or materials furnished by such Subcontractor, and (b) include in each subcontract, contract or agreement with each of its Subcontractors a provision requiring the Subcontractor to pay any amounts due to any Sub-subcontractor performing Work or providing materials hereunder not later than thirty (30) days after the date the Subcontractor receives payment from Contractor which encompasses Work performed or materials furnished by such Sub-subcontractor.

## GEORGIA

In accordance with Section 13-11-5 of the Code of Georgia, Contractor and Owner hereby acknowledge and agree that the retainage contemplated by this Contract constitutes a reasonable amount."

## IDAHO

In accordance with Section 29-115(2) of the Idaho Code, the retainage that Owner may withhold for labor, materials and equipment incorporated in the Work and for materials and equipment suitably stored at the Project site or at some other location agreed upon in writing shall not exceed five percent (5%) of any progress payment, and in no event shall the total amount retained exceed five percent (5%) of the Contract Sum. Notwithstanding the foregoing, there shall be no limitation on the retainage amount if Contractor fails to provide a performance bond issued by a surety acceptable to Owner if so requested by Owner.

## ILLINOIS

In accordance with Chapter 770, Section 60/5 of the Illinois Compiled Statutes, along with each Application for Payment submitted by Contractor to Owner pursuant to the Contract Documents, Contractor shall provide a statement in writing, under oath or verified affidavit, of the names and addresses of all parties furnishing materials and labor and of amounts due, or to become due, to each such party.

## LOUISIANA

CONTRACTOR HEREBY WAIVES ANY AND ALL RIGHTS THAT IT MAY HAVE PURSUANT TO SECTION 2773 OF TITLE 9 OF THE LOUISIANA REVISED STATUTES, AS MAY BE AMENDED OR RESTATED FROM TIME TO TIME.

## MISSISSIPPI

Notwithstanding any provision to the contrary in this Contract, final payment of the Contract Sum to Contractor may be conditioned upon Owner's receipt of the written consent of all sureties of any bonds required pursuant to the terms of this Contract.

**MISSOURI**

Notwithstanding any provision to the contrary in this Contract, retainage that may be withheld for labor, materials and equipment incorporated in the Work and for materials and equipment suitably stored at the Project site or at some other location agreed upon in writing shall not exceed 10% in accordance with Missouri Revised Statute § 436.303; provided, however, that Owner shall have the right to retain additional sums to protect Owner's interest in satisfactory performance of this Contract.

**MONTANA**

**NOTICES TO INCLUDE IN THE "INFORMATION" SECTION OF THE INVITATION TO BID FOR MONTANA CONTRACTS**

**Notice of Approval of Payment Request Provision**

1.  Notwithstanding any provision to the contrary in this Contract, retainage that may be withheld for labor, materials and equipment incorporated in the Work and for materials and equipment suitably stored at the Project site or at some other location agreed upon in writing shall not exceed 10% in accordance with Montana Code Annotated § 28-2-2110(1).

2.  Pursuant to Montana Code Annotated § 28-2-2115(2), Contractor's bid for the Work contemplated by this Contract is subject to the following notice, which notice shall be deemed to amend the Invitation to Bid "Information" section:

3.  This Contract allows the Owner to approve the Contractor's payment request within twenty-five (25) days after receipt of the payment request.

**NEW MEXICO**

1.  Payment of amounts due under this Contract, exclusive of retainage, shall be paid within twenty-one (21) days after Owner receives an undisputed Application for Payment.

2.  Contractor covenants and agrees to make prompt payment to all Subcontractors, Sub-subcontractors, material suppliers, materialmen and other persons or entities providing labor, materials or equipment to, or on behalf of, Contractor within seven (7) days after Contractor's receipt of payment from Owner.

3.  Notwithstanding any provision to the contrary in this Contract, retainage that may be withheld for labor, materials and equipment incorporated in the Work and for materials and equipment suitably stored at the Project site or at some other location agreed upon in writing shall not exceed 5% in accordance with § 57-28-5(E), NMSA 1978.

**NEW YORK**

Contractor and Owner hereby acknowledge and agree that the retainage contemplated by this Contract constitutes a "reasonable amount of the contract sum" in accordance with New York Gen. Bus. § 756-c.

**NORTH DAKOTA**

In accordance with Section 43-07-23 of the North Dakota Century Code, the retainage that may be withheld for labor, materials and equipment incorporated in the Work and for materials and equipment suitably stored at the Project site or at some other location agreed upon in writing shall not exceed ten percent (10%) of each estimate presented until such time as the Work is fifty

percent (50%) complete, at which time no further retainage on estimates may be withheld by Owner.

## OHIO

1.  In accordance with Section 4113.62(A) of the Ohio Revised Code, and notwithstanding any provision of the Contract Documents, no provision of the Contract Documents shall be deemed to waive rights under the Bonds.

2.  Unless otherwise set forth below in this paragraph 2, any action or suit concerning the Contract Documents or related matters shall only be brought in federal or state courts located in the county or counties in which the Work is being performed.  If the above is not applicable, please check the following box and insert the county or counties in which such actions or suits may be brought:

    ☐    Other: _____

## OREGON

1.  In accordance with Section 701.420 of the Oregon Revised Statutes, the retainage that may be withheld for labor, materials and equipment incorporated in the Work and for materials and equipment suitably stored at the Project site or at some other location agreed upon in writing shall not exceed five percent (5%) provided that if Contractor does not provide Owner with the Bonds, then the foregoing limitation on retainage shall not apply in accordance with Section 701.430(2) of the Oregon Revised Statutes.

2.  Pursuant to and in accordance with Section 701.625(2) of the Oregon Revised Statutes, each of Owner and Contractor acknowledges and agrees that the Plans, Specifications and all other Contract Documents expressly allow in a clear and conspicuous manner an alternate billing cycle, requiring Contractor to submit an Application for Payment for each calendar month within ten (10) days after the end of the month to which such Application for Payment relates.  The following notice is hereby incorporated into each page of the Plans and Specifications, and Contractor's bid for the Work contemplated by this Contract is subject thereto:

    Notice of Alternative Billing Cycle

    This Contract allows the Owner to require the submission of Applications for Payment in billing cycles other than 30-day cycles.  Applications for Payment shall be submitted for Work performed during each calendar month within ten (10) days after the end of such calendar month.

3.  Pursuant to and in accordance with Section 701.625(6) of the Oregon Revised Statutes, each of Owner and Contractor acknowledges and agrees that the Plans, Specifications and all other Contract Documents, and all bid plans and construction plans, expressly allow in a clear and conspicuous manner an extended period within which each Application for Payment may be certified by Owner, which period is 25 days after Owner receives each Application for Payment.  The following notice is hereby incorporated into each page of the Plans and Specifications, including the bid plans and construction plans, and Contractor's bid for the Work contemplated by this Contract is subject thereto and all bid plans and construction plans are hereby deemed amended thereby:

    Notice of Extended Certification Period Provision

    This Contract allows Owner to certify Applications for Payment within twenty-five (25) days after receipt of such Applications for Payment.

4.    Pursuant to and in accordance with Section 701.625(3) of the Oregon Revised Statutes, each of Owner and Contractor acknowledges and agrees that the Plans, Specifications and all other Contract Documents expressly allow in a clear and conspicuous manner an extended payment period of 25 days after Owner receives each Application for Payment. The following notice is hereby incorporated into each page of the Plans and Specifications, and Contractor's bid for the Work contemplated by this Contract is subject thereto:

5.    In accordance with Section 701.625(7) of the Oregon Revised Statutes, Contractor hereby represents, warrants and agrees that no Subcontractor, Sub-subcontractor or other material supplier has submitted any bid, proposal or other written pricing information to Contractor that contains certification or payment periods that are shorter than the respective periods set forth in this Contract.

6.    In accordance with Section 701.635 of the Oregon Revised Statutes, and notwithstanding any provision of the Contract Documents, Contractor and each Subcontractor and Sub-subcontractor shall have the rights set forth in Section 701.635.    Contractor hereby covenants and agrees that no contract, subcontract or other agreement with any Subcontractor or Sub-subcontractor shall contain any provisions in violation of Section 701.635.

7.    CONTRACTOR HEREBY WAIVES ALL REQUIREMENTS SET FORTH IN, AND ALL RIGHTS AVAILABLE TO IT UNDER, THE PROVISIONS OF SECTION 87.021(4) OF THE OREGON REVISED STATUTES, AS MAY BE AMENDED OR RESTATED FROM TIME TO TIME.

### SOUTH CAROLINA

1.    CONTRACTOR HEREBY WAIVES ALL REQUIREMENTS SET FORTH IN, AND ALL RIGHTS AVAILABLE TO IT UNDER, THE PROVISIONS OF SECTION 29-6-30 AND SECTION 29-6-90 OF THE CODE OF LAWS OF SOUTH CAROLINA 1976, AS MAY BE AMENDED OR RESTATED FROM TIME TO TIME.

2.    In accordance with Section 29-6-40 of the Code of Laws of South Carolina 1976, Contractor and Owner hereby acknowledge and agree that the retainage contemplated by this Contract constitutes a "reasonable amount."

### SOUTH DAKOTA

1.    In accordance with Section 56-3-16 of the South Dakota Codified Laws, and notwithstanding any other provision of the Contract Documents, the following provision shall be incorporated into and made a part of the Contract Documents:

2.    The obligations of the Contractor shall not extend to the liability of the Architect or Engineer, his agents or employees arising out of:

        (a)    The preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs or specifications, or

        (b)    The giving of or the failure to give directions or instructions by the Architect, or Engineer, his agents or employees provided such giving or failure to give is the primary cause of the injury or damage.

## TENNESSEE

Contractor and Owner hereby acknowledge and agree that the retainage contemplated by this Contract constitutes a "reasonable amount of retainage" in accordance with Section 66-34-203 of the Tennessee Code.

## TEXAS

In accordance with Section 53.101 of the Texas Property Code, if Bonds meeting the requirements of Sections 53.201, 53.202 and 53.203 are not obtained and filed, the retainage that may be withheld for labor, materials and equipment incorporated in the Work and for materials and equipment suitably stored at the Project site or at some other location agreed upon in writing shall equal ten percent (10%) of the Contract Sum.

## UTAH

In accordance with Section 13-8-5(3)(a) and (b) of the Utah Code, the retainage that Owner may withhold for labor, materials and equipment incorporated in the Work and for materials and equipment suitably stored at the Project site or at some other location agreed upon in writing shall not exceed five percent (5%) of any progress payment, and in no event shall the total amount retained exceed five percent (5%) of the Contract Sum.

## VIRGINIA

In accordance with Section 43-4 of the Virginia Code, the retainage that may be withheld for labor, materials and equipment incorporated in the Work and for materials and equipment suitably stored at the Project site or at some other location agreed upon in writing shall not exceed ten percent (10%) of the Contract Sum.

## WYOMING

### NOTICES TO INCLUDE IN THE SPECIFICATIONS FOR WYOMING CONTRACTS

Contractor's bid for the Work contemplated by this Contract is subject to the following notice:

Pursuant to Wyoming Statutes 1977 Section 29-2-111, each Subcontractor, Sub-subcontractor and material supplier must give written notice to the Contractor of the right to claim a lien. This notice must be given to the Contractor within 60 days after the date on which services or materials were first provided and must be sent by certified mail or otherwise delivered to and receipted by the Contractor. The notice must state: (1) that it is a notice of the right to claim a lien against the improvements or property for services or materials furnished; (2) the Subcontractor's, Sub-subcontractor's or material supplier's name, address and phone number, and the name of its contact person; (3) the name and address of the Subcontractor's, Sub-subcontractor's or material supplier's vendor; and (4) the type or description of the services or materials provided. Failure to provide this notice to the Contractor will result in a waiver of the Subcontractor's, Sub-subcontractor's or material supplier's right to a lien. Contractor must post a prominent sign on the construction site citing Section 29-2-111 and stating that any Subcontractor, Sub-subcontractor or material supplier must give notice to the Contractor of the right to claim a lien and that failure to provide the notice will result in the waiver of the Subcontractor's, Sub-subcontractor's or material supplier's right to a lien.

## Preliminary Change Order Budget – Exhibit H

| | |
|---|---|
| Store #: | Wal-Mart Change Order Number: |
| W/M JDE Job #: | Change Directive No:          Date: |
| Purchase Order # | General Description of Change(s): |
| Location: | |
| General Contractor: | |
| Fax Number: | |
| Email Address: | |

| Division | Preliminary C.O. Cost | Description of Cost Changes |
|---|---|---|
| Division 1 – General Requirements | $ | |
| Division 2 – Sitework - Total Sitework This Line | $ | |
| **Sitework Breakouts** | | |
| Demolition | $ | |
| Site Preparation | $ | |
| Earthwork | $ | |
| Paving Base Course | $ | |
| Asphalt Concrete Paving | $ | |
| Portland Concrete Paving | $ | |
| Curbs and Sidewalks | $ | |
| Parking Lot Marking | $ | |
| Water | $ | |
| Storm Drainage | $ | |
| Sewers | $ | |
| Irrigation | $ | |
| Fences | $ | |
| Landscaping | $ | |
| Site Lighting | $ | |
| Utilities and Misc. | $ | |
| Division 3 – Cast-In-Place Concrete | $ | |
| Division 4 – Masonry | $ | |
| Division 5 – Metals | $ | |
| Division 6 – Woods and Plastics | $ | |
| Division 7 – Thermal and Moisture Protection | $ | |
| Division 8 – Doors and Windows | $ | |
| Division 9 – Finishes | $ | |
| Division 10 – Specialties | $ | |
| Division 11 – Equipment | $ | |
| Division 13 – Special Construction | $ | |
| Division 14 – Conveyor Sys | $ | |
| Division 15 – Mechanical | $ | |
| Division 16 – Electrical | $ | |
| Sub Total Amount | $ | |
| GC Markup          % | $ | GC Representative: |
| Applicable Use Tax | $ | Title: |
| Budget Amount Only Total | $ | Date: |
| Owner Approval | | |

#4840-00 and 1305-01 Janesville, Wisconsin Contract (v19)

RECEIVED NOV 0 1 2005

General Contractor | WILLIAM A. RANDOLPH, INC.

# WAL-MART®

WAL-MART STORES, INC. * 2001 S.E. 10TH STREET * BENTONVILLE, AR 72716-0550 * (479) 204-1076

**BIDFORM**
Page 1 of 5
INVITATION TO BID

Re: # 1305-1 (Janesville, WI)
    # 4840-00 Sam's Club

186,703 Sq Feet-WM; 139.930 Sq Feet-Sam's

Bid Date: 10/28/2005

Time: Prior to 3:00 PM
**Central Daylight Savings Time**

The undersigned, having examined the Drawings, Specifications, General Conditions, Supplementary Conditions, Special Conditions, and other related documents, the site of the proposed Work and being familiar with all conditions surrounding the proposed Project, hereby propose to furnish all labor, materials, equipment and supervision to complete the Project in accordance with the contract documents within the time set forth herein for the sums of:

**1. DIVISION 0 & 1 (Wal-Mart)**
- Fee
- General Conditions
- Bonds
- Other
- Special Use Tax (if applicable)                                    $ | 0 |
**Subtotal for Division 0 and 1 (Wal-Mart)**                          $ | 1,100,000 |

**2. DIVISION 2 (Wal-Mart)**
- Earthwork                                                          $ | 800,000 |
- Retaining / Screen Walls / Concrete                               $ | 800,000 |
- Utilities                                                         $ | 800,000 |
- Paving / Signage & Markings / Parking Lot Lighting                $ | 500,000 |
- Landscape, Irrigation & Other                                     $ | 150,000 |
**Subtotal for Division 2**                                         $ | 3,050,000 |

**3. EROSION AND SEDIMENT CONTROLS (Wal-Mart)**
- Labor, Material, equipment and supervision to meet the requirements of the Storm Water Permit, Erosion and Sediment Control Plans, and Storm Water Control described in Specification Section 2370.
**Subtotal for Erosion and Sediment Controls**                      $ | 300,000 |

**4. DIVISION 2A OFF-SITE IMPROVEMENTS AND APPURTENANCES TOTAL (Wal-Mart)**
- Paving, Road Work and Appurtenances                               $ | 0 |
- Earth Work, Utilities and Landscaping                             $ | 450,000 |
- Traffic Signals                                                   $ | 0 |
**Subtotal for Division 2A Off-Site Improvements and Appurtenances Total** $ | 450,000 |

**5. BUILDING & APPURTENANCES (Wal-Mart)**
- Building Structure / Shell Work Division 3-7                       $ | 4,300,000 |
- Building Finishes Division 8-9                                     $ | 1,000,000 |
- Building Equipment & Finishes Division 10-13                       $ | 425,000 |
- Building MEP Mechanical, Electrical, Piping and Fire Sprinkler System $ | 1,500,000 |
**Subtotal for Building and Appurtenances**                         $ | 7,225,000 |

**Wal-Mart Total**     $ [ 12,125,000 ]

**Bid Form**
Page 2 of 5
Invitation to Bid

**1. DIVISION 0 & 1 (Sams Club)**
- Fee
- General Conditions
- Bonds
- Other
- Special Use Tax (If applicable)     $ | 0 |

Subtotal for Division 0 and 1     $ | 1,000,000 |

**2. DIVISION 2 (Sams Club)**
- Earthwork     $ | 500,000 |
- Retaining / Screen Walls / Concrete     $ | 500,000 |
- Utilities     $ | 500,000 |
- Paving / Signage & Markings / Parking Lot Lighting     $ | 400,000 |
- Landscape, Irrigation & Other     $ | 150,000 |

Subtotal for Division 2     $ | 2,050,000 |

**3. EROSION AND SEDIMENT CONTROLS (Sams Club)**
- Labor, Material, equipment and supervision to meet the requirements of the Storm Water Permit, Erosion and Sediment Control Plans, and Storm Water Control described in Specification Section 2370.

Subtotal for Erosion and Sediment Controls     $ | 300,000 |

**4. DIVISION 2A OFF-SITE IMPROVEMENTS AND APPURTENANCES TOTAL (Sams Club)**
- Paving, Road Work and Appurtenances     $ | 0. |
- Earth Work, Utilities and Landscaping     $ | 0 |
- Traffic Signals     $ | 0 |

Subtotal for Division 2A Off-Site Improvements and Appurtenances Total     $ | 0 |

**5. BUILDING & APPURTENANCES (Sams Club)**
- Building Structure / Shell Work Division 3-7     $ | 3,200,000 |
- Building Finishes Division 8-9     $ | 650,000 |
- Building Equipment & Finishes Division 10-13     $ | 75,000 |
- Building MEP Mechanical, Electrical, Piping and Fire Sprinkler System     $ | 1,500,000 |
    $ | 5,415,000 |

Subtotal for Building and Appurtenances

Sam's Club Total     $ | 8,765,000 |

**GRAND TOTAL BASE BID WITH NO ALTERNATES**
**WAL-MART AND SAMS CLUB TOTAL ADDED TOGETHER**     $ | 20,890,000 |

CONSTRUCTION PERIOD WAL-MART:
The Contractor shall mobilize and begin construction within five (5) days following the telephone notice of award. The Contract start date shall be within the same five (5) day time period and shall be agreed upon by Owner and the Contractor. Contractor hereby acknowledges, agrees and covenants that, if Contractor is awarded the Contract to perform the Work and Contractor begins performing any of the Work before receiving a fully executed copy of the Contract that has been signed by duly authorized officers of Contractor and Owner, then commencing performance of the Work shall serve as, and shall be deemed to constitute, Contractor's acceptance of, and agreement to be bound by, the terms and conditions of the Contract Documents included in the Invitation to Bid to the same extent and with the same effect as though such documents had been fully executed, and Contractor shall fully comply with the terms and conditions thereof. In such an event, once the Contractor has received a fully executed copy of the Contract that has been signed by duly authorized officers of Contractor and Owner, the terms and conditions of the Contract Documents, as executed by the parties, shall supercede this provision and shall govern the performance of the Work and the obligations of the parties with respect thereto, and the effective date of the fully executed and delivered Contract shall be the date on which Contractor began performing the Work. The Contractor is hereby committing adequate forces to meet the following milestone dates and achieve the Substantial Completion of all construction indicated in the Contract Documents on or before **September 4, 2006** per Specification Section 01320 and 00800. The Contractor agrees it has sole responsibility to provide all necessary labor, equipment and materials and any and all possible protection of the Project from weather conditions so construction can continue without interruption and the Project and the milestones listed can be completed on or before the stipulated dates as indicated.

Building pad to be 100% complete by no later than  250 days prior to Substantial Completion.

Site utilities to be 100% complete by no later than  90 days prior to Substantial Completion.

Building foundations to be 100% complete by no later than  230 days prior to Substantial Completion.

Masonry shall be 100% by no later than 160 days prior to Substantial Completion.

Roof shall be 100% dried in by no later than 90 days prior to Substantial Completion.

Metal Stud Framing shall be 100% complete by no later than 60 days prior to Substantial Completion.

First lift of the Asphalt paving shall be 100% complete by no later than  60 days prior to Substantial Completion.

Second lift of the Asphalt paving shall be 100% complete by no later than  30 days prior to Substantial Completion.

Road Improvements / Traffic signals shall be 100% operational by no later than 30  days prior to Substantial Completion.

Landscape / Irrigation  shall be 100% complete by no later than 30 days prior to Substantial Completion.

Punch list complete shall be 100% complete by no later than 7 days prior to Substantial Completion.

**Bid Form**
Page 4 of 5
Invitation to Bid

SAMS CLUB may, at any time during the progress of the Work, alter, change, subtract from or add to the plans and specifications or scope of Work without violating the Contract or the terms thereof. The cost of Change Orders, as described in Supplemental Conditions Article 7.2.3, for handling these changes shall not exceed ten percent (10%) of the costs of the work added or, in the case or work reductions, three percent (3%) for the costs of work deducted from the original scope of work. This fee applies to work by the Contractors' own forces and the Subcontractor's and Sub-subcontractor's own forces.

CONSTRUCTION PERIOD SAMS CLUB:
The Contractor shall mobilize and begin construction within five (5) days following the telephone notice of award. The Contract start date shall be within the same five (5) day time period and shall be agreed upon by Owner and the Contractor. Contractor hereby acknowledges, agrees and covenants that, if Contractor is awarded the Contract to perform the Work and Contractor begins performing any of the Work before receiving a fully executed copy of the Contract that has been signed by duly authorized officers of Contractor and Owner, then commencing performance of the Work shall serve as, and shall be deemed to constitute, Contractor's acceptance of, and agreement to be bound by, the terms and conditions of the Contract Documents included in the Invitation to Bid to the same extent and with the same effect as though such documents had been fully executed, and Contractor shall fully comply with the terms and conditions thereof. In such an event, once the Contractor has received a fully executed copy of the Contract that has been signed by duly authorized officers of Contractor and Owner, the terms and conditions of the Contract Documents, as executed by the parties, shall supercede this provision and shall govern the performance of the Work and the obligations of the parties with respect thereto, and the effective date of the fully executed and delivered Contract shall be the date on which Contractor began performing the Work. The Contractor is hereby committing adequate forces to meet the following milestone dates and achieve the Substantial Completion of all construction indicated in the Contract Documents on or before **September 4, 2006**  per Specification Section 01320 and 00800. The Contractor agrees it has sole responsibility to provide all necessary labor, equipment and materials and any and all possible protection of the Project from weather conditions so construction can continue without interruption and the Project and the milestones listed can be completed

on or before the stipulated dates as indicated.

Building pad to be 100% complete by no later than 250 days prior to Substantial Completion.

Site utilities to be 100% complete by no later than 90 days prior to Substantial Completion.

Building foundations to be 100% complete by no later than 230 days prior to Substantial Completion.

Masonry shall be 100% by no later than 160 days prior to Substantial Completion.

Roof shall be 100% dried in by no later than 90 days prior to Substantial Completion.

Metal Stud Framing shall be 100% complete by no later than 60 days prior to Substantial Completion.

First lift of the Asphalt paving shall be 100% complete by no later than 60 days prior to Substantial Completion.

Second lift of the Asphalt paving shall be 100% complete by no later than 30 days prior to Substantial Completion.

Road Improvements / Traffic signals shall be 100% operational by no later than 30 days prior to Substantial Completion.

Landscape / Irrigation shall be 100% complete by no later than 30 days prior to Substantial Completion.

Punch list complete shall be 100% complete by no later than 7 days prior to Substantial Completion.

Receipt of the following is herewith acknowledged:

| | |
|---|---|
| Addenda #1 | 10/12/05 |
| Addenda #2 | 10/13/05 |
| Addenda #3 | 10/21/05 |
| Addenda #4 | 10/21/05 |
| Addenda #5 | 10/24/05 |
| Addenda #6 | 10/24/05 |
| Addenda #7 | 10/25/05 |
| Addenda #8 | |
| Addenda #9 | |
| Addenda #10 | |

**Bid Form**
Page 5 of 5
Invitation to Bid

DATE: | 10/28/05

FIRM: | WILLIAM A. RANDOLPH, INC.

PROJECT MANAGER *(MUST BE COMPLETED)*: | TIM WADDICK

ADDRESS: | 820 LAKESIDE DRIVE - GURNEE

PHONE: | 847-856-0123

PROJECT SUPERINTENDENT: **(WAL-MART)**
TYPE NAME: | MIKE HILTON   3|31|06
DATE OF WAL-MART SWPPP CERTIFICATION: | 2329

PROJECT SUPERINTENDENT: **(WAL-MART)**
TYPE NAME: | NEIL MIKULA   3|31|06
DATE OF WAL-MART SWPPP CERTIFICATION: | 02143

PROJECT SUPERINTENDENT: **(SAMS CLUB)**
TYPE NAME: | MIKE MCMULLIN   3|31|06
DATE OF WAL-MART SWPPP CERTIFICATION: | 2332

PROJECT SUPERINTENDENT: **(SAMS CLUB)**
TYPE NAME: | LOUIE JONES   6|9|06
DATE OF WAL-MART SWPPP CERTIFICATION: | 02737

_This is the Contractor's designated representative responsible to inspect erosion and sediment controls and certify compliance._

The "Firm" is a | CORPORATION | *(Corporation/Partnership)* located in the

state of | IL | *(State)* and is duly authorized to perform under

License No. | NA | *(if required)* as a General Contractor in the above Project location.

VICE PRESIDENT    10/28/05

# RANDOLPH

builders ● contractors ● construction managers

RECEIVED

APR 1 0 2006

WM. A. RANDOLPH, INC.

## SUBCONTRACT AGREEMENT
### SC – 360.00 - 05

The "General Contractor" and "Subcontractor" agree to all provisions set forth in this Agreement made on **Wednesday, April 05, 2006** to provide all items as outlined herein.

**PROJECT:**

| | |
|---|---|
| Name | Wal-Mart Supercenter #1305-01 |
| Location | Kettering Street & Rotamer Road, Janesville, WI |
| Owner | Wal-Mart Stores, Inc. |
| Architect | Raymond Harris & Associates |
| Engineer | Arc Design Resources, Inc. |
| Project # | 360 |
| Phase Code | 05-120 |

**GENERAL CONTRACTOR:**

| | | | |
|---|---|---|---|
| Name | William A. Randolph, Inc. | | |
| Address | 820 Lakeside Drive, Suite 3 | | |
| City/State | Gurnee | IL | 60031 |
| Telephone | (847) 856-0123 | | |
| Fax | (847) 856-0696 | | |

**SUBCONTRACTOR:**

| | | | |
|---|---|---|---|
| Name | D & BR Building Systems, Inc. | | |
| Address | 8600 State Hwy. 19 | | |
| City/State | Edgewood | TX | 75117 |
| Telephone | 903-896-7850 | | |
| Fax | 903-896-4304 | | |
| Contact | Randolph Davis | | |

**CONTRACT PRICE**   $ 140,000.00

Upon satisfactory furnishing of all the material and proper performance and completion of the project described herein, the General Contractor agrees to pay the Subcontractor the "contract price" listed above subject to any additions and deductions authorized in this Agreement.

William A. Randolph, Inc.
Subcontract Agreement

## SECTION 1: SCOPE OF WORK

The Subcontractor agrees to supply all supervision, ~~union shop labor,~~ materials, tools, equipment, appurtenances, periodical and final clean up, storage, freight, and any other items necessary to complete the **Structural Steel Installation** on this project. All work is to be performed in accordance with the plans, addenda and project manuals as per the attached Exhibits A through I and according to the Master contract between William A. Randolph, Inc. and Wal-Mart Corp. dated November 15, 2005.

### Inclusions

All Specification Sections Listed Below as applicable to this scope of work:

00700 – General Conditions Complete
00800 – Supplementary Conditions Complete
01100 - Summary Complete
01255 - Request For Information Complete
01310 - Construction Management and Coordination Complete
01320 - Construction Progress Documentation Complete
01330 - Submittal Procedures Complete
01455 - Mechanical Equipment Testing, Adjusting, and Balancing Complete
01458 - Testing Laboratory Services Complete
01500 - Temporary Facilities and Controls Complete
01600 - Product Requirements Complete
01700 - Execution Requirements Complete
01731 - Cutting and Patching Requirements Complete
01740 - Cleaning Requirements Complete
01770 - Contract Closeout Complete

All Specification Sections Listed Below Complete:

1. 05120 – Structural Steel
2. 05210 – Steel Joists
3. 05300 – Steel Deck

This includes but is not limited to the following:

1. Contract Work as outlined in Exhibits A through I.
2. **Submittals / Shop Drawings:** It is understood that time is of the essence therefore all submittals, shop drawings and any required Permit submittals must be completed within two (2) weeks of the receipt of this subcontract agreement.
3. **Change Orders:** It is imperative that all change orders be submitted correctly and in a timely fashion. The change order procedures are illustrated on Exhibit E and will be strictly enforced.



4. **Closeout Documentation:** Closeout documentation is an essential piece of closing a project out successfully and in a timely manner. The closeout documentation is illustrated on Exhibit F. It is expected that these guidelines be followed to ensure a rapid closeout procedure for this subcontractor and all other companies involved in this project.

## Qualifications

1. It is understood that no work will be subcontracted to a third tier subcontractor without the written consent of the General Contractor.

2. If daily clean up is not being maintained to the satisfaction of the General Contractor's on-site project superintendent, the General Contractor reserves the right to enforce an overall clean up of the jobsite on a weekly basis. In addition to the daily clean up responsibilities outlined herein, each subcontractor present at the jobsite will be required to supply one man for a minimum of four (4) hours per week to ensure that a safe and clean workspace is maintained if requested by the General Contractor. The General Contractor reserves the right to provide labor for general clean up at the subcontractor's expense if the procedures above are not conducted to the satisfaction of the onsite superintendent.

3. A mandatory pre-construction meeting will be held with this subcontractor prior to starting their work to review the following:
   - Contract drawings and specifications, shop drawings and submittals.
   - Schedule and manpower
   - All personnel for this subcontractor having involvement in this project shall be in attendance including the manger, superintendent and foreman.

4. Weekly coordination meetings will be held at the jobsite trailer. An individual responsible for decision-making is required to be in attendance at these meetings.

5. The General Contractor will furnish dumpsters for common construction debris. It is understood that this subcontractor is responsible for general clean up of all debris generated by their operations into said dumpsters on a daily basis.

6. It is understood that this subcontractor is responsible to pay for any and all fees associated with licenses required to perform the work as outlined herein.

7. This subcontractor is responsible to abide by all OSHA regulations and conduct weekly safety training. All meeting minutes from safety training should be copied to the project superintendent.

8. This subcontractor will conduct his operations in such a way as to minimize dirt and/or mud from accumulating in the streets and/or parking lots surrounding the project site. If it is determined that dirt and/or mud are left in a street and/or parking lot as a direct result of the operations of this subcontractor, this subcontractor will use his workmen and/or rubber tire equipment to clean streets and/or parking lots.

9. All hoisting, cranes, trucking, lifts and miscellaneous equipment required for installations of this scope of work to be included. Coordination of all deliveries with project superintendent and project manager will be required. The general contractor will not be responsible for additional costs associated with delays due to material deliveries that were not coordinated at least 48 hours in advance



10. All change order requests and change order work must follow the guidelines set fourth on Exhibit E. Change orders must be submitted, approved and issued by William A Randolph, Inc prior to their inclusion on the monthly pay application. To ensure a quick change order process, **PLEASE SUBMIT A LABOR AND EQUIPMENT RATE SHEET WHEN YOU RETURN YOUR CONTRACT.** This sheet will be used throughout the job for extra work and field change work.

11. ALL PAY APPLICATIONS ARE DUE TO OUR OFFICE VIA U.S. MAIL CERTIFIED MAIL OR OVERNIGHT MAIL. EVERY PROJECT WILL HAVE SPECIFIC DUE DATE REQUIREMENTS; ALL DRAW RELATED INFORMATION WILL BE DETAILED ON ATTACHMENT D. ANY PAY APPLICATIONS RECEIVED INCORRECTLY OR AFTER THE DUE DATE WILL NOT BE INCLUDED ON THE PAY APPLICATION TO THE OWNER. ALL PAY APPLICATIONS MUST BE SUBMITTED ON FULLY EXECUTED INDUSTRY STANDARD AIA FORMS.

12. Three (3) original copies of Exhibit H, partial and final waivers, must be fully completed prior to release of any payments.

## SECTION 2: TAXES

The Contract Price as set forth in this Agreement includes, and the Subcontractor shall pay, all federal, state or local taxes which may be levied or assessed with respect to the subject matter hereof by reason of furnishing any material or the performance of any services of the ownership, use or transfer of any property or otherwise prior to the completion of the project and its acceptance by the Owner.

## SECTION 3: CONTRACT PAPERS

By signing this Agreement, Subcontractor agrees to complete the project in accordance with this Agreement, the Owner's and General Contractor's Master Contract, and all other documents (specifications, addenda, exhibits, schedules, drawings, plans, general, supplementary, and other conditions) which relate to this Agreement. This includes all changes and modifications, including all details prepared by the architect, engineer, or contracting officer, representing the Owner of this project. Taken together, this Agreement and all other papers relating to the completion of this project are called the "Contract Papers".

The Subcontractor agrees that it has thoroughly read the Contract Papers and looked at the job site and adjoining premises relating to this project. Having familiarized itself with the complexities of this job, Subcontractor agrees that the General Contractor has made no misrepresentations of any kind regarding the completion of this project.

By starting work on this project, the Subcontractor communicates to the General Contractor that the job site is in proper condition for such work to begin. If, before starting the work, Subcontractor finds that the job site is not in proper condition for such work to begin, Subcontractor must immediately notify General Contractor in writing. Written notification to the General Contractor must specifically state what needs to be changed or modified on the job site, so the Subcontractor can begin its work.



All questions regarding the true meaning or construction of the Contract Papers will be determined as provided in said Contract Papers.

## SECTION 4: APPLICATION OF THIS AGREEMENT

By signing this Agreement, the Subcontractor binds itself to the General Contractor in two ways. One, the Subcontractor is bound to the General Contractor by the terms of this Agreement. Two, regarding work to be completed by the Subcontractor, the Subcontractor is bound to the General Contractor under the same terms and conditions that the General Contractor is bound to the Owner under the Owner's and General Contractor's Master Contract. The Subcontractor is to report to the General Contractor regarding its obligations, just as the General Contractor is to report to the Owner regarding its respective obligations. Thus, by way of this Agreement, the Subcontractor assumes the same obligations and responsibilities to the Owner (regarding work to be completed by the Subcontractor) that General Contractor assumes to the Owner by way of the Master Contract.

Under the Owner's and General Contractor's Master Contract, the Owner is given certain rights against the General Contractor which enable the Owner to enforce proper completion of the project. This Agreement grants the General Contractor these exact same rights, options, privileges and remedies against Subcontractor, in regard to enforcing completion of the Subcontractor's portion of the project. Therefore, the General Contractor can enforce completion of the project upon the Subcontractor in exactly the same manner the Owner can enforce completion of the project against the General Contractor.

If any provision of this Agreement is inconsistent with the Owner's and General Contractor's Master Contract, this Agreement governs.

The Subcontractor agrees to be bound, to the same extent that the General Contractor is bound, by all decisions of the Owner, other person, court, body, or arbitrator insofar as such rulings or decisions pertain to the Subcontractors' work or the General Contractor's obligations to the Owner.

## SECTION 5: SUBLETTING AND ASSIGNMENTS

The Subcontractor will not sublet any part of the work, nor assign this Agreement, or any money due or to become due under this Agreement, in whole or in part, without the prior written consent of the General Contractor. No such written consent by the General Contractor will release the Subcontractor from any obligation set forth in this Agreement, unless it is expressly so provided and written consent is received.

## SECTION 6: PARTIES IN INTEREST

This Agreement shall be binding on and inure to the benefit of the parties hereto, their heirs, administrators, executors, transferees, successors, and assigns.

William A. Randolph, Inc.
Subcontract Agreement

Nothing in this Agreement, whether express or implied, is intended to confer any right or remedy under or by reason of this Agreement on any person other than the General Contractor and Subcontractor and their respective successors and assigns. Nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third person to any party to this Agreement. No provision of this Agreement shall give any third person any right of subrogation or action against any party to this Agreement.

## SECTION 7: BONDS

~~As a guarantee of its faithful performance of this Agreement, the Subcontractor agrees that it will furnish without expense to the General Contractor, a performance bond and a labor and material payment bond in form as designated by the General Contractor for the project described in Section 1. Each bond must be for the full amount of this Agreement, executed by corporate surety or sureties satisfactory to the General Contractor. No change or alteration of the terms or provisions of this Agreement, or extension of time or premature or over payment to the Subcontractor, will in any way operate to release the surety on said bonds.~~

## SECTION 8: INSURANCE

Before beginning with any work, the Subcontractor must give the General Contractor four copies of its certificates of insurance, issued by insurance companies approved by the General Contractor and an A. M. Best Rating of A X or better, which show coverage by the Subcontractor necessary to cover its responsibility and liabilities on the type of project involved in this Agreement and of the types and in the amounts required by the Master Contract and Contract Documents. In the absence of coverage or limits stated within the contract documents, **the minimum coverage cannot be less than the type and amounts set forth below.** If the Master Contract contains coverage requirements and are set forth within attachment C, then compliance shall be the greater coverage and limits requirements between the Master Contract and the below listed requirements. Subcontractor shall keep said insurance in full force thru final acceptance of the work by the Owner and until contract insurance requirements end.

| | |
|---|---|
| Project Name: | Wal-Mart Sam's Club #4840-00 |
| Project Number: | 360.01 |
| Location: | Kettering Street & Rotamer Road, Janesville, WI 53545 |

## REQUIRED ADDITIONAL INSURED

| | |
|---|---|
| Owner: | Wal-Mart Stores, Inc. |
| Architect: | Raymond Harris & Associates |
| Engineer: | Arc Design Resources, Inc. |
| General Contractor: | William A. Randolph, Inc. |

**GENERAL LIABILITY** Subcontractor shall carry standard ISO General Liability coverage, written on an occurrence basis - including Completed Operations. The coverage must be endorsed to name **William A. Randolph, Inc.** as an "additional insured" (Form CG 2010 11/85 or equivalent – meaning the additional insured coverage form to include work in progress - i.e. ongoing operations and completed work – i.e. Completed Operations) and include the Owner,



Architect and others as "additional insured's" as required in the Master Contract documents for a period of two (2) years after completion of the project. The "Additional Insured" form shall state that this insurance **shall be primary without right of contribution** from any other insurance available to the "additional insured's" and the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance. **Copy of the additional insured endorsement form will be attached to the Certificate of Insurance.** A waiver of subrogation will be provided and noted on the certificate.

The GL shall include such coverage, but not limited to, premises/operations, employees as insured's, explosion, collapse and underground (XCU), broad form contractual (including personal injury), products/completed operations, independent contractors, broad form property damage and personal injury. The CGL must be written on an occurrence basis, with minimum limits of:

| | |
|---|---|
| Each Occurrence | $1,000,000 |
| General Aggregate - Per Project | $2,000,000 |
| Products & Completed Operations Aggregate | $2,000,000 |
| Personal/Advertising Injury | $1,000,000 |
| Fire Damage | $100,000 |
| Medical Payments | $10,000 |

**COMPREHENSIVE AUTOMOBILE LIABILITY** on occurrence basis covering all Owned, Non-Owned and Hired Vehicles for limits of liability equal to $1,000,000 Combined Single Limit.

**WORKER'S COMPENSATION** including Occupations Disease insurance meeting the statutory requirements of the State in which work is to be performed together with a Broad Form All States Endorsement and containing Employer's Liability insurance in an amount of at least:

| | |
|---|---|
| Each Accident | $500,000 |
| Disease – Policy Limit | $500,000 |
| Disease – Each Employee | $500,000 |

Workers Compensation shall waive the rights of subrogation in favor of all additional insured's.

**UMBRELLA LIABILITY** and/or **EXCESS LIABILITY** with coverage at least as broad as the underlying policies.

Occurrence and Aggregate Limits    ~~$5,000,000~~ *50,000,000*

A certificate of insurance form must be filed with William A. Randolph, Inc. prior to the commencement of any work and shall state coverage which will not be altered, cancelled or allowed to expire without thirty (30) days written notice by certified mail to William A. Randolph, Inc. If any of the above coverage's are subject to or are in excess of any deductibles or self-retention, these amounts must be stated on the certificate, and said deductibles and self-retention will be the sole responsibility of Subcontractor. A duplicate certificate and additional insured endorsement shall be sent to T.J. ADAMS GROUP, 333 EAST BUTTERFIELD ROAD, SUITE 500, LOMBARD, IL 60148, ATTN: LYNN A. THOMPSON.



William A. Randolph, Inc.
Subcontract Agreement

It is understood and agreed that authorization is hereby granted to refuse entry to job site and to withhold payments to Subcontractor until a properly executed Certificate of Insurance is received by William A. Randolph, Inc. The acceptance of an insurance certificate shall not be a waiver of any of the requirements set forth within this document.

If the Subcontractor fails to deliver such certificates to the General Contractor within forty-eight (48) hours after demand, or upon cancellation fails to replace them after demand, the General Contractor may take one of two course of action: (1) terminate the Subcontractor's work under this Agreement; or, (2) the General Contractor, in its sole discretion, may obtain such insurance and the Subcontractor hereby agrees to repay the General Contractor, on demand, the full cost of the insurance. If the Subcontractor fails to repay the General Contractor, the General Contractor may deduct the cost of all paid insurance payments from any money coming due to the Subcontractor under this Agreement.

## SECTION 9: SHOP DRAWINGS

Where required for proper execution of the work, the Subcontractor will submit prints of each detailed shop drawing in the quantity requested by the General Contractor for approval and use. After corrections have been made and the drawings are approved by the General Contractor Architect-Engineer, and the Owner or Owner's representative, prints of each drawing as required by the General Contractor will be resubmitted for final distribution.   In dealing with shop drawings, the Subcontractor's must pay special attention to the Contract Papers.   The Subcontractor must comply with all requirements set forth in the Contract Papers with reference to the work to be performed under this Agreement. The approval of any drawing will not relieve the Subcontractor of its obligation to perform the work in the manner necessary to produce the results required by the Contract Papers.

## SECTION 10: SAMPLES AND TESTING

The Subcontractor will submit all samples and arrange for all testing of materials to be used in connection with its work as required by the Contract Papers. Unless other specific arrangements are made in writing, three copies of all samples and test reports will be submitted to the General Contractor. The General Contractor will then submit the samples and test reports to the Owner or Owner's representative for consideration and approval.   Samples and test reports will be submitted well in advance of the start of the Subcontractor's work, so construction of the entire project or any part thereof is not delayed.

## SECTION 11: COMMENCEMENT – SEQUENCE - COORDINATION OF THE WORK

(a) The Subcontractor agrees that time is of the essence of this Agreement and will, subject to review and further direction of the General Contractor:

(1) Immediately prepare for performance of the work;

(2) Begin work as soon as the progress of each portion of the job will permit; and, in any event, proceed on any specific portions of the work within five (5) days after notice from the General Contractor relating thereto.

(3) Provide sufficient quantity of materials, supervision, efficient workmen, and equipment to diligently perform and carry on such portions of the work in such locations, sequence, manner and time, as the General Contractor may direct, to meet the completion date required by the Contract Papers.

(4) Submit a detailed written request to the General Contractor, within thirty (30) days from the date of this Agreement, for all such items of information as may be necessary to fit and coordinate the Subcontractor's work with all other branches of the work. This written request will furnish to the General Contractor such details and written information related to the Subcontractor's work as is needed for the proper coordination if its work with that of other trades. No time extension will be allowed to the Subcontractor for lack of details or other information unless the Subcontractor has made a request for such details or other information in writing to the General Contractor and the General Contractor fails to respond to the Subcontractor in a reasonable amount of time. The Subcontractor will schedule and perform its work to avoid conflict or interference with the work of others, and will so plan and conduct its work as not to interfere with the General Contractor, other Contractors, or trades. The Subcontractor will participate in the preparation of coordinated drawings in areas of congestion, specifically noting and advising the General Contractor of any such interference. The Subcontractor will take all precautions necessary to protect the work of others, whether completed or in process, from damage or disruption.

(b) The Subcontractor agrees to complete its work without delaying other work being performed or to be performed and, on order of the General Contractor, to do certain parts of its work in preference to others. The General Contractor may for any cause postpone or extend the time for performance of the work covered by this Agreement or any portion thereof, and no such postponement or extension shall alter the rights and remedies of the parties under this Agreement. In addition, a time extension will not in any way prejudice or impair the security of the General Contractor under any bond given in pursuance of the requirements set forth in this Agreement. Lastly, such a time extension will not release this Subcontractor from his obligation to complete the work in full compliance with the terms of this Agreement and any authorized time extensions.

(c) In the event that unionized employees of the Subcontractor or any contractor working on the project go on strike for any reason, including but not limited to a strike to protest the use of non-unionized employees on the project, General Contractor will institute a two gate system (the "Two Gate System"). One gate will be marked "Union Workers" and will be used only by unionized workers, including Subcontractor's unionized employees, until the completion of the project, including but not limited to the work identified in Section 1 of this Agreement. The other gate will be marked ("Non-Union Workers") and will be used only by non-unionized



William A. Randolph, Inc.
Subcontract Agreement

workers, including the Subcontractor's non-unionized employees, until the completion of the project, including but not limited to the work identified in Section 1 of this Agreement. The Subcontractor and Subcontractor's employees must report for work at the project at the usual starting time on the first regular work day following the implementation of the Two Gate System regardless of whether the Subcontractor's workers are unionized or non-unionized workers. The Subcontractor or the Subcontractor's employees' failure to report for work at the usual starting time on the first regular work day following the implementation of the Two Gate System will result in a breach of this Agreement.

(d) If a sufficient quantity of materials and workmen are not delivered or furnished promptly, thereby causing or threatening to cause delay in the progress of the work, the General Contractor has the right to investigate the cause and expedite such deliveries of materials and workmen. All expenses incurred by the General Contractor in an effort to remedy a delay or threat of delay will be charged to and paid by the Subcontractor.

## SECTION 12: OVERTIME
Upon written order from the General Contractor, the Subcontractor will work overtime to the extent deemed necessary by the General Contractor to expedite and to comply with all requirements relating to sequence, time of performance, and date of final completion of the Master Contract.

Where the Subcontractor is not in default under any of the provisions of this Agreement, the General Contractor will reimburse the Subcontractor only for the premium actually paid by the Subcontractor on productive labor during such overtime, and state and federal taxes, based upon such premium. Such premium will be computed as the difference between the Subcontractor's wage rates as established by local agreements for straight time and overtime.

If, however, in the opinion of the General Contractor, the Subcontractor is behind schedule in performing the work covered under this Agreement, or otherwise in default under this Agreement, then the resulting costs and expenses incurred will be borne entirely by the Subcontractor.

## SECTION 13: TERMINATION - RIGHT TO PROCEED - DELAYS - EXTENSION OF TIME
Should the Subcontractor fail at any time to supply a sufficient number of properly skilled workmen or sufficient materials and equipment of the proper quality; fail in any respect to complete the work with promptness and diligence; fail in the performance of any of the Agreements contained herein, the General Contractor has the option to provide such labor, materials and equipment. The cost of such labor, materials, and equipment, along with any additional loss or damage occasioned thereby, will be deducted from any money then due or to become due to the Subcontractor under this Agreement.

In addition, if the Subcontractor at any time refuses or neglects to supply a sufficiency of skilled workmen or materials or equipment, fails in any respect to complete the work with promptness,



causes by any action or omission the stoppage or interference with the work of the General Contractor or other subcontractors, fails in the performance of any of the covenants set forth in this Agreement, becomes insolvent, or unable to meet its debts as they mature, the General Contractor has the option at any time after serving forty-eight (48) hours written notice, mailed to the Subcontractor's place of business, to terminate the Subcontractor's work. The General Contractor may then ~~take possession of said plant and work, materials, tools, appliances and equipment of this Subcontractor and~~ through itself or others provide labor, equipment, and materials to complete the work on such terms and conditions as will be deemed necessary. Costs incurred will be deducted from any money then due or to become due to the Subcontractor under this Agreement. Costs incurred are, but not limited to, all charges, expenses, losses, costs, damages, and attorneys' fees, incurred as a result of the Subcontractor's failure to perform. If the General Contractor terminates the Subcontractor, the Subcontractor shall not be entitled to any further payments under this Agreement until the work covered by this Agreement has been completed and accepted by the Owner, and payment has been received by the General Contractor from the Owner with respect thereto. In the event that the unpaid balance due exceeds the expense incurred by the General Contractor, the difference shall be paid to the Subcontractor, but if such expense exceeds the balance due, the Subcontractor agrees to promptly pay the difference to the General Contractor.

Should the Subcontractor be obstructed or delayed in the completion of the work as a result of un-foreseeable causes beyond the control of the Subcontractor, and not due to the Subcontractor's fault or neglect, including but not restricted to acts of God or of the public enemy, acts of government, fires, floods, epidemics, quarantine regulations, strikes or lockouts, the Subcontractor shall notify the General Contractor in writing, within twenty-four (24) hours after the start of such delay, stating the cause or causes thereof. The General Contractor shall immediately ask the Owner for an extension of time stating the cause of the delay asserted by the Subcontractor. The Subcontractor will then become entitled to only such extensions of time for completing the work as the Owner may grant, as a result of the unforeseeable cause. The extension of time granted by the Owner will be a final and conclusive decision.

If from causes beyond the control of the General Contractor, including but not limited to strikes, lockouts, fires, acts of God or the public enemy, floods, epidemics, quarantine regulations, and freight embargos, the General Contractor is obstructed or prevented from performing any work on the project, and considers it inadvisable to receive materials therefore, then the Subcontractor will, upon notification from the General Contractor, stop deliveries to and performance of any work agreed to under this Agreement until the General Contractor state that the conditions are such that it is advisable to resume operations. The Subcontractor agrees to and will resume delivery of materials and performance of this work as required by written notification to it by the General Contractor.

No interruption, cessation, postponement or delay in the start or progress of the work from any cause whatsoever, even if caused by the Subcontractor, including but not limited to disputes, will relieve the Subcontractor of its duty to perform or give rise to any right to damages or additional compensation from the General Contractor except to the extent that reimbursement is received



William A. Randolph, Inc.
Subcontract Agreement

from the Owner by the General Contractor therefore with respect to the Subcontractor's operations. The Subcontractor expressly waives and releases any other or further right to such damages in excess of an amount commensurate (proportionate) with any allowance related to this Subcontractor's operations which the General Contractor receives from the Owner. In addition, the Subcontractor agrees that no additional compensation or damages shall be allowed for any cause except as provided in this paragraph and Section 2. In any event the Subcontractor shall diligently proceed with the work as directed by the General Contractor.

In the event the Master Contract, or any part thereof, is terminated for any reason whatsoever, the General Contractor shall have the right to terminate this Agreement with Subcontractor.

## SECTION 14: INSPECTION AND APPROVAL-CORRECTIONS

The work herein described will be subject at all times to the inspection and approval of the General Contractor and Owner, to whom it shall be made entirely satisfactory, and the Subcontractor will provide sufficient, safe and proper facilities at all times for such inspection of the work.

Within 24 hours after receiving written notice from the General Contractor, the Subcontractor will, at its own expense and without injury to the surrounding work, proceed to remove and correctly replace all portion of its work which either the General Contractor or Owner condemns as failing to conform to the Contract Papers. In addition, the Subcontractor will reimburse the General Contractor for any resulting loss of damage suffered by it. In the event the Subcontractor fails to correct the defective work, the General Contractor or Owner may remedy it at the Subcontractor's expense and deduct the cost from any amount then due or to become due the Subcontractor. If such amount is insufficient, or if no amount shall be due, then the Subcontractor will pay all additional costs to the General Contractor. If, in the opinion of the General Contractor and Owner it is not worthwhile to correct the defective work, the General Contractor may assess and deduct from any amount then due or to become due the Subcontractor, or if such amounts are insufficient the Subcontractor agrees to pay, the difference in value, as determined by the Owner, between the work as performed and the work as required by the Contract Papers.

## SECTION 15: GUARANTEES

The Subcontractor warrants that all materials and equipment furnished will be new unless otherwise specified. The Subcontractor also warrants that all work under this Agreement will be of good quality, free from faults and defects, and in conformance with the Contract Papers. The Subcontractor unconditionally guarantees the work against any and all defects in materials or workmanship for the longer of (1) one year following the date of final acceptance of the work by General Contractor and Owner, or (2) the time specified for General Contractor's guarantee of the work, if any, to the Owner. The warranty provided by way of this Agreement will be in addition to and not in limitation of any other warranty or remedy provided by law or by the Contract Papers.

The Subcontractor agrees that if any portion of said materials or workmanship furnished by him will not in every way be good, sound, efficient and well-suited for the purposes for which it is intended, and such deficiency becomes apparent, detected by inspection, detected within the time of the guarantee period, or is detected in the absence of any specified guarantee, then the Subcontractor may be liable to the General Contractor or Owner. The Subcontractor will, at any time and upon notice from General Contractor or Owner, promptly correct any specified faults or imperfections in workmanship or material. The Subcontractor is to pay all damages for such fault; and in the event of the failure of the Subcontractor to so correct the same, the General Contractor or Owner may remedy the same at the Subcontractor's expense and deduct the cost of damages from any amount then due or to become due to the Subcontractor. If such amount shall be insufficient, or if there will be nothing due the Subcontractor, the Subcontractor will pay the General Contractor such costs and damages, or the balance thereof.

Neither the making of the final payment under this Agreement, nor any provision of the aforesaid plans and specifications, nor any act of General Contractor or Owner will relieve the Subcontractor of responsibility for encumbrances and liens growing out of the performance of this Agreement or for the installation of faulty materials or workmanship. Unless otherwise specified, the Subcontractor will remedy any defects and will pay for any damage or additional work resulting from the defective work, which appears within the period referred to in this Agreement.

The Subcontractor will furnish, in a form satisfactory to the General Contractor and Owner and before final payment is made by the General Contractor to the Subcontractor, all specific and general guarantees from the Subcontractor and the manufacturers of materials used in connection with its work. In addition, the Subcontractor will furnish to the General Contractor all bonds relating to materials used in connection with its work, as required by the Contract Papers.

## SECTION 16: PAYMENTS

In regard to all work agreed to in the Contract Papers and discounting any prior estimates, the General Contractor agrees to make monthly payments for the Subcontractor's work, to the extent that it has been completed. The monthly payments will be in the amount allowed and paid to the General Contractor by the Owner. Only upon the General Contractor receiving payment from the Owner does the General Contractor become obligated to make payments to the Subcontractor. Further, 10% of all monthly payments to the Subcontractor will be retained. This amount will be retained for final payment, on the condition that all work is completed by a date satisfactory to the General Contractor and all improper or rejected work has been corrected.

Within 15 days from the date of this Agreement, the Subcontractor must give the General Contractor a detailed and itemized breakdown of all work covered by this Agreement and the Contract Papers. The Contract Price must be distributed, among the individual items of material, labor, and other costs, on a mutually agreed basis that proportionately reflects all quantities and values of the above. Each month, and in accordance with the Contract Papers, the Subcontractor must give the General Contractor a written request for a progress payment. This written request



William A. Randolph, Inc.
Subcontract Agreement

for payment must contain a true and accurate estimate of the work completed during that month, accompanied by a breakdown that conforms to the one provided for above.

These written requests for payment will be prepared by the Subcontractor on special forms provided by the General Contractor. All written requests for payment will contain the following: (1) the Subcontractor's sworn statement certifying that it has fully paid for the work performed and materials furnished for which payment is requested from the General Contractor; and, (2) waivers under the applicable mechanics' lien laws executed by the Subcontractor and each of the Subcontractor's suppliers and its subcontractors, if any. In addition, when requested by the General Contractor, the Subcontractor will give the General Contractor certified copies of payrolls and receipted invoices and vouchers substantiating full payment by the Subcontractor for such work, materials and costs. In the event any of the above requirements have not been fulfilled, the General Contractor may withhold any payment, or portion thereof.

On the condition that the General Contractor has received from the Owner written approval and full payment for the work described herein, final payment to the Subcontractor will be made 30 days after the work has been completed by the Subcontractor so long as it is to the satisfaction of the Owner and General Contractor. Final payment is further subject to the General Contractor's prior receipt from the Subcontractor all written guarantees and bonds; all systems operating and maintenance manuals; parts lists, spare parts, and tools as required by the Contract Papers in connection with the Subcontractor's work; a final waiver of lien; complete release; and, an affidavit certifying the Subcontractor's payment in full of all items relating to the cost of the work, all in accordance with this Agreement.

No progress payment made by the General Contractor to the Subcontractor will be construed as a waiver of the right of the General Contractor to require the fulfillment of all terms of this Agreement. Neither certificate given nor payment made under this Agreement will constitute any evidence of performance except the final certificate or final payment. Also, neither the final certificate nor final payment will be construed to be an acceptance of defective work or improper materials.

With respect to any notices received by the General Contractor or Owner, the General Contractor may retain out of any payment due or to become due to the Subcontractor an amount sufficient to fully indemnify the General Contractor and the Owner against the following: any lien, charge, claim or demand, asserted against the Owner or General Contractor, their property or any property related to such claim, which is chargeable to the Subcontractor. In addition, the General Contractor has the option to retain any amount it deems essential to assure completion of the Subcontractor's work and satisfaction of the Subcontractor's unpaid accounts.

The General Contractor, on receipt of such notice, further reserves the right to pay directly for any labor, materials, and other costs of the Subcontractor, related in any manner to the Subcontractor's work under this Agreement. If the General Contractor chooses to pay directly, it can then charge the Subcontractor or deduct from the Subcontractor's monthly payments the amount owed to the General Contractor. The Subcontractor expressly waives any rights, claims,

demands, damages or causes of actions, against the General Contractor by reason of any such payments made or money withheld or deducted as mentioned above.

If the General Contractor is compelled to spend money in defending itself, discharging, or otherwise disposing of any claim of lien or other demand in excess of retained or expended sums hereby authorized to be used for the General Contractor's liquidation of any claim arising from or pertaining to this Agreement or the Subcontractor's work under this Agreement, the Subcontractor shall pay the excess amounts spent by the General Contractor upon demand.

REFERENCE EXHIBIT A FOR GOVERNING PAYMENT TERMS OF THIS CONTRACT.

## SECTION 17: AFFIDAVIT OF PAYMENT - WAIVER OF LIEN - RELEASE

~~As further consideration for this Agreement, the Subcontractor waives and releases all lien or right of lien that either now exists or may arise for work or labor performed or materials furnished, under this Agreement under any present or future law upon the building or improvement in connection with which the work is to be performed, the land upon which the same is situated, and upon any money due or to become due to the General Contractor in connection therewith.~~  The Subcontractor agrees to furnish a good and sufficient waiver of lien in writing, of the same tenor and effect as provided above, from all persons and corporations furnishing labor or materials for the completion of the work under this Agreement. The Subcontractor also agrees to submit to the General Contractor, at the time of final payment, an affidavit certifying to the Subcontractor's payment in full for all items relating to the work under this Agreement and a final waiver of lien and complete release, all in the form designated by the General Contractor.

## SECTION 18: OBLIGATIONS AND INDEMNITIES

In further consideration of the payment by the General Contractor of the sum stated in this Agreement, the Subcontractor agrees:

(a) To furnish all machinery, tools, equipment, supplies, temporary offices, sheds, tool houses, hoist and hoist operator, and all other items necessary for the proper performance of its work under this Agreement; to keep the site of the work clean of the Subcontractor's packaging materials, debris and rubbish, including the coffee cups and lunch wrappings of Subcontractor's workmen; and promptly upon completion of the work to remove all its equipment and temporary installations and clean up and remove from the site of the work all debris caused by its operation under this Agreement, and to pay the General Contractor the cost of repairing any damage caused by the Subcontractor including but not limited to replacing broken glass, plaster patching and other restorative work. If the Subcontractor fails to comply with the foregoing, General Contractor, at its option, may cause same to be remedied and charge the expense of the Subcontractor.

(b) To indemnify and save harmless the General Contractor and Owner from and against any and all claims, demands, suits, judgments, loss, damage, liquidated damages, penalties and expense

William A. Randolph, Inc.
Subcontract Agreement

(including legal fees and expenses), liens, liabilities, and costs incurred, by reason of or resulting from, or which may be claimed to have resulted from, the following:

(1) Failure of the Subcontractor to perform its work, or any of the promises herein contained, in strict accordance with this Agreement; including but not limited to the furnishing of defective materials or workmanship, disrupting the General Contractor's efforts to complete the work economically, the causing of the General Contractor's failure to meet the completion date, and delay chargeable to the Subcontractor.

(2) The Subcontractor's operations; including but not limited to claims under any provisions of the Workmen's Compensation or Employer's Liability Acts of the State in which this Agreement is to be performed, or claims by or on behalf of any employee of the Subcontractor or any person claiming injury to person or property caused by the Subcontractor, its servants, agents or employees.

(3) The carelessness or negligence of any act or omission of the Subcontractor, its agents, employees, workmen or Subcontractors; including but not limited to injuries received or death sustained by any person, fellow servant, or others, or arising from damage to any property; it being understood that the Subcontractor shall be liable for any and all damage injury caused by it or its agents, employees, workmen or Subcontractors, although the material was not supplied or the work was not performed by the Subcontractor.

(4) Materials furnished or labor performed by the Subcontractor; the Subcontractor will pay promptly, when due, for all labor and material used or required by it. Cost of labor and materials assumed by the Subcontractor will include, but not be limited to the following: (a) all contributions to employee welfare funds, including pension funds, vacation funds, apprentice funds, industry advancements and the like, if any, and all contributions, taxes or premiums payable under any state or federal laws which are measured upon the payroll of employees, by whomsoever employed, engaged in the performance of the work included in this Agreement; and (b) all local, state, and federal taxes measured by or imposed in connection with the performance of work or the furnishing of materials under this Agreement, including but not limited to all sales and uses taxes as imposed by reason of the purchase or use of any kind of personal property in performance of this work. Should the General Contractor be served with any writ of summons or notice of lien, said General Contractor shall give prompt notice of service of such writ or notice of such claim of lien to the Subcontractor and shall permit the said Subcontractor to defend by its own counsel. If, in the opinion of the General Contractor, the Subcontractor fails to defend with diligence, the General Contractor in its sole discretion may undertake to defend, and all expenses and attorneys' fees incurred as a result thereof shall be charged to the Subcontractor.

(5) Defaults by the Subcontractor hereunder, including but not limited to failure to perform any duties or obligations under this Agreement.

(6) Any claim of infringement of any patent by reason of anything supplied under this Agreement by the Subcontractor; it being understood that any action brought against the General Contractor or Owner founded upon any such claim shall be defended by, and at the sole expense of, the Subcontractor. If, in the opinion of the General Contractor, the Subcontractor fails to defend with diligence, the General Contractor in its sole discretion may undertake to defend. If the General Contractor undertakes to defend, all expenses and attorneys' fees incurred as a result thereof will be charged to the Subcontractor.

(c) That it shall be responsible for the care and protection of all property pertaining to its work including but not limited to materials, supplies, equipment, tools and all of its facilities which are used at or stored at the job site or incorporated in the structure. This responsibility shall continue until the Owner's final acceptance of its work regardless of (1) who furnishes the storage facilities, (2) who holds title to such property, and (3) whether or not progress payments have been made. Subcontractor agrees to fully restore any loss, destruction or damaged work, and to fully indemnify and save harmless both the General Contractor and the Owner from and against any loss or damage due to shortages in any such property resulting from any cause, including but not limited to burglary, theft, damage or destruction, carelessness or improper handling or any other cause which may prevent any part of said property from being used or installed, and accepted as in accordance with the requirements of the Contract Papers, with the sole exception of such portion of said loss, destruction or damaged work as may be covered by insurance of the Owner or General Contractor. Nothing herein will be construed, however, as requiring the Owner or General Contractor to carry insurance other than as stipulated in the Contract Papers between the Owner and the General Contractor.

(d) That in performing this Agreement it will comply with all record-keeping and notice-posting requirements of all applicable federal, state, and local employment-related statutes and the regulations.

(e) In the manufacture, assembly, deliver, erection and installation of materials and performance of the work covered by this Agreement, Subcontractor will only employ labor satisfactory to the General Contractor.

(f) In performing this Agreement, the Subcontractor will comply with all applicable federal, state and local statutes and regulations regarding employment, including recruitment, hiring and composition of the work force, including but not limited to Title VII of the Civil Rights Act of 1964, the Fair Labor Standards Act of 1938, the Immigration Reform Control Act of 1986, the Davis Bacon Act, the Employee Retirement Income Security Act, the Rehabilitation Act of 1973, the Occupational Safety and Health Act of 1970, and Executive Orders 11246, and 12138, all amendments thereto and all regulations issued there under. In particular, without limiting the foregoing:

(1) The Subcontractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Subcontractor will take affirmative action to ensure that applicants are employed, and that employees



William A. Randolph, Inc.
Subcontract Agreement

are treated during employment without regard to their race, color, religion, sex, or national origin. Such action shall include but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Subcontractor agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth provisions of this nondiscrimination clause.

(2) The Subcontractor will, in all solicitations or advertising for employees placed by or on behalf of the Subcontractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(3) The Subcontractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice advising the said labor union or workers' representatives of the Subcontractor's commitments under this section and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The Subcontractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor, and will permit access to his books, records, and accounts by the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(5) In the event of the Subcontractor's non-compliance with the nondiscrimination clauses of this Agreement or with any of the above described rules, regulations, or orders, this Agreement may be canceled, terminated, or suspended in whole or in part.

(6) The Subcontractor will include the provisions of paragraphs (f)(1) through (5) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 25, 1965, so that such provisions will be binding upon each contractor or vendor.

## SECTION 19: CHANGE ORDERS
The Subcontractor shall have no dealings with any party or parties other than the General Contractor in regard to performance, changes, additions or omissions in connection with this work. This agreement cannot be changed except by a properly executed written Change Order, made a part hereof by specific reference therein and indicating the change so ordered. No work shall be commenced by the Subcontractor in connection with any changes or additions to the work or changes in the Contract Papers until the Subcontractor receives a written order from the undersigned officer or manager or his successor of the General Contractor to proceed. Upon such written order, the Subcontractor shall execute the extra work, as the General Contractor shall



require. An equitable adjustment shall be made for all such changes, which shall in no event exceed the proportionate adjustment made to the General Contractor by the Owner; and, the written order covering the change shall state the specific amounts to be added to or deducted from the Contract Price and time of completion.

In the event a condition arises wherein the Subcontractor is, in its opinion, called upon to perform any changes in the work hereunder for which the amount of compensation to be added or deducted has not been previously agreed upon between parties, it shall prepare and submit to the General Contractor a proposal describing the changes proposed to be made, together with a detailed statement of the quantities and cost involved. The Subcontractor shall keep accurate, detailed and itemized records of the cost of any such change it performs, and shall report all such costs to the General Contractor. The General Contractor may, at its option, prescribe the form and manner of said records and report. The Subcontractor shall in any event furnish each day to the General Contractor certified copies of all time sheets, receiving and inspection reports, and all other basic documents required by the General Contractor, properly evidencing expenditures relating to the Subcontractor's costs for the changes in question. The Subcontractor's application to the General Contractor for payment shall be accompanied by certified copies of all pertinent payrolls, invoices and vouchers to the additional work.

The General Contractor's or Owner's receipt or acknowledgment of the Subcontractor's Change Order claims, any other alleged claim or any notice or report, including report of costs and time relating thereto, shall not be construed as the General Contractor's or Owner's acknowledgement or acceptance of the accuracy and validity of any portion of such claim or report, until such time as final Change Order amounts are determined by the General Contractor to be appropriate and agreed upon as an equitable adjustment, and the signature of the General Contractor's officer or manager or his successor is attached thereto.

SECTION 20: DISPUTES
In case of any dispute between the parties relating in any way to the performance of the work, the sufficiency of the materials furnished, the proper interpretation of the Contract Papers, or the adjustment of the Contract Price, such dispute shall be finally and conclusively determined by the methods provided by the Contract Papers, or, in the absence of any provision in the Contract Papers, by the General Contractor. In the meantime the Subcontractor shall diligently proceed with the work as directed by the General Contractor.

SECTION 21: COMPLIANCE WITH LAWS AND REGULATIONS - LICENSES - PERMITS
This Agreement shall be interpreted in accordance with the law of the State of Illinois.
(Mechanic's liens shall be interpreted in accordance with the law of the State of Wisconsin, but all other terms of this Agreement shall be interpreted in accordance with the law of the State of Illinois.)
All work performed and materials furnished under this Agreement, and the installation of such materials by the Subcontractor, will comply in every respect with all applicable laws, ordinances and regulations of duly constituted authorities in force in the location where the work is being



William A. Randolph, Inc.
Subcontract Agreement

performed. If any licenses, notices, or permits are required in connection with the work being performed, additional to the general permit procured under the Master Contract, the same will be furnished by the Subcontractor at its own cost and expense.

## SECTION 22: ALCOHOL AND SUBSTANCE ABUSE

Alcoholic beverages and controlled substances are not to be brought onto the jobsite or kept on the jobsite by the Subcontractor, his employees, suppliers, or by any others providing services for the Subcontractor.

Persons whose functions are impaired by or who are known to be illegal users of alcoholic beverages or controlled substances are not to be employed by Subcontractor for work to be done under this Agreement.

Persons whose functions are impaired by use of alcoholic beverages or controlled substances or on whose person the use of alcoholic beverages or controlled substances can be detected, or who are known to have used alcoholic beverages before reporting for work or during work are not to be permitted to enter upon the jobsite. If use of alcoholic beverages or controlled substances becomes known, the person is to be promptly escorted from the jobsite by the Subcontractor or his supervisor.

The Subcontractor is to prevent hazard to his employees, other persons and to the work by preventing the presence or use on the jobsite of alcoholic beverages or controlled substances or by persons using such beverages or substances.

## SECTION 23: WAIVER

No waiver of or failure to assert any breach, condition, term, or covenant of this Agreement shall constitute a continuing waiver or a waiver of any subsequent breach of the same or any other breach, condition, term or covenant.

## SECTION 24: SEVERABILITY

In case any one or more of the provisions of this Agreement or any application thereof shall be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions contained within this Agreement and any other application of this Agreement shall not in any way be affected or impaired.

## SECTION 25: NOTICES

Any notice required under this Agreement shall be in writing and may be delivered personally, or by certified or registered mail, with postage prepaid, to the parties named in this Agreement at the addresses indicated on page one of this Agreement.

## SECTION 26: ATTORNEYS' FEES

~~The General Contractor shall be entitled to recover from Subcontractor all attorneys' fees incurred by the General Contractor in enforcing any of its rights under this Agreement.~~

Each Contractor shall pay their own legal fees.

## SECTION 27: MODIFICATION

No amendment or modification of this Agreement shall be valid or binding upon a party unless made in writing and signed by a duly authorized representative of said party.

## SECTION 28: ENTIRE AGREEMENT

This Agreement constitutes the entire Agreement between the General Contractor and Subcontractor with respect to the subject matter defined by the Agreement itself. This Agreement supersedes all prior or contemporaneous Agreements, understandings, communications, conditions, or representations of any kind whatsoever, if any, between the General Contractor and Subcontractor, whether oral or written.

William A. Randolph, Inc.
Subcontract Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate all on the day and year first above written.

D & BR BUILDING SYSTEMS, INC.

By: _____    Date: 4/7/06

Name: William H. Ricketts

Title: President

Witness: Lee A Chavenz

Witness: _____


WILLIAM A. RANDOLPH, INC.

By: Anthony Riccardi    Date: 4-13-06

Name: Anthony Riccardi

Title: Pres.

Witness: Edul Al

Witness: _____

*EXHIBIT A*

# D & BR BUILDING SYSTEMS, INC.
*Structural Steel Erectors*

Phone (903) 896-7850
FAX ( 903) 896-4304

8600 State Hwy 19
Edgewood, TX  75117

April 5, 2006

## CONTRACT AGREEMENT

**PROJECT:**
Wal-Mart Supercenter #1305-01
Kettering St. & Rotamer Rd.  Janesville, WI
Wal-Mart Stores, Inc.

**GENERAL CONTRACTOR:**
William A Randolph, Inc.
820 Lakeside Dr., Ste. 3
Gurnee, IL  60031
847-856-0123          FAX 847-856-0696

This document shall act as the governing instrument between General Contractor and D & BR Building Systems, Inc., and shall be included as part of the contract documents.

D & BR Building Systems, Inc. agrees to provide the unloading of owner supplied materials and perform the steel erection of the main building structure defined as follows:

Unload owner supplied materials as needed for our scope of work.
Level anchor bolt nuts at each column location to elevation nut provided by Contractor.
Erect and plumb main structure columns.
Erect main structure girders and beams.  Permanently fasten per details.
Erect main structure joists, bridging, and x-bridging.  Permanently fasten per details.
Load bundles of decking on top of structure as needed for decking placement.
Erect wind girts and permanently fasten where walls and imbeds are available.
Install joist and girder continuity angles and drag struts where required and available.

Items specifically NOT included in this scope of work are:

Erection of front vestibule members.
Erection of loading dock and TLE members.
Installation of perimeter angles, bridging clips, fastening ANY members to walls not in place.
Installation of metal decking.
Installation of skylight, RTU, and exhaust fan frames and curbs.
Installation of any miscellaneous steel, canopies, or other members.

Any issues created by working conditions (i.e. union troubles) are the sole responsibility of the contractor, as outlined in correspondence with D & BR Building Systems, Inc.

Contract sum is $140,000.00 (one hundred and forty thousand dollars).
Progress billings will be submitted by D & BR on the 1st and 15th of each month. Payments from Contractor MUST be received in our office within 14 calendar days of receipt of billing by Contractor, less 10% retainage. Immediately upon completion of our contract, retainage must be reduced to 5%. Change orders must be received in our office prior to the commencement of extra work. Change orders will be billed and paid with progress billings as described above. ALL delays caused to D & BR, through no fault of our own will be paid by contractor.

If masonry walls and ALL exterior canopy and TLE pit footings are 100% complete by 5/8/06, the following alternates may be applied:

Alternate 1: Install the metal decking, skylight and RTU curbs, frames, and perimeter angles to walls.
        Additional $45,000.00
Alternate 2: Install vestibule steel, TLE pit structural steel, and canopy members.
        Additional $15,000.00
Alternate 3: If footings for the dock area are ready to stand steel on by 4/17/06.
        Additional $7500.00
Alternate 4: If footings in the dock area are NOT ready to stand steel on by 4/17/06.
        Additional $~~22,500.00~~ $15,000.00 added to Alternate No. 3 GVR,
Alternate 5: If footings in the TLE area are ready to stand steel on by 4/24/06.
        Additional $7,500.00
Alternate 6: If footings in the TLE area are NOT ready to stand steel on by 4/24/06.
        Additional $~~22,500.00~~ $15,000.00 added to Alternate No. 5
Alternate 7: If perimeter angle must be lasered in to accommodate decking.
        Additional $10.00 per lineal foot of angle.
Alternate 8: If walls are not completed in advance of deck installation. of A.R,
        Additional $25,000.00 to be adjusted proportionally to amount completed wall.
Alternate 9: Install TLE pit platforms, stairs, and handrails.
        Additional $10,000.00

Neither D & BR nor Contractor are obligated to enter into future agreements.

D & BR Building Systems, Inc. will NOT be able to remobilize this project to complete unfinished work, with the exception of completing punchlist items on work we perform.

In witness whereof, the parties hereto have caused this Agreement to be executed in duplicate all on the day and year first above written.

D & BR Building Systems, Inc.

By: _William H Rht_

Name: _William H Ricketts_

Title: _President_

Witness: _Randolph McDonns_

Date: _4-5-06_

William A Randolph, Inc.

By: _Anthony Riccardi_

Name: _Anthony Riccardi_

Title: _Pred_

Witness: _Earl Al_

Date: _____

| WM. A. **RANDOLPH** INC. builders • contractors • construction managers | PROJECT | Wal-Mart Supercenter #1305-01 |
|---|---|---|
| | ADDRESS | |
| | CITY | Janesville |
| | STATE/ZIP | WI |
| | TRADE | 05-120 |
| **WAL★MART®** | COMPANY | D & BR Building Systems, Inc. |
| | CONTACT | Randolph Davis |
| | PHONE | 903-896-7850 |
| DESCRIPTION | QTY. | COST / INCLUSIONS / EXCLUSIONS |
| All work included in but not limited to the following specification sections: | | $215,000.00 |
| 05120 - Structural Steel | | COMPLETE |
| 05210 - Steel Joists | | COMPLETE |
| 05300 - Steel Deck | | COMPLETE |
| Receive and Install all Structural Steel | | INCLUDED |
| Receive and Install all Steel Joists | | INCLUDED |
| Receive and Install all Metal Deck | | INCLUDED |
| Recevie and Install all Structural Roof Curbs (Excluding EF Curbs) | | INCLUDED |
| Receive and Install Metal Deck at auto center canopy | | INCLUDED |
| Receive and Install Struc. steel & deck at Auto Center Pit | | INCLUDED |
| Receive and Install Pit Frames per 6/S8 and 8/S8 (Excluding Platforms) | | INCLUDED |
| Receive and Install Satellite Support | | INCLUDED |
| Receive and Install Roof Frames / Curb Headers | | INCLUDED |
| Receive and Install Condenser Framing 5/S4.1 w/bracing | | INCLUDED |
| Receive and Install Jib Crane w/Guardrail | | INCLUDED |
| Receive and Install lube reel brackets | | INCLUDED |
| Receive and Install joist reinforcing furnished by GC | | INCLUDED |
| Receive Steel starting 3 weeks after Sam's Start Date. | | INCLUDED |
| Complete all steel and metal deck installation | | 7 weeks |
| | | |
| MISCELLANEOUS | | |
| All drawings reviewed | | INCLUDED |
| Necessary field coordination with other trades | | INCLUDED |
| Permits | | INCLUDED |
| Taxes | | INCLUDED |
| Access and staging reviewed | | INCLUDED |
| Site visit has been performed | | INCLUDED |
| Weekly job meetings will be attended | | INCLUDED |
| Change order maximums (10%) | | INCLUDED |
| UNION / NON-UNION | | Non-Union |
| TOTALS | | $215,000.00 |
| ALTERNATES | ADD / DEUCT | COST / INCLUSIONS / EXCLUSIONS |
| Ironworker | | $60/ MH |
| Ironworker Superintendent | | $70/ MH |
| | | |
| | | |

End of Attachment A

Project Number: 360.00

**EXHIBIT B**
**Drawing Matrix**

| Drawing Number | Title | Issued Date | Latest Revision Number | Latest Revision Date | Designer |
|---|---|---|---|---|---|
| C1 | Cover Sheet | 10/3/05 | | | Arc Design Resources, Inc. |
| C2 | Comprehensive Layout | 10/3/05 | | | Arc Design Resources, Inc. |
| C3 | Erosion & Sediment Control Swppp Site Map Details, General, Maintenance | 10/3/05 | | | Arc Design Resources, Inc. |
| C4 | Erosion And Sediment Control Swppp Site Map - Phase 1 Sam's Club | 10/3/05 | | | Arc Design Resources, Inc. |
| C5 | Erosion And Sediment Control Swppp Site Map - Phase 1 Wal-Mart | 10/3/05 | | | Arc Design Resources, Inc. |
| C6 | Erosion And Sediment Control Swppp Site Map - Phase 2 Sam's Club | 10/3/05 | | | Arc Design Resources, Inc. |
| C7 | Erosion And Sediment Control Swppp Site Map - Phase 2 Wal-Mart | 10/3/05 | | | Arc Design Resources, Inc. |
| C8 | Erosion And Sediment Control Swppp Site Map - Phase 3 Sam's Club | 10/3/05 | | | Arc Design Resources, Inc. |
| C9 | Erosion And Sediment Control Swppp Site Map - Phase 3 Wal-Mart | 10/3/05 | | | Arc Design Resources, Inc. |
| C10 | Layout Plan Sam's Club | 10/3/05 | | | Arc Design Resources, Inc. |
| C11 | Layout Plan Wal-Mart | 10/3/05 | | | Arc Design Resources, Inc. |
| C12 | Grading Plan Sam's Club | 10/3/05 | | 10/13/05 | Arc Design Resources, Inc. |
| C13 | Grading Plan Wal-Mart | 10/3/05 | 1 | 10/13/05 | Arc Design Resources, Inc. |
| C14 | Plan And Profile Bike Path | 10/3/05 | | | Arc Design Resources, Inc. |
| C15 | Plan And Profile Bike Path | 10/3/05 | | | Arc Design Resources, Inc. |
| C16 | Drainage Plan Sam's Club | 10/3/05 | | 10/13/05 | Arc Design Resources, Inc. |
| C17 | Drainage Plan Wal-Mart | 10/3/05 | 1 | 10/13/05 | Arc Design Resources, Inc. |
| C18 | Special Drainage Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C19 | Special Drainage Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C20 | Utility Plan Sam's Club | 10/3/05 | | | Arc Design Resources, Inc. |
| C21 | Utility Plan Wal-Mart | 10/3/05 | 1 | 10/13/05 | Arc Design Resources, Inc. |
| C22 | Landscape Plan Sam's Club | 10/3/05 | | | Arc Design Resources, Inc. |
| C23 | Landscape Plan Wal-Mart | 10/3/05 | | | Arc Design Resources, Inc. |
| C24 | Irrigation Plan Sam's Club | 10/3/05 | | | Arc Design Resources, Inc. |
| C25 | Irrigation Plan Wal-Mart | 10/3/05 | | | Arc Design Resources, Inc. |
| C26 | Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C27 | Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C28 | Details | 10/3/05 | | 10/13/05 | Arc Design Resources, Inc. |
| C29 | Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C30 | Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C31 | Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C32 | Retaining Wall Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C33 | Retaining Wall Details | 10/3/05 | | | Arc Design Resources, Inc. |
| V1 | Alta / Ascm Land Title Survey | 10/3/05 | | | Arc Design Resources, Inc. |
| V2 | Alta / Ascm Land Title Survey | 10/3/05 | | | Arc Design Resources, Inc. |
| V3 | Alta / Ascm Land Title Survey | 10/3/05 | | | Arc Design Resources, Inc. |
| C1 | Cover Sheet | 10/5/05 | | | Raymond Harris & Associates |

Project Number: 360.00

**EXHIBIT B**
**Drawing Matrix**

Wal-Mart Supercenter #1305-01
Janesville, WI

| Drawing Number | Title | Issued Date | Latest Revision Number | Latest Revision Date | Designer |
|---|---|---|---|---|---|
| N1 | General Information | 6/24/05 | | | Raymond Harris & Associates |
| A1 | Floor Plan | 6/24/05 | | | Raymond Harris & Associates |
| A1.1 | Floor Finish Plan | 1/11/05 | | | Raymond Harris & Associates |
| A2 | Exterior Elevations | 10/5/05 | 4 | 10/21/05 | Raymond Harris & Associates |
| A2.1 | Exterior Details | 1/11/05 | | | Raymond Harris & Associates |
| A2.2 | Signage | 1/11/05 | | | Raymond Harris & Associates |
| A2.3 | Enlarged Exterior Elevations | 10/5/05 | | | Raymond Harris & Associates |
| A3 | Exterior Wall Sections | 10/5/05 | 3 | 10/21/05 | Raymond Harris & Associates |
| A3.1 | Exterior Wall Sections | 10/5/05 | | | Raymond Harris & Associates |
| A3.2 | Exterior Wall Sections | 10/5/05 | 3 | 10/21/05 | Raymond Harris & Associates |
| A3.3 | Vestibule Wall Sections and Details | 10/5/05 | 3 | 10/21/05 | Raymond Harris & Associates |
| A3.4 | Exterior Wall Sections | 10/5/05 | | | Raymond Harris & Associates |
| A3.5 | Exterior Wall Sections | 10/5/05 | 3 | 10/21/05 | Raymond Harris & Associates |
| A3.6 | Exterior Wall Sections | 10/5/05 | | | Raymond Harris & Associates |
| A3.7 | Exterior Wall Sections | 10/5/05 | 3 | 10/21/05 | Raymond Harris & Associates |
| A4 | Roof Plan | 10/5/05 | | | Raymond Harris & Associates |
| A4.1 | Roof Details | 10/5/05 | 2 | 10/21/05 | Raymond Harris & Associates |
| A4.2 | Roof Details | 10/5/05 | 2 | 10/21/05 | Raymond Harris & Associates |
| A5 | Vestibule | 10/5/05 | | | Raymond Harris & Associates |
| A5.1 | Enlarged Plans | 10/5/05 | | | Raymond Harris & Associates |
| A5.2 | Enlarged Plans | 6/24/05 | | | Raymond Harris & Associates |
| A5.3 | Enlarged GM Vestibule | 10/5/05 | 2 | 10/21/05 | Raymond Harris & Associates |
| A5.4 | Enlarged GR Vestibule | 10/5/05 | 3 | 10/21/05 | Raymond Harris & Associates |
| A5.5 | Vestibule Details | 3/25/05 | | | Raymond Harris & Associates |
| A5.6 | Toilet Plans and Elevations | 10/5/05 | | | Raymond Harris & Associates |
| A6 | Office Plan | 10/5/05 | | | Raymond Harris & Associates |
| A6.1 | Partition Types and Details | 3/25/05 | | | Raymond Harris & Associates |
| A6.2 | Interior Wall Sections | 1/11/05 | | | Raymond Harris & Associates |
| A7 | Room Finish Schedule | 10/5/05 | | | Raymond Harris & Associates |
| A8 | Door Schedule | 10/5/05 | | | Raymond Harris & Associates |
| A8.1 | Door Details | 10/5/05 | | | Raymond Harris & Associates |
| A8.2 | Door and Window Details | 10/5/05 | | | Raymond Harris & Associates |
| A9 | Millwork | 1/11/05 | | | Raymond Harris & Associates |
| A9.1 | Details | 1/11/05 | | | Raymond Harris & Associates |
| AC1 | Auto Center | 6/24/05 | | | Raymond Harris & Associates |
| AC1.1 | Auto Center Details | 1/11/05 | | | Raymond Harris & Associates |
| AC1.2 | Tile Kiosk | 1/11/05 | | | Raymond Harris & Associates |
| AC2 | Auto Center Equipment | 6/24/05 | | | Raymond Harris & Associates |
| AC2.1 | Auto Center Equipment Details | 1/11/05 | | | Raymond Harris & Associates |
| GA1 | Front Grocery and Liquor Floor Plan | 6/24/05 | | | Boice, Raidl, Rhea Architects |
| GA1.1 | Rear Grocery Floor Plan | 3/25/05 | | | Boice, Raidl, Rhea Architects |
| GA2 | Front Grocery Fixture Plan | 6/24/05 | | | Boice, Raidl, Rhea Architects |
| GA2.1 | Rear Grocery Fixture Plan | 6/24/05 | | | Boice, Raidl, Rhea Architects |
| GA3 | Grocery Interior Elevations | 6/24/05 | | | Boice, Raidl, Rhea Architects |
| GA4 | Grocery Wall Sections | 6/24/05 | | | Boice, Raidl, Rhea Architects |

Project Number: 360.00

**EXHIBIT B**
**Drawing Matrix**

| Drawing Number | Title | Issued Date | Latest Revision Number | Latest Revision Date | Designer |
|---|---|---|---|---|---|
| GA4.1 | Grocery Wall Sections | 6/24/05 | | | Boice, Raidl, Rhea Architects |
| GA5. | Grocery Details | 6/24/05 | | | Boice, Raidl, Rhea Architects |
| GC1 | Garden Center Floor and Roof Plan | 10/5/05 | | | Raymond Harris & Associates |
| GC2 | Garden Center Elevations | 10/5/05 | | | Raymond Harris & Associates |
| GC2.1 | Garden Center Elevations | 10/5/05 | 2 | 10/24/05 | Raymond Harris & Associates |
| GC2.2 | Garden Center Fence Details | 10/5/05 | 2 | 10/24/05 | Raymond Harris & Associates |
| GC3 | Garden Center Sections | 10/5/05 | | | Raymond Harris & Associates |
| GC3.1 | Garden Center Sections | 10/5/05 | 3 | 10/21/05 | Raymond Harris & Associates |
| GC3.2 | Garden Center Sections | 10/5/05 | 2 | 10/21/05 | Raymond Harris & Associates |
| GC4 | Garden Center Sections | 10/5/05 | | | Raymond Harris & Associates |
| GC4.1 | Garden Center Door Details | 3/25/05 | | | Raymond Harris & Associates |
| GC5 | Garden Center Details | 1/11/05 | | | Raymond Harris & Associates |
| GC5.1 | Garden Center Details | 1/11/05 | | | Raymond Harris & Associates |
| PH1 | Pharmacy | 10/5/05 | | | Raymond Harris & Associates |
| PH1.1 | Pharmacy Sections and Details | 10/5/05 | | | Raymond Harris & Associates |
| SB | Snack Bar | 2/16/05 | | | Boice, Raidl, Rhea Architects |
| SP1 | Site Plan | 10/5/05 | | | Raymond Harris & Associates |
| SP2 | Site Details | 10/5/05 | | | Raymond Harris & Associates |
| SP2.1 | Site Details | 10/5/05 | | | Raymond Harris & Associates |
| SP2.2 | Bale and Pallet Storage | 3/25/05 | | | Raymond Harris & Associates |
| E1 | Lighting Plan | 6/24/05 | 2 | 10/21/05 | Henderson Engineers, Inc. |
| E1.1 | Enlarged Lighting Plans | 6/24/05 | | | Henderson Engineers, Inc. |
| E1.2 | Lighting Details and Site Lighting | 6/24/05 | | | Henderson Engineers, Inc. |
| E2 | Power Plan | 3/25/05 | 2 | 10/21/05 | Henderson Engineers, Inc. |
| E2.1 | Power Drop Plan | 1/11/05 | | | Henderson Engineers, Inc. |
| E2.2 | Enlarged Power Plans | 6/24/05 | | | Henderson Engineers, Inc. |
| E2.3 | Enlarged Power Plans | 6/24/05 | 3 | 10/21/05 | Henderson Engineers, Inc. |
| E2.4 | Enlarged Power Plans | 6/24/05 | | | Henderson Engineers, Inc. |
| E3 | Electrical Details, Symbols, and Schedule | 6/24/05 | | | Henderson Engineers, Inc. |
| E4 | One-Line Diagram, Details and Schedule | 6/24/05 | 3 | 10/21/05 | Henderson Engineers, Inc. |
| E4.1 | Panelboard Schedules | 6/24/05 | 3 | 10/21/05 | Henderson Engineers, Inc. |
| E4.2 | Panelboard Schedules | 6/24/05 | 3 | 10/21/05 | Henderson Engineers, Inc. |
| E4.3 | Panelboard Schedules | 6/24/05 | 3 | 10/21/05 | Henderson Engineers, Inc. |
| E5 | Auto Center Electrical Plans and Schedul | 6/24/05 | 2 | 10/21/05 | Henderson Engineers, Inc. |
| EM1 | Energy Management Plan | 6/24/05 | | | Henderson Engineers, Inc. |
| GE1 | Enlarged Grocery Lighting Plans | 6/24/05 | 3 | 10/21/05 | Henderson Engineers, Inc. |
| GE2 | Enlarged Grocery Power Plans & Schedul | 6/24/05 | 3 | 10/21/05 | Henderson Engineers, Inc. |
| RE1 | Refrig Electrical Plan | 6/24/05 | 3 | 10/21/05 | Henderson Engineers, Inc. |
| RE1.1 | Refrig Electrical Plan | 6/24/05 | 3 | 10/21/05 | Henderson Engineers, Inc. |
| REM1 | Refrig Energy Management Plan | 6/24/05 | 2 | 10/21/05 | Henderson Engineers, Inc. |
| FP1 | Fire Site Utility Plan | 6/24/05 | | | Henderson Engineers, Inc. |
| FP2 | Overall Fire Sprinkler Plan | 6/24/05 | 2 | 10/21/05 | Henderson Engineers, Inc. |
| FP2.1 | Fire Sprinkler Plan System 1 | 6/24/05 | | | Henderson Engineers, Inc. |

Project Number: 360.00

**EXHIBIT B**
**Drawing Matrix**

Wal-Mart Supercenter #1305-01
Janesville, WI

| Drawing Number | Title | Issued Date | Latest Revision Number | Latest Revision Date | Designer |
|---|---|---|---|---|---|
| FP2.2 | Fire Sprinkler Plan System 2 | 6/24/05 | | | Henderson Engineers, Inc. |
| FP2.3 | Fire Sprinkler Plan System 3 | 6/24/05 | 2 | 10/21/05 | Henderson Engineers, Inc. |
| FP2.4 | Fire Sprinkler Plan System 4 | 6/24/05 | | | Henderson Engineers, Inc. |
| FP2.5 | Fire Sprinkler Plan System 5 | 6/24/05 | | | Henderson Engineers, Inc. |
| FP3 | Fire Protection Details | 6/24/05 | | | Henderson Engineers, Inc. |
| FP3.1 | Fire Protection Details | 1/11/05 | | | Henderson Engineers, Inc. |
| FP4 | Skid Mounted Fire Pump | 6/24/05 | | | Henderson Engineers, Inc. |
| GM1 | Front Grocery HVAC Plan and Details | 10/5/05 | | | Henderson Engineers, Inc. |
| GM2 | Rear Grocery HVAC Plan | 10/5/05 | | | Henderson Engineers, Inc. |
| GP1 | Front Grocery DWV Plan | 6/24/05 | | | Henderson Engineers, Inc. |
| GP2 | Rear Grocery DWV Plan | 6/24/05 | | | Henderson Engineers, Inc. |
| GP3 | Grocery DWV Riser | 6/24/05 | | | Henderson Engineers, Inc. |
| GP4 | Front Grocery Water Plan and Schedules | 6/24/05 | | | Henderson Engineers, Inc. |
| GP5 | Rear Grocery Water Plan and Details | 1/11/05 | | | Henderson Engineers, Inc. |
| GP6 | Grocery Water Riser and Details | 6/24/05 | | | Henderson Engineers, Inc. |
| M1 | HVAC Plan | 6/24/05 | | | Henderson Engineers, Inc. |
| M2 | Enlarged HVAC Plans | 6/24/05 | | | Henderson Engineers, Inc. |
| M3 | Mechanical Schedules and Details | 10/5/05 | 4 | 10/21/05 | Henderson Engineers, Inc. |
| MP1 | Mechanical Roof Plan and Details | 6/24/05 | | | Henderson Engineers, Inc. |
| MP2 | Auto Center Plans & Details | 6/24/05 | | | Henderson Engineers, Inc. |
| P1 | Plumbing Plan | 6/24/05 | 2 | 10/21/05 | Henderson Engineers, Inc. |
| P2 | Enlarged Plumbing Plans & Risers | 2/16/05 | | | Henderson Engineers, Inc. |
| P3 | Enlarged Plumbing Plans & Risers | 6/24/05 | | | Henderson Engineers, Inc. |
| P4 | Plumbing Schedules and Details | 1/11/05 | | | Henderson Engineers, Inc. |
| R1 | Front Refrig Plan | 6/24/05 | | | Henderson Engineers, Inc. |
| R2 | Rear Refrig Plan | 3/25/05 | | | Henderson Engineers, Inc. |
| R3 | Refrig Schedules | 6/24/05 | | | Henderson Engineers, Inc. |
| R4 | Refrig Schedules | 6/24/05 | | | Henderson Engineers, Inc. |
| R5 | Refrig Schedules | 6/24/05 | | | Henderson Engineers, Inc. |
| S0 | General Structural Information | 10/5/05 | 2 | 10/21/05 | Wallace Engineering |
| S1 | Foundation Plan | 6/24/05 | 3 | 10/21/05 | Wallace Engineering |
| S1.1 | Slab Plan | 6/24/05 | 3 | 10/21/05 | Wallace Engineering |
| S10 | Foundation and Framing Plans and Details | 3/25/05 | | | Wallace Engineering |
| S10.1 | Vestibule Framing Elevation and Details | 10/5/05 | | | Wallace Engineering |
| S11 | Monument Sign Details | 3/25/05 | | | Wallace Engineering |
| S2 | Foundation Details | 3/25/05 | | | Wallace Engineering |
| S2.1 | Foundation Details | 1/11/05 | | | Wallace Engineering |
| S3 | Roof Framing Plan | 6/24/05 | 3 | 10/21/05 | Wallace Engineering |
| S4 | General Schedules and Diagrams | 3/25/05 | | | Wallace Engineering |
| S4.1 | Framing Schedule | 6/24/05 | 2 | 10/21/05 | Wallace Engineering |
| S4.2 | Framing Schedule | 3/25/05 | 2 | 10/21/05 | Wallace Engineering |
| S4.3 | Wind Girt Diagrams | 3/25/05 | | | Wallace Engineering |
| S5 | Framing Details | 1/11/05 | | | Wallace Engineering |

**EXHIBIT B**
**Drawing Matrix**

| Drawing Number | Title | Issued Date | Latest Revision Number | Latest Revision Date | Designer |
|---|---|---|---|---|---|
| S5.1 | Framing Details | 3/25/05 | | | Wallace Engineering |
| S6 | GR Vestibule Plans | 6/24/05 | | | Wallace Engineering |
| S6.1 | GM Vestibule Plans | 6/24/05 | | | Wallace Engineering |
| S6.2 | Vestibule Details | 6/24/05 | | | Wallace Engineering |
| S7 | Garden Center Foundation Plan and Deta | 10/5/05 | | | Wallace Engineering |
| S7.1 | Garden Center Framing Plan and Details | 6/24/05 | | | Wallace Engineering |
| S7.2 | Garden Center Framing Details | 10/5/05 | | | Wallace Engineering |
| S8 | Auto Center Foundation Plan and Details | 10/5/05 | | | Wallace Engineering |
| S8.1 | Auto Center Framing Plan and Details | 10/5/05 | 4 | 10/21/05 | Wallace Engineering |
| S8.2 | Auto Center Kiosk Foundation Plan and D | 10/5/05 | | | Wallace Engineering |
| S9 | Pharmacy Plans and Details | 10/5/05 | | | Wallace Engineering |

EXHIBIT C

## SUBCONTRACT AGREEMENT INSURANCE RIDER

Subcontractors of William A. Randolph, Inc. shall purchase and maintain during the entire project and during the warranty period, insurance with the minimum limits and coverage shown below or, if greater - the requirements set forth in the Contract Documents, from insurance companies acceptable to William A. Randolph, Inc.

**GENERAL LIABILITY**
Subcontractor shall carry standard ISO General Liability coverage, written on an occurrence basis - including Completed Operations. The coverage must be endorsed to name William A. Randolph, Inc. as an "additional insured" (Form CG2010 11/85 or equivalent – meaning the additional insured coverage form to include work in progress - i.e. ongoing operations and completed work – i.e. Completed Operations) and include the Owner, Architect and others as "additional insureds" as required in the contract documents for a period of 2 years after project completion. The "Additional Insured" form shall state that this insurance shall be primary without right of contribution from any other insurance available to the "additional insureds" and the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance. Copy of the additional insured endorsement form is to be attached to the Certificate of Insurance. A waiver of subrogation will be provided.

The GL shall include such coverage, but not limited to, premises/operations, employees as insureds, explosion, collapse and underground (XCU), broad form contractual (including personal injury), products/completed operations, independent contractors, broad form property damage and personal injury. The CGL must be written on an occurrence basis, with minimum limits of:

| | |
|---|---|
| Each Occurrence | $ 1,000,000 |
| General Aggregate - Per Project | $ 2,000,000 |
| Products & Completed Operations Aggregate | $ 2,000,000 |
| Personal/Advertising Injury | $ 1,000,000 |
| Fire Damage | $ 100,000 |
| Medical Payments | $ 10,000 |

**COMPREHENSIVE AUTOMOBILE LIABILITY** on occurrence basis covering all Owned, Non-Owned and Hired Vehicles for limits of liability equal to $1,000,000 Combined Single Limit.

**WORKER'S COMPENSATION** including Occupations Disease insurance meeting the statutory requirements of the State in which work is to be performed together with a Broad Form All States Endorsement and containing Employer's Liability insurance in an amount of at least $500,000 Each Accident / $500,000 Disease – Policy Limit / $500,000 Disease – Each Employee. Workers Compensation shall waive the rights of subrogation in favor of all additional insureds.

**UMBRELLA LIABILITY and/or EXCESS LIABILITY** with coverage at least as broad as the underlying policies. The per occurrence and aggregate limits shall be as stated under Section 8: Insurance in the Subcontract Agreement.

A certificate of insurance form must be filed with William A. Randolph, Inc. prior to the commencement of any work and must state coverage will not be altered, cancelled or allowed to expire without thirty (30) days written notice by certified mail to William A. Randolph, Inc. If any of the above coverages are subject to or are in excess of any deductibles or self-retention, these amounts must be stated on the certificate, and said deductibles and self-retention will be the sole responsibility of Subcontractor. A duplicate certificate and additional insured endorsement shall be sent to T.J. ADAMS GROUP, 333 EAST BUTTERFIELD ROAD, SUITE 500, LOMBARD, IL 60148, ATTN: LYNN A. THOMPSON

It is understood and agreed that the insurance coverage and limits, required above, shall not limit the extent of Subcontractor's responsibilities and liabilities specified within Contract Documents or by law. It is understood and agreed that authorization is hereby granted to refuse entry to job site and to withhold payments to Subcontractor until a properly executed Certificate of Insurance is received by William A. Randolph, Inc., Subcontractor's Insurance Requirements set forth herein shall become and be part of any purchase order or contract issued by William A. Randolph, Inc. to Subcontractor as though fully set forth in said purchase order or contract.

Should Subcontractor fail or neglect to provide the required insurance, William A. Randolph, Inc. shall have the right, but not the duty, to provide such insurance and deduct from any money that may be due or become due to Subcontractor for any and all premium or costs William A. Randolph, Inc. incurs. Equivalent insurance coverage must be obtained from each Sub-subcontractor and Supplier, if any, before permitting them on the site of the project. Otherwise, such insurance for Sub-subcontractors and Suppliers must be included within Subcontractor's insurance policies.

End of EXHIBIT C
(Draft 12/20/04)

EXHIBIT D

PAY APPLICATION REQUIREMENTS

**Project:**   Wal-Mart Supercenter #1305-01
**Job #:**   360.00
**Location:**   Janesville, WI
**Pay Application Due Date:** 25th of the Month

1. A schedule of values (S.O.V.) must be pre-approved by the project manager prior to the first pay application being submitted. The schedule of values should be sent via email or mail and MUST include all suppliers and subcontractors that you will be using on the specific project. The schedule of values must be type written on AIA standard forms (page 2, continuation sheet). The schedule of values is due to the project manager no later than 2 weeks after contract award. A complete labor and equipment rate sheet must accompany the project schedule of values.

2. Submit the pay application to our main office no later than the date listed above. The pay applications must be type written on AIA standard documents with no exceptions. The dollar values must accurately reflect the work in place or the projected work in place at the end of the pay period. (typically, the last day of the month) Faxed pay applications are acceptable under the following conditions:
   a. It is your responsibility to confirm the pay application has been received and is accepted. Confirmation can be via phone or via email.
   b. An original hard copy must be mailed on the date the copy was faxed.
   c. Faxed copies must be legible.

3. Pay applications will not be accepted unless waivers have been received from the previous month's application. All waivers are to be mailed in with original signatures with three copies being provided for each pay period.

4. Pay applications will not be accepted unless a current certificate of insurance is on file for the referenced project.

5. Pay applications will not be accepted unless a fully executed contract is on file for the referenced project.

6. Only change orders in writing on William A. Randolph, Inc. letter head and executed can be included on the pay applications. Change orders included on the pay applications that have not been issued will result in the pay application being rejected.

7. Back Charges are not to appear on pay applications. All back charges that have been approved by the project manager are to be invoiced separately from the main contract. Back charges included on pay applications will result in the pay application being rejected.

8. No late pay applications will be accepted. If your application is not received by the specified due date, you will be included on the next month's pay application. No early payment will be considered, under any circumstances, due to pay applications not being properly submitted in a timely fashion.

9. The guidelines outlined above, if followed, will ensure that you are paid in a timely fashion and that properly prepared applications will not be delayed due to incomplete or late pay applications from other contractors.

10. If you have any questions, regarding the required forms, due date, approved change orders, they should be addressed at the weekly project coordination meetings or be directed to the project accountant.

End of Exhibit D

EXHIBIT E

## CHANGE ORDER SUBMITTAL REQUIREMENTS

**Project:**    Wal-Mart Supercenter #1305-01
**Job #:**      360.00
**Location:**   Janesville, WI

1. Change orders can be submitted for the following reasons:
   a. Drawing revision
   b. Field Condition / RFI response
   c. Owner Request
   d. City Request
   e. Scope of work not included in contract
2. Change orders must be submitted in a timely fashion. Any change order request/claim that is not submitted within the time frame requested or within 15 days from the date the work was completed, will not be considered for payment. All rights to extra cost and time are waived if proper documentation is not received within the established time frames.
3. Drawing revisions must be priced within 7 days of receipt. Any schedule and cost changes must be completely itemized. All drawing revisions must be acknowledged in writing even if there are no cost or schedule impacts.
4. Field changes must be approved prior to beginning work, must be verified by the project superintendent and all costs related to the field change must be submitted within 15 days of completing the work.
5. Change orders must include the following breakdown:
   a. Labor – (total number of hours x applicable rate) Labor costs must be listed separately for each specific change that has occurred. The labor rates should not included overhead and profit as this is to be included as a line item for each change. (Labor rate sheets must be agreed to and submitted within 2 weeks of contract) No lump sum labor prices will be accepted.
   b. Material – (material quantity x unit price) Material should be listed for each specific change that has occurred. When possible, include supplier back up (quotes or invoices) to substantiate the costs you are submitting. Tax should be included on all material. No lump sum material prices will be accepted.
   c. Equipment – (equipment hours x unit rate) Equipment should be listed for each specific change that has occurred. If trucking to and from the jobsite is necessary, list this as separate line items. If the equipment is already on the jobsite, no mobilization charges will be allowed.
   d. Subcontracts – If you have a subcontractor that is affected by the change, the subcontractors quote must be included with your change order request. The quotes must adhere to the same guidelines listed above or they will not be accepted.
   e. OH&P – Is to be included as the last line item of the quote and cannot exceed 10% of the total value of the change for all work.
6. Change order requests are to be sent via mail and faxed. It is your responsibility to confirm that the requests have been received.
7. All change orders must be approved in writing and issued on a William A. Randolph, Inc. change order prior to being billed.
8. A change order log, indicating approved, pending and rejected change orders, must be maintained and submitted on a monthly basis.

End of Exhibit E

EXHIBIT F

## CLOSE OUT DOCUMENTATION REQUIREMENTS

**Project:** Wal-Mart Supercenter #1305-01
**Job #:** 360.00
**Location:** Janesville, WI
**Close Out Specification Section:** 01770 Contract Closeout
**Number of Copies Required:** Three (3)

1. All requirements of the above referenced specification sections and those sections applicable to your specific contract must be met.

2. Subcontractor warranty letters, manufacturer warranty letters, operation and maintenance instructions as related to your subcontracts scope of work and as build drawings as related to your subcontracts scope of work must be included in this final submittal.

3. Operations and Maintenance Manuals will generically contain the following items, consult individual project specification sections as listed above for more specific requirements:
   A. List of Equipment
   B. Parts List
   C: Operating Instructions
   D. Maintenance Instructions for Equipment
   E. Maintenance Instructions for Finishes
   F. Shop Drawings and Product Data

4. As Build Drawings should be maintained throughout the job and a clean copy of these must be included with the closeout submittals. The documents should be clearly labeled/corrected in a colored ink to define what if any changes were made to the design drawings during the construction process.

5. All close out material must be received within 30 days of subcontract completion. Late, incorrect and/or incomplete closeout submittals will be accessed a $250 per day late fee. This fee will not be waived for any reason.

6. 8-1/2" x 11" closeout documentation should be neatly organized; three hole punched, and unbound.

7. The failure to submit all required closeout documentation as detailed above and as listed in the contract documents will affect the ability to close this project out with the owner and will in turn affect everyone involved with this project. All parties involved appreciate the timely submittal of this subcontractor's closeout document.

End of Exhibit F

## EXHIBIT G

## PROJECT INFORMATION SUPPLEMENT

| | |
|---|---|
| **Project:** | Wal-Mart Supercenter #1305-01 |
| **Job #:** | 360.00 |
| **Location:** | Janesville, WI |

Congratulations on your recent award of contract and welcome to the project team for the above referenced project. The contents and attachments to this supplement contain important information that should be reviewed with all members of your team and kept for future reference.

### Project Directory

The below contacts will be part of the William A. Randolph, Inc. team working on this project. Any questions you have may be directed to anyone of the following individuals.

**Contract Administrator:** Bernadette Cook – Ext. 120
**Email Address:** bernadette.cook@warandolph.com

The contract administrator is responsible for sending, receiving and processing contract documents, including but not limited to subcontracts, change orders and insurance certificates. All insurance certificates and/or questions related to insurance should be directed to the contract administrator.

**Project Accountant:** Ed Smith – Ext. 101
**Email Address:** ed.smith@warandolph.com

The project accountant is responsible for all matters related to the monthly draw preparation, draw payouts and payment waiver information. Monthly pay applications are to be sent to the attention of the project accountant. Verification that your companies pay application and other draw related paperwork has been received should be made with the project accountant.

| **Project Superintendents:** | Mike Leonard | Walter Flaga |
|---|---|---|
| Mobile Phone: | (847) 652-8272 | (740) 252-7365 |
| Email Address: | mike.leonard@warandolph.com | walter.flaga@warandolph.com |
| Site Phone: | *TBD* | *TBD* |
| Site Fax: | *TBD* | *TBD* |

The project superintendent will perform all scheduling of trades, and will monitor the Safety program and the Drug and Alcohol policies. The main contract includes an aggressive schedule with several key milestone completion dates; it is imperative that your company's field personnel work closely with the project superintendent and other trades to ensure a safe, productive and successful work environment.

| **Project Manager:** | Tom Carrano |
|---|---|
| Mobile Phone: | (847) 514-4517 |
| Email Address: | tom.carrano@warandolph.com |

The project manager will be responsible for overseeing all aspects of the project including but not limited to writing subcontracts, reviewing change order requests, reviewing pay applications, processing submittals, schedule administration and reviewing and compiling close out documentation.

## Drug and Alcohol Policy

A copy of the William A. Randolph, Inc. Drug and Alcohol policy accompanies this contract. This is a zero tolerance policy and will be monitored by the project superintendent as well as all other members of William A. Randolph, Inc.

## Insurance

No subcontractors will be allowed on site without first filing an acceptable certificate of insurance as defined in section 8 and Exhibit C of this contract. A sample certificate is attached to this contract for your reference. Please contact the contract administrator if you have any questions related to insurance.

## Job Site Safety

A copy of the William A. Randolph, Inc. Health and Safety Manual accompanies this contract. It is important that all field personnel are familiar with safety practices required under the most current 29 CFR 1926 OSHA Construction Industry Regulations, the William A. Randolph, Inc. health and safety manual and individual subcontractor safety policies. It is imperative that all persons working on a William A. Randolph, Inc. site follow safety procedures at all times. If an unsafe condition is found or field personnel are unsure of what safety measures should be taken in any given situation the project superintendent must be notified immediately.

## Sexual Harassment Policy

Every individual has the right to work in an atmosphere that promotes equal opportunity and prohibits discriminatory practices, including sexual harassment. Sexual harassment, whether verbal, physical or environmental, is unlawful. It is unacceptable at William A. Randolph, Inc. and will not be tolerated. A complete copy of the William A Randolph, Inc. Sexual Harassment Policy is available upon request; contact the contractor administrator if a copy is desired.

## Subcontractor Labor Reports

An example of the Subcontractor Manpower Daily Report immediately follows this Exhibit. At the end of the work week, each subcontractor will turn in a completed copy of this report to the project superintendent. Anyone who is performing work on this site is to be accounted for on a manpower daily report, including second-tier contractors (contractors hired by your company).

2 of 3



EXHIBIT G



## SUBCONTRACTOR MANPOWER DAILY REPORT

Day of the Week _____          Project Name _____

Date _____          Subcontractor _____

Project No. _____          Trade _____

| FIRST | MIDDLE | LAST | POSITION | M | T | W | T | | | |
|-------|--------|------|----------|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | Foreman Initials | | | | | |

CERTIFICATION - By initialing above and signing below, I certify that on the day that labor hours were recorded, the names recorded represent those individuals who were in fact and performing work at the subject project in accordance with William A. Randolph, Inc. company policy and health & safety procedures.

WARI
Superintendent _____
Initials

Subcontractor
Foreman _____
Signature

3 of 3

WAIVER OF LIEN TO DATE

STATE OF } 
COUNTY OF } SS

TO WHOM IT MAY CONCERN:

WHEREAS the undersigned has been employed by _____ William A. Randolph, Inc. _____

to furnish _____

for the premises known as _____ Wal-Mart Supercenter Store #1305-01 _____

of which _____ Wal-Mart Stores, Inc. _____ is the Owner.

THE undersigned, for and in consideration of _____

_____ Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of Illinois, erating to mechanics' liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other consideration due or to become due from the Owner, on account of all labor, services, material, fixtures, apparatus or machinery, furnished to this date by the undersigned for the above-described premises, INCLUDING EXTRAS.*

DATE _____

COMPANY NAME _____

ADDRESS _____

_____

SIGNATURE AND TITLE _____

*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT.

## CONTRACTOR'S AFFIDAVIT

STATE OF }
COUNTY OF } SS

TO WHOM IT MAY CONCERN:

THE undersigned (Name) _____ being duly sworn, deposes and that

he or she is (Position) _____ who is the

of (Company Name) _____ work on the building

contractor furnishing _____

located at _____ Kettering Street and Rotamer Road, Janesville, WI 53545 _____

owned by _____ Wal-Mart Stores, Inc. _____

That the total amount of the contract including extras* is on which he has received payment of     $ _____

on which he or she has received payment of   $ _____ prior to this payment. That all waivers are true, correct and genuine and delivered unconditionally and that there is no claim either legal or equitable to defeat the validity of said waivers. That the following are the names of all parties who have furnished material or labor, or both, for said work and all parties having contracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said work according to plans and specifications:

| NAMES | WHAT FOR | CONTRACT PRICE INCLDG EXTRAS* | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| TOTAL LABOR AND MATERIAL INCLUDING EXTRAS* |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

SIGNED THIS _____ DAY OF _____

SIGNATURE _____

SUBSCRIBED AND SWORN
TO BEFORE ME THIS _____ DAY OF _____

SIGNATURE _____

*EXTRAS INCLUDE BUT ARE NOT LIMITED
TO CHANGE ORDERS, BOTH ORAL AND
WRITTEN, TO THE CONTRACT.

Notary Signature & Seal



**FINAL WAIVER OF LIEN**

STATE OF         }
COUNTY OF      } SS

TO WHOM IT MAY CONCERN:

WHEREAS the undersigned has been employed by _____ William A. Randolph, Inc. _____

to furnish _____

for the premises known as _____ Wal-Mart Supercenter Store #1305-01 _____

of which _____ Wal-Mart Stores, Inc. _____ is the Owner.

THE undersigned, for and in consideration of _____

$0.00      Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of Illinois, erating to mechanics' liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other consideration due or to become due from the Owner, on account of all labor, services, material, fixtures, apparatus or machinery, heretofore furnished, or which may be furnished at any time hereafter, by or on behalf of the undersigned, for the above-described premises. INCLUDING EXTRAS.*

DATE _____      COMPANY NAME _____

                      ADDRESS _____

SIGNATURE AND TITLE _____

*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT.

**CONTRACTOR'S AFFIDAVIT**

STATE OF         }
COUNTY OF      } SS

TO WHOM IT MAY CONCERN:

THE undersigned (Name) _____ being duly sworn, deposes and that

he or she is (Position) _____

of (Company Name) _____ who is the

                            work on the building

contractor furnishing _____

located at _____ Kettering Street and Rotamer Road, Janesville, WI 53545 _____

owned by _____ Wal-Mart Stores, Inc. _____

That the total amount of the contract including extras* is on which he has received payment of    $ _____

on which he or she has received payment of   $ _____ prior to this payment. That all waivers are true, correct and genuine and delivered unconditionally and that there is no claim either legal or equitable to defeat the validity of said waivers. That the following are the names of all parties who have furnished material or labor, or both, for said work and all parties having contracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said work according to plans and specifications:

| NAMES | WHAT FOR | CONTRACT PRICE INCLDG EXTRAS* | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|-------|----------|-------------------------------|-------------|--------------|-------------|
|       |          |                               |             |              |             |
|       |          |                               |             |              |             |
|       |          |                               |             |              |             |
|       |          |                               |             |              |             |
|       |          |                               |             |              |             |
| TOTAL LABOR AND MATERIAL INCLUDING EXTRAS* | | | | | |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

SIGNED THIS _____ DAY OF _____

                SIGNATURE _____

SUBSCRIBED AND SWORN
TO BEFORE ME THIS _____ DAY OF _____

                SIGNATURE _____

                        Notary Signature & Seal

*EXTRAS INCLUDE BUT ARE NOT LIMITED
TO CHANGE ORDERS, BOTH ORAL AND
WRITTEN, TO THE CONTRACT.

Exhibit I
Wal-Mart Supercenter #1305 Janesville, WI





Exhibit I
Wal-Mart Supercenter #1305 Janesville, WI

| ID | Task Name | Duration | Start | Finish |
|---|---|---|---|---|
| 43 | Roofing | 25 days | Wed 5/30/06 | Tue 6/6/06 |
| 44 | Roofing Sheet Metal and Panels | 15 days | Wed 6/7/06 | Tue 6/27/06 |
| 45 | Roofing Milestones | 0 days | Tue 6/6/05 | Tue 6/6/05 |
| 46 | Underground Piping | 30 days | Mon 4/24/06 | Fri 6/2/06 |
| 47 | Firelection Building Pad | 20 days | Wed 5/31/06 | Tue 6/27/06 |
| 48 | Re-Prep and Fine Grade Store under SDG | 5 days | Wed 6/28/06 | Tue 7/4/06 |
| 49 | Pour Freezer/Cooler Pads and Piers | 10 days | Wed 5/24/06 | Tue 6/8/08 |
| 50 | Grey Concrete SDG | 10 days | Wed 5/24/06 | Tue 6/6/06 |
| 51 | Colored Concrete SDG | 15 days | Wed 6/21/06 | Tue 7/11/06 |
| 52 | Wet Cure | 22 days | Wed 6/21/06 | Thu 7/20/06 |
| 53 | 30 Day Concrete Cure | 40 days | Wed 6/21/06 | Tue 8/15/06 |
| 54 | Epoxy CJ Caulking | 25 days | Wed 7/19/06 | Tue 8/22/06 |
| 55 | Wood Planking | 10 days | Wed 8/2/06 | Tue 8/15/06 |
| 56 | Chem SDG,Densifier and Scrubbing | 10 days | Wed 8/16/06 | Tue 8/29/06 |
| 57 | Interior Drywall Partitions | 20 days | Wed 6/7/06 | Tue 7/4/06 |
| 58 | Floor Finishes - Offices and Non-Sales | 15 days | Wed 7/5/06 | Tue 7/25/06 |
| 59 | Paint Interior | 20 days | Wed 6/28/06 | Tue 8/1/06 |
| 60 | Trim and Millwork | 20 days | Wed 8/2/06 | Tue 8/29/06 |
| 61 | Deliver Coolers and Freezers | 0 days | Tue 6/6/06 | Tue 6/6/06 |
| 62 | Refrigeration Rough-In | 30 days | Mon 5/8/06 | Fri 6/16/06 |
| 63 | MEP Rough - Ceiling | 40 days | Mon 5/22/06 | Fri 6/16/06 |
| 64 | Sales Floor Light Fixtures | 15 days | Mon 5/29/06 | Fri 6/16/06 |
| 65 | Paint Sales Floor Ceiling | 45 days | Mon 6/12/06 | Fri 8/18/06 |
| 66 | MEP Trim | 10 days | Mon 8/15/06 | Fri 9/1/06 |
| 67 | Connect Equipment | 10 days | Mon 8/21/06 | Fri 9/1/06 |
| 68 | Turn Over | 5 days | Mon 9/4/06 | Mon 9/4/06 |
| 69 | Install Wal-Mart Supplied Fixtures - Stock | 5 days | Mon 9/4/06 | Fri 9/8/06 |
| 70 | Install Wal-Mart Supplied Fixtures - Sales | 5 days | Mon 9/11/06 | Fri 9/15/06 |
| 71 | Building Punchlist | 7 days | Mon 9/4/06 | Tue 9/12/06 |

Task ▬▬▬  Progress ◆  Milestone ◆

Summary ▬▬▬  Rolled Up Task ▬▬▬  Rolled Up Milestone ◇

Rolled Up Progress ▬▬▬  Split .......  External Tasks ▬▬▬

Project Summary ▬▬▬  Group By Summary ▬▬▬

William R. Randolph, Inc.
Project: Wal-Mart Supercenter #1305 J
Date: Fri 1/20/06

Page 2

# WM. A. RANDOLPH INC.
builders • contractors • construction managers

## SUBCONTRACT AGREEMENT
### SC – 360.01 - 05

The "General Contractor" and "Subcontractor" agree to all provisions set forth in this Agreement made on **Friday, March 10, 2006** to provide all items as outlined herein for:

## PROJECT:

| | |
|---|---|
| Name | Wal-Mart Sam's Club #4840-00 |
| Location | Kettering Street & Rotamer Road, Janesville, WI |
| Owner | Wal-Mart Stores, Inc. |
| Architect | Raymond Harris & Associates |
| Engineer | Arc Design Resources, Inc. |
| Project # | 360.01 |
| Phase Code | 05-120 |

## GENERAL CONTRACTOR:

| | | | |
|---|---|---|---|
| Name | William A. Randolph, Inc. | | |
| Address | 820 Lakeside Drive, Suite 3 | | |
| City/State | Gurnee | IL | 60031 |
| Telephone | (847) 856-0123 | | |
| Fax | (847) 856-0696 | | |

## SUBCONTRACTOR:

| | | | |
|---|---|---|---|
| Name | D & BR Building Systems, Inc. | | |
| Address | 8600 State Hwy. 19 | | |
| City/State | Edgewood | TX | 75117 |
| Telephone | 903-896-7850 | | |
| Fax | 903-896-4304 | | |
| Contact | Randolph Davis | | |

## CONTRACT PRICE    $ 115,000.00

Upon satisfactory furnishing of all the material and proper performance and completion of the project described herein, the General Contractor agrees to pay the Subcontractor the "contract price" listed above subject to any additions and deductions authorized in this Agreement.

# SECTION 1: SCOPE OF WORK

The Subcontractor agrees to supply all supervision, ~~union shop labor~~, materials, tools, equipment, appurtenances, periodical and final clean up, storage, freight, and any other items necessary to complete the **Structural Steel Installation** on this project. All work is to be performed in accordance with the plans, addenda and project manuals as per the attached Exhibits A through I and according to the Master contract between William A. Randolph, Inc. and Wal-Mart Corp. dated November 15, 2005.

## Inclusions

All Specification Sections Listed Below as applicable to this scope of work:

00700 – General Conditions Complete
00800 – Supplementary Conditions Complete
01100 - Summary Complete
01255 - Request For Information Complete
01310 - Construction Management and Coordination Complete
01320 - Construction Progress Documentation Complete
01330 - Submittal Procedures Complete
01455 - Mechanical Equipment Testing, Adjusting, and Balancing Complete
01458 - Testing Laboratory Services Complete
01500 - Temporary Facilities and Controls Complete
01600 - Product Requirements Complete
01700 - Execution Requirements Complete
01731 - Cutting and Patching Requirements Complete
01740 - Cleaning Requirements Complete
01770 - Contract Closeout Complete

All Specification Sections Listed Below Complete:

1. 05120 – Structural Steel
2. 05210 – Steel Joists
3. 05300 – Steel Deck

This includes but is not limited to the following:

1. Contract Work as outlined in Exhibits A through I.
2. **Submittals / Shop Drawings:** It is understood that time is of the essence therefore all submittals, shop drawings and any required Permit submittals must be completed within two (2) weeks of the receipt of this subcontract agreement.
3. **Change Orders:** It is imperative that all change orders be submitted correctly and in a timely fashion. The change order procedures are illustrated on Exhibit E and will be strictly enforced.

William A. Randolph, Inc.
Subcontract Agreement

4. **Closeout Documentation:** Closeout documentation is an essential piece of closing a project out successfully and in a timely manner. The closeout documentation is illustrated on Exhibit F. It is expected that these guidelines be followed to ensure a rapid closeout procedure for this subcontractor and all other companies involved in this project.

## Qualifications

1. It is understood that no work will be subcontracted to a third tier subcontractor without the written consent of the General Contractor.
2. If daily clean up is not being maintained to the satisfaction of the General Contractor's on-site project superintendent, the General Contractor reserves the right to enforce an overall clean up of the jobsite on a weekly basis. In addition to the daily clean up responsibilities outlined herein, each subcontractor present at the jobsite will be required to supply one man for a minimum of four (4) hours per week to ensure that a safe and clean workspace is maintained if requested by the General Contractor. The General Contractor reserves the right to provide labor for general clean up at the subcontractor's expense if the procedures above are not conducted to the satisfaction of the onsite superintendent.
3. A mandatory pre-construction meeting will be held with this subcontractor prior to starting their work to review the following:
   - Contract drawings and specifications, shop drawings and submittals.
   - Schedule and manpower
   - All personnel for this subcontractor having involvement in this project shall be in attendance including the manger, superintendent and foreman.
4. Weekly coordination meetings will be held at the jobsite trailer. An individual responsible for decision-making is required to be in attendance at these meetings.
5. The General Contractor will furnish dumpsters for common construction debris. It is understood that this subcontractor is responsible for general clean up of all debris generated by their operations into said dumpsters on a daily basis.
6. It is understood that this subcontractor is responsible to pay for any and all fees associated with licenses required to perform the work as outlined herein.
7. This subcontractor is responsible to abide by all OSHA regulations and conduct weekly safety training. All meeting minutes from safety training should be copied to the project superintendent.
8. This subcontractor will conduct his operations in such a way as to minimize dirt and/or mud from accumulating in the streets and/or parking lots surrounding the project site. If it is determined that dirt and/or mud are left in a street and/or parking lot as a direct result of the operations of this subcontractor, this subcontractor will use his workmen and/or rubber tire equipment to clean streets and/or parking lots.
9. All hoisting, cranes, trucking, lifts and miscellaneous equipment required for installations of this scope of work to be included.  Coordination of all deliveries with project superintendent and project manager will be required.  The general contractor will not be responsible for additional costs associated with delays due to material deliveries that were not coordinated at least 48 hours in advance

William A. Randolph, Inc.
Subcontract Agreement

10. All change order requests and change order work must follow the guidelines set fourth on Exhibit E. Change orders must be submitted, approved and issued by William A Randolph, Inc prior to their inclusion on the monthly pay application. To ensure a quick change order process, **PLEASE SUBMIT A LABOR AND EQUIPMENT RATE SHEET WHEN YOU RETURN YOUR CONTRACT.** This sheet will be used throughout the job for extra work and field change work.

11. ALL PAY APPLICATIONS ARE DUE TO OUR OFFICE VIA U.S. MAIL CERTIFIED MAIL OR OVERNIGHT MAIL. EVERY PROJECT WILL HAVE SPECIFIC DUE DATE REQUIREMENTS; ALL DRAW RELATED INFORMATION WILL BE DETAILED ON ATTACHMENT D. ANY PAY APPLICATIONS RECEIVED INCORRECTLY OR AFTER THE DUE DATE WILL NOT BE INCLUDED ON THE PAY APPLICATION TO THE OWNER. ALL PAY APPLICATIONS MUST BE SUBMITTED ON FULLY EXECUTED INDUSTRY STANDARD AIA FORMS.

12. Three (3) original copies of Exhibit H, partial and final waivers, must be fully completed prior to release of any payments.

## SECTION 2: TAXES

The Contract Price as set forth in this Agreement includes, and the Subcontractor shall pay, all federal, state or local taxes which may be levied or assessed with respect to the subject matter hereof by reason of furnishing any material or the performance of any services of the ownership, use or transfer of any property or otherwise prior to the completion of the project and its acceptance by the Owner.

## SECTION 3: CONTRACT PAPERS

By signing this Agreement, Subcontractor agrees to complete the project in accordance with this Agreement, the Owner's and General Contractor's Master Contract, and all other documents (specifications, addenda, exhibits, schedules, drawings, plans, general, supplementary, and other conditions) which relate to this Agreement. This includes all changes and modifications, including all details prepared by the architect, engineer, or contracting officer, representing the Owner of this project. Taken together, this Agreement and all other papers relating to the completion of this project are called the "Contract Papers".

The Subcontractor agrees that it has thoroughly read the Contract Papers and looked at the job site and adjoining premises relating to this project. Having familiarized itself with the complexities of this job, Subcontractor agrees that the General Contractor has made no misrepresentations of any kind regarding the completion of this project.

By starting work on this project, the Subcontractor communicates to the General Contractor that the job site is in proper condition for such work to begin. If, before starting the work, Subcontractor finds that the job site is not in proper condition for such work to begin, Subcontractor must immediately notify General Contractor in writing. Written notification to the General Contractor must specifically state what needs to be changed or modified on the job site, so the Subcontractor can begin its work.

All questions regarding the true meaning or construction of the Contract Papers will be determined as provided in said Contract Papers.

## SECTION 4: APPLICATION OF THIS AGREEMENT

By signing this Agreement, the Subcontractor binds itself to the General Contractor in two ways. One, the Subcontractor is bound to the General Contractor by the terms of this Agreement. Two, regarding work to be completed by the Subcontractor, the Subcontractor is bound to the General Contractor under the same terms and conditions that the General Contractor is bound to the Owner under the Owner's and General Contractor's Master Contract. The Subcontractor is to report to the General Contractor regarding its obligations, just as the General Contractor is to report to the Owner regarding its respective obligations. Thus, by way of this Agreement, the Subcontractor assumes the same obligations and responsibilities to the Owner (regarding work to be completed by the Subcontractor) that General Contractor assumes to the Owner by way of the Master Contract.

Under the Owner's and General Contractor's Master Contract, the Owner is given certain rights against the General Contractor which enable the Owner to enforce proper completion of the project. This Agreement grants the General Contractor these exact same rights, options, privileges and remedies against Subcontractor, in regard to enforcing completion of the Subcontractor's portion of the project. Therefore, the General Contractor can enforce completion of the project upon the Subcontractor in exactly the same manner the Owner can enforce completion of the project against the General Contractor.

If any provision of this Agreement is inconsistent with the Owner's and General Contractor's Master Contract, this Agreement governs.

The Subcontractor agrees to be bound, to the same extent that the General Contractor is bound, by all decisions of the Owner, other person, court, body, or arbitrator insofar as such rulings or decisions pertain to the Subcontractors' work or the General Contractor's obligations to the Owner.

## SECTION 5: SUBLETTING AND ASSIGNMENTS

The Subcontractor will not sublet any part of the work, nor assign this Agreement, or any money due or to become due under this Agreement, in whole or in part, without the prior written consent of the General Contractor. No such written consent by the General Contractor will release the Subcontractor from any obligation set forth in this Agreement, unless it is expressly so provided and written consent is received.

## SECTION 6: PARTIES IN INTEREST

This Agreement shall be binding on and inure to the benefit of the parties hereto, their heirs, administrators, executors, transferees, successors, and assigns.

William A. Randolph, Inc.
Subcontract Agreement

Nothing in this Agreement, whether express or implied, is intended to confer any right or remedy under or by reason of this Agreement on any person other than the General Contractor and Subcontractor and their respective successors and assigns. Nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third person to any party to this Agreement. No provision of this Agreement shall give any third person any right of subrogation or action against any party to this Agreement.

## SECTION 7: BONDS

~~As a guarantee of its faithful performance of this Agreement, the Subcontractor agrees that it will furnish without expense to the General Contractor, a performance bond and a labor and material payment bond in form as designated by the General Contractor for the project described in Section 1. Each bond must be for the full amount of this Agreement, executed by corporate surety or sureties satisfactory to the General Contractor. No change or alteration of the terms or provisions of this Agreement, or extension of time or premature or over-payment to the Subcontractor, will in any way operate to release the surety on said bonds.~~

## SECTION 8: INSURANCE

Before beginning with any work, the Subcontractor must give the General Contractor four copies of its certificates of insurance, issued by insurance companies approved by the General Contractor and an A. M. Best Rating of A X or better, which show coverage by the Subcontractor necessary to cover its responsibility and liabilities on the type of project involved in this Agreement and of the types and in the amounts required by the Master Contract and Contract Documents. In the absence of coverage or limits stated within the contract documents, **the minimum coverage cannot be less than the type and amounts set forth below.** If the Master Contract contains coverage requirements and are set forth within attachment C, then compliance shall be the greater coverage and limits requirements between the Master Contract and the below listed requirements. Subcontractor shall keep said insurance in full force thru final acceptance of the work by the Owner and until contract insurance requirements end.

|  |  |
|---|---|
| Project Name: | Wal-Mart Sam's Club #4840-00 |
| Project Number: | 360.01 |
| Location: | Kettering Street & Rotamer Road, Janesville, WI 53545 |

## REQUIRED ADDITIONAL INSURED

|  |  |
|---|---|
| Owner: | Wal-Mart Stores, Inc. |
| Architect: | Raymond Harris & Associates |
| Engineer: | Arc Design Resources, Inc. |
| General Contractor: | William A. Randolph, Inc. |

**GENERAL LIABILITY** Subcontractor shall carry standard ISO General Liability coverage, written on an occurrence basis - including Completed Operations. The coverage must be endorsed to name William A. Randolph, Inc. as an "additional insured" (Form CG 2010 11/85 or equivalent – meaning the additional insured coverage form to include work in progress - i.e. ongoing operations and completed work – i.e. Completed Operations) and include the Owner,

# William A. Randolph, Inc.
## Subcontract Agreement

Architect and others as "additional insured's" as required in the Master Contract documents for a period of two (2) years after completion of the project. The "Additional Insured" form shall state that this insurance **shall be primary without right of contribution** from any other insurance available to the "additional insured's" and the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance. **Copy of the additional insured endorsement form will be attached to the Certificate of Insurance.** A waiver of subrogation will be provided and noted on the certificate.

The GL shall include such coverage, but not limited to, premises/operations, employees as insured's, explosion, collapse and underground (XCU), broad form contractual (including personal injury), products/completed operations, independent contractors, broad form property damage and personal injury. The CGL must be written on an occurrence basis, with minimum limits of:

| | |
|---|---|
| Each Occurrence | $1,000,000 |
| General Aggregate - Per Project | $2,000,000 |
| Products & Completed Operations Aggregate | $2,000,000 |
| Personal/Advertising Injury | $1,000,000 |
| Fire Damage | $100,000 |
| Medical Payments | $10,000 |

**COMPREHENSIVE AUTOMOBILE LIABILITY** on occurrence basis covering all **Owned, Non-Owned and Hired Vehicles** for limits of liability equal to **$1,000,000** Combined Single Limit.

**WORKER'S COMPENSATION** including Occupations Disease insurance meeting the statutory requirements of the State in which work is to be performed together with a Broad Form All States Endorsement and containing **Employer's Liability** insurance in an amount of at least:

| | |
|---|---|
| Each Accident | $500,000 |
| Disease – Policy Limit | $500,000 |
| Disease – Each Employee | $500,000 |

Workers Compensation shall waive the rights of subrogation in favor of all additional insured's.

**UMBRELLA LIABILITY** and/or **EXCESS LIABILITY** with coverage at least as broad as the underlying policies.
$5,000,000.00 W VH
Occurrence and Aggregate Limits    ~~$8,000,000~~    JBz

A certificate of insurance form must be filed with **William A. Randolph, Inc.** prior to the commencement of any work and shall state coverage which will not be altered, cancelled or allowed to expire without thirty (30) days written notice by certified mail to **William A. Randolph, Inc.** If any of the above coverage's are subject to or are in excess of any deductibles or self-retention, these amounts must be stated on the certificate, and said deductibles and self-retention will be the sole responsibility of Subcontractor. A duplicate certificate and additional insured endorsement shall be sent to T.J. ADAMS GROUP, 333 EAST BUTTERFIELD ROAD, SUITE 500, LOMBARD, IL 60148, ATTN: LYNN A. THOMPSON.

William A. Randolph, Inc.
Subcontract Agreement

It is understood and agreed that authorization is hereby granted to refuse entry to job site and to withhold payments to Subcontractor until a properly executed Certificate of Insurance is received by **William A. Randolph, Inc.** The acceptance of an insurance certificate shall not be a waiver of any of the requirements set forth within this document.

If the Subcontractor fails to deliver such certificates to the General Contractor within forty-eight (48) hours after demand, or upon cancellation fails to replace them after demand, the General Contractor may take one of two course of action:  (1) terminate the Subcontractor's work under this Agreement; or, (2) the General Contractor, in its sole discretion, may obtain such insurance and the Subcontractor hereby agrees to repay the General Contractor, on demand, the full cost of the insurance.  If the Subcontractor fails to repay the General Contractor, the General Contractor may deduct the cost of all paid insurance payments from any money coming due to the Subcontractor under this Agreement.

## SECTION 9: SHOP DRAWINGS

Where required for proper execution of the work, the Subcontractor will submit prints of each detailed shop drawing in the quantity requested by the General Contractor for approval and use. After corrections have been made and the drawings are approved by the General Contractor Architect-Engineer, and the Owner or Owner's representative, prints of each drawing as required by the General Contractor will be resubmitted for final distribution.   In dealing with shop drawings, the Subcontractor's must pay special attention to the Contract Papers.   The Subcontractor must comply with all requirements set forth in the Contract Papers with reference to the work to be performed under this Agreement.  The approval of any drawing will not relieve the Subcontractor of its obligation to perform the work in the manner necessary to produce the results required by the Contract Papers.

## SECTION 10: SAMPLES AND TESTING

The Subcontractor will submit all samples and arrange for all testing of materials to be used in connection with its work as required by the Contract Papers.  Unless other specific arrangements are made in writing, three copies of all samples and test reports will be submitted to the General Contractor.  The General Contractor will then submit the samples and test reports to the Owner or Owner's representative for consideration and approval.   Samples and test reports will be submitted well in advance of the start of the Subcontractor's work, so construction of the entire project or any part thereof is not delayed.

## SECTION 11: COMMENCEMENT – SEQUENCE - COORDINATION OF THE WORK

(a) The Subcontractor agrees that time is of the essence of this Agreement and will, subject to review and further direction of the General Contractor:

(1) Immediately prepare for performance of the work;

# William A. Randolph, Inc.
## Subcontract Agreement

(2) Begin work as soon as the progress of each portion of the job will permit; and, in any event, proceed on any specific portions of the work within five (5) days after notice from the General Contractor relating thereto.

(3) Provide sufficient quantity of materials, supervision, efficient workmen, and equipment to diligently perform and carry on such portions of the work in such locations, sequence, manner and time, as the General Contractor may direct, to meet the completion date required by the Contract Papers.

(4) Submit a detailed written request to the General Contractor, within thirty (30) days from the date of this Agreement, for all such items of information as may be necessary to fit and coordinate the Subcontractor's work with all other branches of the work. This written request will furnish to the General Contractor such details and written information related to the Subcontractor's work as is needed for the proper coordination if its work with that of other trades. No time extension will be allowed to the Subcontractor for lack of details or other information unless the Subcontractor has made a request for such details or other information in writing to the General Contractor and the General Contractor fails to respond to the Subcontractor in a reasonable amount of time. The Subcontractor will schedule and perform its work to avoid conflict or interference with the work of others, and will so plan and conduct its work as not to interfere with the General Contractor, other Contractors, or trades. The Subcontractor will participate in the preparation of coordinated drawings in areas of congestion, specifically noting and advising the General Contractor of any such interference. The Subcontractor will take all precautions necessary to protect the work of others, whether completed or in process, from damage or disruption.

(b) The Subcontractor agrees to complete its work without delaying other work being performed or to be performed and, on order of the General Contractor, to do certain parts of its work in preference to others. The General Contractor may for any cause postpone or extend the time for performance of the work covered by this Agreement or any portion thereof, and no such postponement or extension shall alter the rights and remedies of the parties under this Agreement. In addition, a time extension will not in any way prejudice or impair the security of the General Contractor under any bond given in pursuance of the requirements set forth in this Agreement. Lastly, such a time extension will not release this Subcontractor from his obligation to complete the work in full compliance with the terms of this Agreement and any authorized time extensions.

(c) In the event that unionized employees of the Subcontractor or any contractor working on the project go on strike for any reason, including but not limited to a strike to protest the use of non-unionized employees on the project, General Contractor will institute a two gate system (the "Two Gate System"). One gate will be marked "Union Workers" and will be used only by unionized workers, including Subcontractor's unionized employees, until the completion of the project, including but not limited to the work identified in Section 1 of this Agreement. The other gate will be marked ("Non-Union Workers") and will be used only by non-unionized

William A. Randolph, Inc.
Subcontract Agreement

workers, including the Subcontractor's non-unionized employees, until the completion of the project, including but not limited to the work identified in Section 1 of this Agreement. The Subcontractor and Subcontractor's employees must report for work at the project at the usual starting time on the first regular work day following the implementation of the Two Gate System regardless of whether the Subcontractor's workers are unionized or non-unionized workers. The Subcontractor or the Subcontractor's employees' failure to report for work at the usual starting time on the first regular work day following the implementation of the Two Gate System will result in a breach of this Agreement.

(d) If a sufficient quantity of materials and workmen are not delivered or furnished promptly, thereby causing or threatening to cause delay in the progress of the work, the General Contractor has the right to investigate the cause and expedite such deliveries of materials and workmen. All expenses incurred by the General Contractor in an effort to remedy a delay or threat of delay will be charged to and paid by the Subcontractor.

## SECTION 12: OVERTIME

Upon written order from the General Contractor, the Subcontractor will work overtime to the extent deemed necessary by the General Contractor to expedite and to comply with all requirements relating to sequence, time of performance, and date of final completion of the Master Contract.

Where the Subcontractor is not in default under any of the provisions of this Agreement, the General Contractor will reimburse the Subcontractor only for the premium actually paid by the Subcontractor on productive labor during such overtime, and state and federal taxes, based upon such premium. Such premium will be computed as the difference between the Subcontractor's wage rates as established by local agreements for straight time and overtime.

If, however, in the opinion of the General Contractor, the Subcontractor is behind schedule in performing the work covered under this Agreement, or otherwise in default under this Agreement, then the resulting costs and expenses incurred will be borne entirely by the Subcontractor.

## SECTION 13: TERMINATION - RIGHT TO PROCEED - DELAYS - EXTENSION OF TIME

Should the Subcontractor fail at any time to supply a sufficient number of properly skilled workmen or sufficient materials and equipment of the proper quality; fail in any respect to complete the work with promptness and diligence; fail in the performance of any of the Agreements contained herein, the General Contractor has the option to provide such labor, materials and equipment. The cost of such labor, materials, and equipment, along with any additional loss or damage occasioned thereby, will be deducted from any money then due or to become due to the Subcontractor under this Agreement.

In addition, if the Subcontractor at any time refuses or neglects to supply a sufficiency of skilled workmen or materials or equipment, fails in any respect to complete the work with promptness,

William A. Randolph, Inc.
Subcontract Agreement

causes by any action or omission the stoppage or interference with the work of the General Contractor or other subcontractors, fails in the performance of any of the covenants set forth in this Agreement, becomes insolvent, or unable to meet its debts as they mature, the General Contractor has the option at any time after serving forty-eight (48) hours written notice, mailed to the Subcontractor's place of business, to terminate the Subcontractor's work. The General Contractor may then ~~take possession of said plant and work, materials, tools, appliances and equipment of this Subcontractor and~~ through itself or others provide labor, equipment, and materials to complete the work on such terms and conditions as will be deemed necessary. Costs incurred will be deducted from any money then due or to become due to the Subcontractor under this Agreement. Costs incurred are, but not limited to, all charges, expenses, losses, costs, damages, and attorneys' fees, incurred as a result of the Subcontractor's failure to perform. If the General Contractor terminates the Subcontractor, the Subcontractor shall not be entitled to any further payments under this Agreement until the work covered by this Agreement has been completed and accepted by the Owner, and payment has been received by the General Contractor from the Owner with respect thereto. In the event that the unpaid balance due exceeds the expense incurred by the General Contractor, the difference shall be paid to the Subcontractor, but if such expense exceeds the balance due, the Subcontractor agrees to promptly pay the difference to the General Contractor.

Should the Subcontractor be obstructed or delayed in the completion of the work as a result of un-foreseeable causes beyond the control of the Subcontractor, and not due to the Subcontractor's fault or neglect, including but not restricted to acts of God or of the public enemy, acts of government, fires, floods, epidemics, quarantine regulations, strikes or lockouts, the Subcontractor shall notify the General Contractor in writing, within twenty-four (24) hours after the start of such delay, stating the cause or causes thereof. The General Contractor shall immediately ask the Owner for an extension of time stating the cause of the delay asserted by the Subcontractor. The Subcontractor will then become entitled to only such extensions of time for completing the work as the Owner may grant, as a result of the unforeseeable cause. The extension of time granted by the Owner will be a final and conclusive decision.

If from causes beyond the control of the General Contractor, including but not limited to strikes, lockouts, fires, acts of God or the public enemy, floods, epidemics, quarantine regulations, and freight embargoes, the General Contractor is obstructed or prevented from performing any work on the project, and considers it inadvisable to receive materials therefore, then the Subcontractor will, upon notification from the General Contractor, stop deliveries to and performance of any work agreed to under this Agreement until the General Contractor state that the conditions are such that it is advisable to resume operations. The Subcontractor agrees to and will resume delivery of materials and performance of this work as required by written notification to it by the General Contractor.

No interruption, cessation, postponement or delay in the start or progress of the work from any cause whatsoever, even if caused by the Subcontractor, including but not limited to disputes, will relieve the Subcontractor of its duty to perform or give rise to any right to damages or additional compensation from the General Contractor except to the extent that reimbursement is received

William A. Randolph, Inc.
Subcontract Agreement

from the Owner by the General Contractor therefore with respect to the Subcontractor's operations. The Subcontractor expressly waives and releases any other or further right to such damages in excess of an amount commensurate (proportionate) with any allowance related to this Subcontractor's operations which the General Contractor receives from the Owner. In addition, the Subcontractor agrees that no additional compensation or damages shall be allowed for any cause except as provided in this paragraph and Section 2. In any event the Subcontractor shall diligently proceed with the work as directed by the General Contractor.

In the event the Master Contract, or any part thereof, is terminated for any reason whatsoever, the General Contractor shall have the right to terminate this Agreement with Subcontractor.

## SECTION 14: INSPECTION AND APPROVAL-CORRECTIONS
The work herein described will be subject at all times to the inspection and approval of the General Contractor and Owner, to whom it shall be made entirely satisfactory, and the Subcontractor will provide sufficient, safe and proper facilities at all times for such inspection of the work.

Within 24 hours after receiving written notice from the General Contractor, the Subcontractor will, at its own expense and without injury to the surrounding work, proceed to remove and correctly replace all portion of its work which either the General Contractor or Owner condemns as failing to conform to the Contract Papers. In addition, the Subcontractor will reimburse the General Contractor for any resulting loss of damage suffered by it. In the event the Subcontractor fails to correct the defective work, the General Contractor or Owner may remedy it at the Subcontractor's expense and deduct the cost from any amount then due or to become due the Subcontractor. If such amount is insufficient, or if no amount shall be due, then the Subcontractor will pay all additional costs to the General Contractor. If, in the opinion of the General Contractor and Owner it is not worthwhile to correct the defective work, the General Contractor may assess and deduct from any amount then due or to become due the Subcontractor, or if such amounts are insufficient the Subcontractor agrees to pay, the difference in value, as determined by the Owner, between the work as performed and the work as required by the Contract Papers.

## SECTION 15: GUARANTEES
The Subcontractor warrants that all materials and equipment furnished will be new unless otherwise specified. The Subcontractor also warrants that all work under this Agreement will be of good quality, free from faults and defects, and in conformance with the Contract Papers. The Subcontractor unconditionally guarantees the work against any and all defects in materials or workmanship for the longer of (1) one year following the date of final acceptance of the work by General Contractor and Owner, or (2) the time specified for General Contractor's guarantee of the work, if any, to the Owner. The warranty provided by way of this Agreement will be in addition to and not in limitation of any other warranty or remedy provided by law or by the Contract Papers.

# William A. Randolph, Inc.
## Subcontract Agreement

The Subcontractor agrees that if any portion of said materials or workmanship furnished by him will not in every way be good, sound, efficient and well-suited for the purposes for which it is intended, and such deficiency becomes apparent, detected by inspection, detected within the time of the guarantee period, or is detected in the absence of any specified guarantee, then the Subcontractor may be liable to the General Contractor or Owner. The Subcontractor will, at any time and upon notice from General Contractor or Owner, promptly correct any specified faults or imperfections in workmanship or material. The Subcontractor is to pay all damages for such fault; and in the event of the failure of the Subcontractor to so correct the same, the General Contractor or Owner may remedy the same at the Subcontractor's expense and deduct the cost of damages from any amount then due or to become due to the Subcontractor. If such amount shall be insufficient, or if there will be nothing due the Subcontractor, the Subcontractor will pay the General Contractor such costs and damages, or the balance thereof.

Neither the making of the final payment under this Agreement, nor any provision of the aforesaid plans and specifications, nor any act of General Contractor or Owner will relieve the Subcontractor of responsibility for encumbrances and liens growing out of the performance of this Agreement or for the installation of faulty materials or workmanship. Unless otherwise specified, the Subcontractor will remedy any defects and will pay for any damage or additional work resulting from the defective work, which appears within the period referred to in this Agreement.

The Subcontractor will furnish, in a form satisfactory to the General Contractor and Owner and before final payment is made by the General Contractor to the Subcontractor, all specific and general guarantees from the Subcontractor and the manufacturers of materials used in connection with its work. In addition, the Subcontractor will furnish to the General Contractor all bonds relating to materials used in connection with its work, as required by the Contract Papers.

## SECTION 16: PAYMENTS

In regard to all work agreed to in the Contract Papers and discounting any prior estimates, the General Contractor agrees to make monthly payments for the Subcontractor's work, to the extent that it has been completed. The monthly payments will be in the amount allowed and paid to the General Contractor by the Owner. Only upon the General Contractor receiving payment from the Owner does the General Contractor become obligated to make payments to the Subcontractor. Further, 10% of all monthly payments to the Subcontractor will be retained. This amount will be retained for final payment, on the condition that all work is completed by a date satisfactory to the General Contractor and all improper or rejected work has been corrected.

Within 15 days from the date of this Agreement, the Subcontractor must give the General Contractor a detailed and itemized breakdown of all work covered by this Agreement and the Contract Papers. The Contract Price must be distributed, among the individual items of material, labor, and other costs, on a mutually agreed basis that proportionately reflects all quantities and values of the above. Each month, and in accordance with the Contract Papers, the Subcontractor must give the General Contractor a written request for a progress payment. This written request

## William A. Randolph, Inc.
### Subcontract Agreement

for payment must contain a true and accurate estimate of the work completed during that month, accompanied by a breakdown that conforms to the one provided for above.

These written requests for payment will be prepared by the Subcontractor on special forms provided by the General Contractor. All written requests for payment will contain the following: (1) the Subcontractor's sworn statement certifying that it has fully paid for the work performed and materials furnished for which payment is requested from the General Contractor; and, (2) waivers under the applicable mechanics' lien laws executed by the Subcontractor and each of the Subcontractor's suppliers and its subcontractors, if any. In addition, when requested by the General Contractor, the Subcontractor will give the General Contractor certified copies of payrolls and receipted invoices and vouchers substantiating full payment by the Subcontractor for such work, materials and costs. In the event any of the above requirements have not been fulfilled, the General Contractor may withhold any payment, or portion thereof.

On the condition that the General Contractor has received from the Owner written approval and full payment for the work described herein, final payment to the Subcontractor will be made 30 days after the work has been completed by the Subcontractor so long as it is to the satisfaction of the Owner and General Contractor. Final payment is further subject to the General Contractor's prior receipt from the Subcontractor all written guarantees and bonds; all systems operating and maintenance manuals; parts lists, spare parts, and tools as required by the Contract Papers in connection with the Subcontractor's work; a final waiver of lien; complete release; and, an affidavit certifying the Subcontractor's payment in full of all items relating to the cost of the work, all in accordance with this Agreement.

No progress payment made by the General Contractor to the Subcontractor will be construed as a waiver of the right of the General Contractor to require the fulfillment of all terms of this Agreement. Neither certificate given nor payment made under this Agreement will constitute any evidence of performance except the final certificate or final payment. Also, neither the final certificate nor final payment will be construed to be an acceptance of defective work or improper materials.

With respect to any notices received by the General Contractor or Owner, the General Contractor may retain out of any payment due or to become due to the Subcontractor an amount sufficient to fully indemnify the General Contractor and the Owner against the following: any lien, charge, claim or demand, asserted against the Owner or General Contractor, their property or any property related to such claim, which is chargeable to the Subcontractor. In addition, the General Contractor has the option to retain any amount it deems essential to assure completion of the Subcontractor's work and satisfaction of the Subcontractor's unpaid accounts.

The General Contractor, on receipt of such notice, further reserves the right to pay directly for any labor, materials, and other costs of the Subcontractor, related in any manner to the Subcontractor's work under this Agreement. If the General Contractor chooses to pay directly, it can then charge the Subcontractor or deduct from the Subcontractor's monthly payments the amount owed to the General Contractor. The Subcontractor expressly waives any rights, claims,

William A. Randolph, Inc.
Subcontract Agreement

demands, damages or causes of actions, against the General Contractor by reason of any such payments made or money withheld or deducted as mentioned above.

If the General Contractor is compelled to spend money in defending itself, discharging, or otherwise disposing of any claim of lien or other demand in excess of retained or expended sums hereby authorized to be used for the General Contractor's liquidation of any claim arising from or pertaining to this Agreement or the Subcontractor's work under this Agreement, the Subcontractor shall pay the excess amounts spent by the General Contractor upon demand.

REFERENCE EXHIBIT A FOR GOVERNING PAYMENT TERMS OF THIS CONTRACT.

## SECTION 17: AFFIDAVIT OF PAYMENT - WAIVER OF LIEN - RELEASE

~~As further consideration for this Agreement, the Subcontractor waives and releases all lien or right of lien that either now exists or may arise for work or labor performed or materials furnished, under this Agreement under any present or future law upon the building or improvement in connection with which the work is to be performed, the land upon which the same is situated, and upon any money due or to become due to the General Contractor in connection therewith.~~ The Subcontractor agrees to furnish a good and sufficient waiver of lien in writing, of the same tenor and effect as provided above, from all persons and corporations furnishing labor or materials for the completion of the work under this Agreement. The Subcontractor also agrees to submit to the General Contractor, at the time of final payment, an affidavit certifying to the Subcontractor's payment in full for all items relating to the work under this Agreement and a final waiver of lien and complete release, all in the form designated by the General Contractor.

## SECTION 18: OBLIGATIONS AND INDEMNITIES

In further consideration of the payment by the General Contractor of the sum stated in this Agreement, the Subcontractor agrees:

(a) To furnish all machinery, tools, equipment, supplies, temporary offices, sheds, tool houses, hoist and hoist operator, and all other items necessary for the proper performance of its work under this Agreement; to keep the site of the work clean of the Subcontractor's packaging materials, debris and rubbish, including the coffee cups and lunch wrappings of Subcontractor's workmen; and promptly upon completion of the work to remove all its equipment and temporary installations and clean up and remove from the site of the work all debris caused by its operation under this Agreement, and to pay the General Contractor the cost of repairing any damage caused by the Subcontractor including but not limited to replacing broken glass, plaster patching and other restorative work. If the Subcontractor fails to comply with the foregoing, General Contractor, at its option, may cause same to be remedied and charge the expense of the Subcontractor.

(b) To indemnify and save harmless the General Contractor and Owner from and against any and all claims, demands, suits, judgments, loss, damage, liquidated damages, penalties and expense

William A. Randolph, Inc.

Subcontract Agreement

(including legal fees and expenses), liens, liabilities, and costs incurred, by reason of or resulting from, or which may be claimed to have resulted from, the following:

(1) Failure of the Subcontractor to perform its work, or any of the promises herein contained, in strict accordance with this Agreement; including but not limited to the furnishing of defective materials or workmanship, disrupting the General Contractor's efforts to complete the work economically, the causing of the General Contractor's failure to meet the completion date, and delay chargeable to the Subcontractor.

(2) The Subcontractor's operations; including but not limited to claims under any provisions of the Workmen's Compensation or Employer's Liability Acts of the State in which this Agreement is to be performed, or claims by or on behalf of any employee of the Subcontractor or any person claiming injury to person or property caused by the Subcontractor, its servants, agents or employees.

(3) The carelessness or negligence of any act or omission of the Subcontractor, its agents, employees, workmen or Subcontractors; including but not limited to injuries received or death sustained by any person, fellow servant, or others, or arising from damage to any property; it being understood that the Subcontractor shall be liable for any and all damage injury caused by it or its agents, employees, workmen or Subcontractors, although the material was not supplied or the work was not performed by the Subcontractor.

(4) Materials furnished or labor performed by the Subcontractor; the Subcontractor will pay promptly, when due, for all labor and material used or required by it. Cost of labor and materials assumed by the Subcontractor will include, but not be limited to the following: (a) all contributions to employee welfare funds, including pension funds, vacation funds, apprentice funds, industry advancements and the like, if any, and all contributions, taxes or premiums payable under any state or federal laws which are measured upon the payroll of employees, by whomsoever employed, engaged in the performance of the work included in this Agreement; and (b) all local, state, and federal taxes measured by or imposed in connection with the performance of work or the furnishing of materials under this Agreement, including but not limited to all sales and uses taxes as imposed by reason of the purchase or use of any kind of personal property in performance of this work. Should the General Contractor be served with any writ of summons or notice of lien, said General Contractor shall give prompt notice of service of such writ or notice of such claim of lien to the Subcontractor and shall permit the said Subcontractor to defend by its own counsel. If, in the opinion of the General Contractor, the Subcontractor fails to defend with diligence, the General Contractor in its sole discretion may undertake to defend, and all expenses and attorneys' fees incurred as a result thereof shall be charged to the Subcontractor.

(5) Defaults by the Subcontractor hereunder, including but not limited to failure to perform any duties or obligations under this Agreement.

William A. Randolph, Inc.
Subcontract Agreement

(6) Any claim of infringement of any patent by reason of anything supplied under this Agreement by the Subcontractor; it being understood that any action brought against the General Contractor or Owner founded upon any such claim shall be defended by, and at the sole expense of, the Subcontractor. If, in the opinion of the General Contractor, the Subcontractor fails to defend with diligence, the General Contractor in its sole discretion may undertake to defend. If the General Contractor undertakes to defend, all expenses and attorneys' fees incurred as a result thereof will be charged to the Subcontractor.

(c) That it shall be responsible for the care and protection of all property pertaining to its work including but not limited to materials, supplies, equipment, tools and all of its facilities which are used at or stored at the job site or incorporated in the structure. This responsibility shall continue until the Owner's final acceptance of its work regardless of (1) who furnishes the storage facilities, (2) who holds title to such property, and (3) whether or not progress payments have been made. Subcontractor agrees to fully restore any loss, destruction or damaged work, and to fully indemnify and save harmless both the General Contractor and the Owner from and against any loss or damage due to shortages in any such property resulting from any cause, including but not limited to burglary, theft, damage or destruction, carelessness or improper handling or any other cause which may prevent any part of said property from being used or installed, and accepted as in accordance with the requirements of the Contract Papers, with the sole exception of such portion of said loss, destruction or damaged work as may be covered by insurance of the Owner or General Contractor. Nothing herein will be construed, however, as requiring the Owner or General Contractor to carry insurance other than as stipulated in the Contract Papers between the Owner and the General Contractor. THE SUBCONTRACTOR SHALL BE RESPONSIBLE FOR FIXING ANY MATERIAL OF EQUIPMENT DAMAGED BY THE SUBCONTRACTOR.

(d) That in performing this Agreement it will comply with all record-keeping and notice-posting requirements of all applicable federal, state, and local employment-related statutes and the regulations.

(e) In the manufacture, assembly, deliver, erection and installation of materials and performance of the work covered by this Agreement, Subcontractor will only employ labor satisfactory to the General Contractor.

(f) In performing this Agreement, the Subcontractor will comply with all applicable federal, state and local statutes and regulations regarding employment, including recruitment, hiring and composition of the work force, including but not limited to Title VII of the Civil Rights Act of 1964, the Fair Labor Standards Act of 1938, the Immigration Reform Control Act of 1986, the Davis Bacon Act, the Employee Retirement Income Security Act, the Rehabilitation Act of 1973, the Occupational Safety and Health Act of 1970, and Executive Orders 11246, and 12138, all amendments thereto and all regulations issued there under. In particular, without limiting the foregoing:

(1) The Subcontractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Subcontractor will take affirmative action to ensure that applicants are employed, and that employees

# William A. Randolph, Inc.
## Subcontract Agreement

are treated during employment without regard to their race, color, religion, sex, or national origin. Such action shall include but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Subcontractor agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth provisions of this nondiscrimination clause.

(2) The Subcontractor will, in all solicitations or advertising for employees placed by or on behalf of the Subcontractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(3) The Subcontractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice advising the said labor union or workers' representatives of the Subcontractor's commitments under this section and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The Subcontractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor, and will permit access to his books, records, and accounts by the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(5) In the event of the Subcontractor's non-compliance with the nondiscrimination clauses of this Agreement or with any of the above described rules, regulations, or orders, this Agreement may be canceled, terminated, or suspended in whole or in part.

(6) The Subcontractor will include the provisions of paragraphs (f)(1) through (5) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 25, 1965, so that such provisions will be binding upon each contractor or vendor.

## SECTION 19: CHANGE ORDERS

The Subcontractor shall have no dealings with any party or parties other than the General Contractor in regard to performance, changes, additions or omissions in connection with this work. This agreement cannot be changed except by a properly executed written Change Order, made a part hereof by specific reference therein and indicating the change so ordered. No work shall be commenced by the Subcontractor in connection with any changes or additions to the work or changes in the Contract Papers until the Subcontractor receives a written order from the undersigned officer or manager or his successor of the General Contractor to proceed. Upon such written order, the Subcontractor shall execute the extra work, as the General Contractor shall

# William A. Randolph, Inc.
## Subcontract Agreement

require. An equitable adjustment shall be made for all such changes, which shall in no event exceed the proportionate adjustment made to the General Contractor by the Owner; and, the written order covering the change shall state the specific amounts to be added to or deducted from the Contract Price and time of completion.

In the event a condition arises wherein the Subcontractor is, in its opinion, called upon to perform any changes in the work hereunder for which the amount of compensation to be added or deducted has not been previously agreed upon between parties, it shall prepare and submit to the General Contractor a proposal describing the changes proposed to be made, together with a detailed statement of the quantities and cost involved. The Subcontractor shall keep accurate, detailed and itemized records of the cost of any such change it performs, and shall report all such costs to the General Contractor. The General Contractor may, at its option, prescribe the form and manner of said records and report. The Subcontractor shall in any event furnish each day to the General Contractor certified copies of all time sheets, receiving and inspection reports, and all other basic documents required by the General Contractor, properly evidencing expenditures relating to the Subcontractor's costs for the changes in question. The Subcontractor's application to the General Contractor for payment shall be accompanied by certified copies of all pertinent payrolls, invoices and vouchers to the additional work.

The General Contractor's or Owner's receipt or acknowledgment of the Subcontractor's Change Order claims, any other alleged claim or any notice or report, including report of costs and time relating thereto, shall not be construed as the General Contractor's or Owner's acknowledgement or acceptance of the accuracy and validity of any portion of such claim or report, until such time as final Change Order amounts are determined by the General Contractor to be appropriate and agreed upon as an equitable adjustment, and the signature of the General Contractor's officer or manager or his successor is attached thereto.

## SECTION 20: DISPUTES

In case of any dispute between the parties relating in any way to the performance of the work, the sufficiency of the materials furnished, the proper interpretation of the Contract Papers, or the adjustment of the Contract Price, such dispute shall be finally and conclusively determined by the methods provided by the Contract Papers, or, in the absence of any provision in the Contract Papers, by the General Contractor. In the meantime the Subcontractor shall diligently proceed with the work as directed by the General Contractor.

## SECTION 21: COMPLIANCE WITH LAWS AND REGULATIONS - LICENSES - PERMITS

This Agreement shall be interpreted in accordance with the law of the State of Illinois.
(Mechanic's liens shall be interpreted in accordance with the law of the State of Wisconsin, but all other terms of this Agreement shall be interpreted in accordance with the law of the State of Illinois.)
All work performed and materials furnished under this Agreement, and the installation of such materials by the Subcontractor, will comply in every respect with all applicable laws, ordinances and regulations of duly constituted authorities in force in the location where the work is being

## William A. Randolph, Inc.
### Subcontract Agreement

performed. If any licenses, notices, or permits are required in connection with the work being performed, additional to the general permit procured under the Master Contract, the same will be furnished by the Subcontractor at its own cost and expense.

## SECTION 22: ALCOHOL AND SUBSTANCE ABUSE
Alcoholic beverages and controlled substances are not to be brought onto the jobsite or kept on the jobsite by the Subcontractor, his employees, suppliers, or by any others providing services for the Subcontractor.

Persons whose functions are impaired by or who are known to be illegal users of alcoholic beverages or controlled substances are not to be employed by Subcontractor for work to be done under this Agreement.

Persons whose functions are impaired by use of alcoholic beverages or controlled substances or on whose person the use of alcoholic beverages or controlled substances can be detected, or who are known to have used alcoholic beverages before reporting for work or during work are not to be permitted to enter upon the jobsite. If use of alcoholic beverages or controlled substances becomes known, the person is to be promptly escorted from the jobsite by the Subcontractor or his supervisor.

The Subcontractor is to prevent hazard to his employees, other persons and to the work by preventing the presence or use on the jobsite of alcoholic beverages or controlled substances or by persons using such beverages or substances.

## SECTION 23: WAIVER
No waiver of or failure to assert any breach, condition, term, or covenant of this Agreement shall constitute a continuing waiver or a waiver of any subsequent breach of the same or any other breach, condition, term or covenant.

## SECTION 24: SEVERABILITY
In case any one or more of the provisions of this Agreement or any application thereof shall be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions contained within this Agreement and any other application of this Agreement shall not in any way be affected or impaired.

## SECTION 25: NOTICES
Any notice required under this Agreement shall be in writing and may be delivered personally, or by certified or registered mail, with postage prepaid, to the parties named in this Agreement at the addresses indicated on page one of this Agreement.

## SECTION 26: ATTORNEYS' FEES
~~The General Contractor shall be entitled to recover from Subcontractor all attorneys' fees incurred by the General Contractor in enforcing any of its rights under this Agreement.~~
Each Contractor shall pay their own legal fees.

William A. Randolph, Inc.
Subcontract Agreement

## SECTION 27: MODIFICATION

No amendment or modification of this Agreement shall be valid or binding upon a party unless made in writing and signed by a duly authorized representative of said party.

## SECTION 28: ENTIRE AGREEMENT

This Agreement constitutes the entire Agreement between the General Contractor and Subcontractor with respect to the subject matter defined by the Agreement itself. This Agreement supersedes all prior or contemporaneous Agreements, understandings, communications, conditions, or representations of any kind whatsoever, if any, between the General Contractor and Subcontractor, whether oral or written.

William A. Randolph, Inc.
Subcontract Agreement

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed in duplicate all on the day and year first above written.

## D & BR BUILDING SYSTEMS, INC.

By: _____    Date: _3-13-06_

Name: _____

Title: _President_

Witness: _____

Witness: _____

## WILLIAM A. RANDOLPH, INC.

By: _____    Date: _3/13/06_

Name: _Joseph B Zutkis_

Title: _Project Manager_

Witness: _____

Witness: _____

# EXHIBIT A

# D & BR BUILDING SYSTEMS, INC.

*Structural Steel Erectors*

Phone (903) 896-7850
FAX ( 903) 896-4304

8600 State Hwy 19
Edgewood, TX  75117

March 10, 2006

## CONTRACT AGREEMENT

**PROJECT:**
Wal-Mart Supercenter #1305
Kettering St. & Rotamer Rd.  Janesville, WI
Wal-Mart Stores, Inc.

**GENERAL CONTRACTOR:**
William A Randolph, Inc.
820 Lakeside Dr., Ste. 3
Gurnee, IL  60031
847-856-0123         FAX 847-856-0696

This document shall act as the governing instrument between General Contractor and D & BR Building Systems, Inc.

D & BR Building Systems, Inc. agrees to provide the unloading of owner supplied materials and perform the steel erection of the main building structure defined as follows:

Unload owner supplied materials as needed for our scope of work.
Level anchor bolt nuts at each column location to elevation nut provided by Contractor.
Erect and plumb main structure columns.
Erect main structure girders and beams.  Permanently fasten per details.
Erect main structure joists, bridging, and x-bridging.  Permanently fasten per details.
Load bundles of decking on top of structure as needed for decking placement.
Erect wind girts and permanently fasten where walls and imbeds are available.
Install joist and girder continuity angles and drag struts where required and available.

Items specifically NOT included in this scope of work are:

* Erection of front vestibule members.
* Erection of mezzanine members.
Installation of perimeter angles, bridging clips, fastening ANY members to walls not in place.
* Installation of metal decking.
Installation of skylight, RTU, and exhaust fan frames and curbs.
Installation of any miscellaneous steel, canopies, or other members.

Any issues created by working conditions (i.e. union troubles) are the sole responsibility of the contractor, as outlined in correspondence with D & BR Building Systems, Inc.

Contract sum is $115,000.00 (one hundred and fifteen thousand dollars).
Progress billings will be submitted by D & BR on the 1st and 15th of each month.
Payments from Contractor MUST be received in our office within 14 calendar days of receipt of billing by Contractor, less 10% retainage. Immediately upon completion of our contract, retainage must be reduced to 5%. Change orders must be received in our office prior to the commencement of extra work. Change orders will be billed and paid with progress billings as described above.

Neither D & BR nor Contractor are obligated to enter into future agreements.

In witness whereof, the parties hereto have caused this Agreement to be executed in duplicate all on the day and year first above written.

D & BR Building Systems, Inc.

By: _____
Name: _David S. Ricketts_____
Title: _Vice President_____
Witness: _____
Date: _3/10/06_____

William A Randolph, Inc.

By: _____
Name: _Joseph B. Zutku_____
Title: _Project Manager_____
Witness: _____
Date: _3/13/06_____

JBZ

* ALTERNATES
* OUTSIDE WALLS TO BE COMPLETE 100% BY APRIL 3, 2006.

* MEZZANINES, FRONT VESTIBULE, METAL DECKING, STRUCTURAL CURBS

* $45,000.00

Project Number: 360.01

**EXHIBIT B**
**Drawing Matrix**

| Drawing Number | Title | Issued Date | Latest Revision Number | Latest Revision Date | Designer |
|---|---|---|---|---|---|
| C1 | Cover Sheet | 10/3/05 | | | Arc Design Resources, Inc. |
| C2 | Comprehensive Layout | 10/3/05 | | | Arc Design Resources, Inc. |
| C3 | Erosion And Sediment Control Swppp Site Map Details, General Notes, And Maintenance Notes | 10/3/05 | | | Arc Design Resources, Inc. |
| C4 | Erosion And Sediment Control Swppp Site Map - Phase 1 Sam's Club | 10/3/05 | | | Arc Design Resources, Inc. |
| C5 | Erosion And Sediment Control Swppp Site Map - Phase 1 Wal-Mart | 10/3/05 | | | Arc Design Resources, Inc. |
| C6 | Erosion And Sediment Control Swppp Site Map - Phase 2 Sam's Club | 10/3/05 | | | Arc Design Resources, Inc. |
| C7 | Erosion And Sediment Control Swppp Site Map - Phase 2 Wal-Mart | 10/3/05 | | | Arc Design Resources, Inc. |
| C8 | Erosion And Sediment Control Swppp Site Map - Phase 3 Sam's Club | 10/3/05 | | | Arc Design Resources, Inc. |
| C9 | Erosion And Sediment Control Swppp Site Map - Phase 3 Wal-Mart | 10/3/05 | | | Arc Design Resources, Inc. |
| C10 | Layout Plan Sam's Club | 10/3/05 | | | Arc Design Resources, Inc. |
| C11 | Layout Plan Wal-Mart | 10/3/05 | | | Arc Design Resources, Inc. |
| C12 | Grading Plan Sam's Club | 10/3/05 | 1 | 10/13/05 | Arc Design Resources, Inc. |
| C13 | Grading Plan Wal-Mart | 10/3/05 | 1 | 10/13/05 | Arc Design Resources, Inc. |
| C14 | Plan And Profile Bike Path | 10/3/05 | | | Arc Design Resources, Inc. |
| C15 | Plan And Profile Bike Path | 10/3/05 | | | Arc Design Resources, Inc. |
| C16 | Drainage Plan Sam's Club | 10/3/05 | 1 | 10/13/05 | Arc Design Resources, Inc. |
| C17 | Drainage Plan Wal-Mart | 10/3/05 | 1 | 10/13/05 | Arc Design Resources, Inc. |
| C18 | Special Drainage Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C19 | Special Drainage Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C20 | Utility Plan Sam's Club | 10/3/05 | | | Arc Design Resources, Inc. |
| C21 | Utility Plan Wal-Mart | 10/3/05 | 1 | 10/13/05 | Arc Design Resources, Inc. |
| C22 | Landscape Plan Sam's Club | 10/3/05 | | | Arc Design Resources, Inc. |
| C23 | Landscape Plan Wal-Mart | 10/3/05 | | | Arc Design Resources, Inc. |
| C24 | Irrigation Plan Sam's Club | 10/3/05 | | | Arc Design Resources, Inc. |
| C25 | Irrigation Plan Wal-Mart | 10/3/05 | | | Arc Design Resources, Inc. |
| C26 | Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C27 | Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C28 | Details | 10/3/05 | 1 | 10/13/05 | Arc Design Resources, Inc. |

Project Number: 360.01

**EXHIBIT B**
**Drawing Matrix**

Sam's Club #4840-00
Janesville, WI

| Drawing Number | Title | Issued Date | Latest Revision Number | Latest Revision Date | Designer |
|---|---|---|---|---|---|
| C29 | Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C30 | Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C31 | Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C32 | Retaining Wall Details | 10/3/05 | | | Arc Design Resources, Inc. |
| C33 | Retaining Wall Details | 10/3/05 | | | Arc Design Resources, Inc. |
| V1 | Alta / Ascm Land Title Survey | 10/3/05 | | | Arc Design Resources, Inc. |
| V2 | Alta / Ascm Land Title Survey | 10/3/05 | | | Arc Design Resources, Inc. |
| V3 | Alta / Ascm Land Title Survey | 10/3/05 | | | Arc Design Resources, Inc. |
| C-01 | Cover Sheet | 7/1/05 | 3 | 10/12/05 | Raymond Harris & Associates |
| N-01 | General Information | 1/11/05 | | | Raymond Harris & Associates |
| SP-01 | Site Plan | 7/1/05 | | | Raymond Harris & Associates |
| SP-02 | Site Details | 7/1/05 | | | Raymond Harris & Associates |
| SP-02.1 | Site Details | 7/1/05 | | | Raymond Harris & Associates |
| SP-02.2 | Site Details | 7/1/05 | | | Raymond Harris & Associates |
| A-01 | Floor Plan | 7/1/05 | 3 | 10/21/05 | Raymond Harris & Associates |
| A-01.1 | Fixture Plan (Not In Bid Set) | | | | |
| A-02 | Exterior Elevations | 9/30/05 | | | Raymond Harris & Associates |
| A-02.1 | Signage Details | 9/30/05 | | | Raymond Harris & Associates |
| A-03 | Exterior Wall Sections And | 7/1/05 | | | Raymond Harris & Associates |
| A-03.1 | Exterior Wall Sections And | 7/1/05 | | | Raymond Harris & Associates |
| A-03.2 | Exterior Wall Sections And | 7/1/05 | | | Raymond Harris & Associates |
| A-03.3 | Exterior Wall Sections And | 6/20/05 | | | Raymond Harris & Associates |
| A-04 | Roof Plan | 9/30/05 | | | Raymond Harris & Associates |
| A-04.1 | Roof Details | 7/1/05 | | | Raymond Harris & Associates |
| A-04.2 | Canopy Sections And Details | 6/20/05 | | | Raymond Harris & Associates |
| A-05 | Vestibule | 7/1/05 | | | Raymond Harris & Associates |
| A-05.1 | Cigarette Sales, Vision Center, | 7/1/05 | | | Raymond Harris & Associates |
| A-05.2 | Enlarged Plans | 7/1/05 | 4 | 10/21/05 | Raymond Harris & Associates |
| A-06 | Enlarged Plans | 7/1/05 | | | Raymond Harris & Associates |
| A-06.1 | Partition Types And Details | 1/11/05 | | | Raymond Harris & Associates |
| A-06.2 | Interior Sections and Details | 7/1/05 | | | Raymond Harris & Associates |
| A-07 | Room Finish Schedule | 7/1/05 | | | Raymond Harris & Associates |
| A-08 | Door Schedule | 7/1/05 | | | Raymond Harris & Associates |
| A-08.1 | Door Details | 7/1/05 | | | Raymond Harris & Associates |
| A-08.2 | Windows Details | 7/1/05 | | | Raymond Harris & Associates |
| A-09 | Millwork | 6/20/05 | | | Raymond Harris & Associates |
| A-09.1 | Miscellaneous Details | 7/1/05 | | | Raymond Harris & Associates |
| AC-01 | Auto Center | 7/1/05 | | | Raymond Harris & Associates |
| PH-01 | Pharmacy | 7/1/05 | | | Raymond Harris & Associates |
| SB-01 | Snack Bar | 7/1/05 | 5 | 10/21/05 | Raymond Harris & Associates |
| GA-01 | Grocery Floor Plan | 7/1/05 | | | Boice, Raidl, Rhea Architects |
| GA-02 | Grocery Fixture Plan | 7/1/05 | | | Boice, Raidl, Rhea Architects |

Project Number: 360.01

**EXHIBIT B**
**Drawing Matrix**

Sam's Club #4840-00
Janesville, WI

| Drawing Number | Title | Issued Date | Latest Revision Number | Latest Revision Date | Designer |
|---|---|---|---|---|---|
| GA-03 | Finish Plan And Interior Elevations | 7/1/05 | | | Boice, Raidl, Rhea Architects |
| GA-04 | Wall Sections | 6/20/05 | | | Boice, Raidl, Rhea Architects |
| GA-05 | Grocery Details | 6/20/05 | | | Boice, Raidl, Rhea Architects |
| S-00 | General Structural Information | 7/1/05 | 2 | 10/21/05 | Steven A. Dial, P.E. |
| S-01 | Foundation Plan | 9/30/05 | 4 | 10/21/05 | Steven A. Dial, P.E. |
| S-01.1 | Slab Plan | 7/1/05 | 3 | 10/21/05 | Steven A. Dial, P.E. |
| S-02 | Foundation Details | 1/11/05 | | | Steven A. Dial, P.E. |
| S-02.1 | Foundation Details | 1/11/05 | | | Steven A. Dial, P.E. |
| S-02.2 | Foundation Details | 7/1/05 | | | Steven A. Dial, P.E. |
| S-03 | Roof Framing Plan | 9/30/05 | 4 | 10/21/05 | Steven A. Dial, P.E. |
| S-04 | General Schedules And Diagrams | 6/20/05 | | | Steven A. Dial, P.E. |
| S-04.1 | Framing Schedule And Diagrams | 6/20/05 | | | Steven A. Dial, P.E. |
| S-04.2 | Joist Girder Diagrams | 7/1/05 | 3 | 10/21/05 | Steven A. Dial, P.E. |
| S-04.3 | Wind Girt Diagrams And Schedule | 7/1/05 | 3 | 10/21/05 | Steven A. Dial, P.E. |
| S-05 | Framing Details | 1/11/05 | | | Steven A. Dial, P.E. |
| S-05.1 | Framing Details | 7/1/05 | | | Steven A. Dial, P.E. |
| S-05.2 | Framing Details | 9/30/05 | | | Steven A. Dial, P.E. |
| S-05.3 | Framing Details | 9/30/05 | 4 | 10/21/05 | Steven A. Dial, P.E. |
| S-06 | Vestibule Foundation Plan And Details | 7/1/05 | | | Steven A. Dial, P.E. |
| S-06.1 | Vestibule Framing Plan And Details | 9/30/05 | | | Steven A. Dial, P.E. |
| S-06.2 | Vestibule Framing Details | 7/1/05 | | | Steven A. Dial, P.E. |
| S-06.3 | Signage And Canopy Details | 9/30/05 | | | Steven A. Dial, P.E. |
| S-07 | Mezzanine Framing Plan And Details | 7/1/05 | 3 | 10/21/05 | Steven A. Dial, P.E. |
| S-08 | Auto Center Foundation Plan And Details | 7/1/05 | | | Steven A. Dial, P.E. |
| S-08.1 | Auto Center Framing Plan And Details | 6/20/05 | | | Steven A. Dial, P.E. |
| FP-01 | Fire Site Utility Plan | 7/1/05 | | | TVA Fire & Life Safety, Inc. |
| FP-02 | Overall Fire Sprinkler Plan | 7/1/05 | | | TVA Fire & Life Safety, Inc. |
| FP-02.1 | Fire Sprinkler Plan - System 1 | 7/1/05 | | | TVA Fire & Life Safety, Inc. |
| FP-02.2 | Fire Sprinkler Plan - System 2 | 7/1/05 | | | TVA Fire & Life Safety, Inc. |
| FP-02.3 | Fire Sprinkler Plan - System 3 | 7/1/05 | | | TVA Fire & Life Safety, Inc. |
| FP-02.4 | Fire Sprinkler Plan - System 4 | 7/1/05 | | | TVA Fire & Life Safety, Inc. |
| FP-02.5 | Fire Sprinkler Plan - System 5 | 7/1/05 | | | TVA Fire & Life Safety, Inc. |
| FP-03 | Fire Protection Details | 7/1/05 | | | TVA Fire & Life Safety, Inc. |

Project Number: 360.01

**EXHIBIT B**
**Drawing Matrix**

Sam's Club #4840-00
Janesville, WI

| Drawing Number | Title | Issued Date | Latest Revision Number | Latest Revision Date | Designer |
|---|---|---|---|---|---|
| FP-03.1 | Fire Protection Details | 7/1/05 | | | TVA Fire & Life Safety, Inc. |
| FP-03.2 | Fire Protection Details | 7/1/05 | | | TVA Fire & Life Safety, Inc. |
| P-01 | Plumbing Plan | 7/1/05 | | | Paul C. Parks Engineering |
| P-02 | Enlarged Plumbing Plans And | 6/20/05 | | | Paul C. Parks Engineering |
| P-03 | Enlarged Plumbing Plans And | 6/20/05 | | | Paul C. Parks Engineering |
| P-04 | Plumbing Details | 6/20/05 | | | Paul C. Parks Engineering |
| P-05 | Plumbing Schedules | 6/20/05 | | | Paul C. Parks Engineering |
| M-01 | HVAC Plan | 9/30/05 | | | Paul C. Parks Engineering |
| M-02 | Enlarged HVAC Plans | 9/30/05 | | | Paul C. Parks Engineering |
| M-03 | Mechanical Details | 1/11/05 | | | Paul C. Parks Engineering |
| M-04 | Mechanical Schedules | 9/30/05 | | | Paul C. Parks Engineering |
| MP-01 | Roof Plan | 9/30/05 | | | Paul C. Parks Engineering |
| MP-02 | Auto Center Plan And Details | 6/20/05 | | | Paul C. Parks Engineering |
| GP-01 | Grocery DWV Plan | 7/1/05 | | | Paul C. Parks Engineering |
| GP-02 | Grocery Water Plan | 7/1/05 | | | Paul C. Parks Engineering |
| GP-03 | Grocery DWV And Water Risers | 7/1/05 | | | Paul C. Parks Engineering |
| GM-01 | Grocery HVAC Plan | 6/20/05 | | | Paul C. Parks Engineering |
| R-01 | Refrigeration Plan And Details | 7/1/05 | | | Paul C. Parks Engineering |
| R-02 | Refrigeration Schedules | 6/20/05 | | | Paul C. Parks Engineering |
| R-02.1 | Refrigeration Schedules | 6/20/05 | | | Paul C. Parks Engineering |
| R-03 | Refrigeration Plan | 6/20/05 | | | Paul C. Parks Engineering |
| E-01 | Lighting Plan | 6/20/05 | 2 | 10/24/05 | Paul C. Parks Engineering |
| E-01.1 | Enlarged Lighting Plans | 7/1/05 | | | Paul C. Parks Engineering |
| E-01.2 | Lighting Details And Site | 6/20/05 | 2 | 10/24/05 | Paul C. Parks Engineering |
| E-02 | Power Plan | 9/30/05 | | | Paul C. Parks Engineering |
| E-02.1 | Power Drop Plan | 6/20/05 | | | Paul C. Parks Engineering |
| E-02.2 | Enlarged Power Plans | 7/1/05 | | | Paul C. Parks Engineering |
| E-02.3 | Enlarged Power Plans And Schedules | 9/30/05 | | | Paul C. Parks Engineering |
| E-03 | Electrical Details, Symbols, And Schedules | 6/20/05 | | | Paul C. Parks Engineering |
| E-04 | Electrical One-Line Diagrams And Details | 9/30/05 | | | Paul C. Parks Engineering |
| E-04.1 | Panelboard Schedules | 6/20/05 | | | Paul C. Parks Engineering |
| E-04.2 | Panelboard Schedules | 9/30/05 | | | Paul C. Parks Engineering |
| E-05 | Auto Center Electrical Plans And Schedules | 6/20/05 | | | Paul C. Parks Engineering |
| EM-01 | Energy Management System Cable Plan | 9/30/05 | 3 | 10/24/05 | Paul C. Parks Engineering |
| REM-01 | Refrig Energy Management Plans And Details | 7/1/05 | | | Paul C. Parks Engineering |
| RE-01 | Refrigeration Electrical Plans | 7/1/05 | | | Paul C. Parks Engineering |
| RE-01.1 | Refrigeration Electrical Plans | 6/20/05 | | | Paul C. Parks Engineering |

EXHIBIT C

SUBCONTRACT AGREEMENT INSURANCE RIDER

.ubcontractors of Miam.Randlph̄Inc.shall purchase and maintain during the entire project and during the warranty period, insurance with the minimum limits and coverage shown below or, if greater - the requirements set forth in the Contract Documents, from insurance companies acceptable to Miam.Randlph̄Inc.

GNERAL LIABILITY

Subcontractor shall carry standard ISO General Liability coverage, written on an occurrence basis - including Completed Operations. The coverage must be endorsed to name Miam.Randlph̄Inc.    as an "additional insured" (form CG for eqivlent    – meaning the additional insured coverage form to include work in progress - i.e. ongoing operations and completed work – i.e. Completed Operations) and include the Owner, Architect and others as "additional insureds" as required in the contract documents for a period of 2 years after project completion. The "Additional Insured" form shall state that this insurance all be primry ithut rig ofco    ntribution formny othr insrance    available to the "additional insureds" and the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance. Copy of the additional insured endorsement form is to be attached to the Certificate of Insurance. A waiver of subrogation will be provided.

The GL shall include such coverage, but not limited to, premises/operations, employees as insureds, explosion, collapse and underground (XCU), broad form contractual (including personal injury), products/completed operations, independent contractors, broad form property damage and personal injury. The CGL must be written on an occurrence basis, with minimum limits of:

|  |  |
|---|---|
| Each Occurrence | $ 1,000,000 |
| General Aggregate - Per Project | $ 2,000,000 |
| Products & Completed Operations Aggregate | $ 2,000,000 |
| Personal/Advertising Injury | $ 1,000,000 |
| Fire Damage | $ 100,000 |
| Medical Payments | $ 10,000 |

COMPREHENSIE AUTOMOBILE LIABILITY    on occurrence basis covering all Owned, Non-Owned and Hired Vehicles for limits of liability equal to $1,000,000 Combined Single Limit.

WRKRS COMPENSATION    including Occupations Disease insurance meeting the statutory requirements of the State in which work is to be performed together with a Broad Form All States Endorsement and containing Eployer'sLiability insurance in an amount of at least $500,000 Each Accident / $500,000 Disease – Policy Limit / $500,000 Disease – Each Employee. Workers Compensation shall waive the rights of subrogation in favor of all additional insureds.

UMBRELLA LIABILITY anfir EXCESS LIABILITY    with coverage at least as broad as the underlying policies. The per occurrence and aggregate limits shall be as stated under Section 8: Insurance in the Subcontract Agreement.

A certificate of insurance form must be filed with Miam.Randlph̄Inc.prior to the commencement of any work    and must state coverage will not be altered, cancelled or allowed to expire without thirty (30) days written notice by certified mail to Miam.Randlph̄Inc. If any of the above coverages are subject to    or are in excess of any deductibles or self-retention, these amounts must be stated on the certificate, and said deductibles and self-retention will be the sole responsibility of Subcontractor. A duplicate certificate and additional insured endorsement shall be sent to T.J. ADAMS GROUP, 333 EAST BUTTERFIELD ROAD, SUITE 500, LOMBARD, IL 60148, ATTN: LYNN A. THOMPSON

It is understood and agreed that the insurance coverage and limits, required above, shall not limit the extent of Subcontractor's responsibilities and liabilities specified within Contract Documents or by law. It is understood and agreed that authorization is hereby granted to refuse entry to job site and to withhold payments to Subcontractor until a properly executed Certificate of Insurance is received by Miam.Randlph̄Inc,    Subcontractor's Insurance Requirements set forth herein shall become and be part of any purchase order or contract issued by Miam.Randlph̄Inc.    to Subcontractor as though fully set forth in said purchase order or contract.

Should Subcontractor fail or neglect to provide the required insurance, Miam.Randlph̄Inc.shall have the right, but not the duty, to provide such insurance and deduct from any money that may be due or become due to Subcontractor for any and all premium or costs Miam. Randlph̄Inc. incurs. Equivalent insurance coverage must be obtained from each Sub-subcontractor and Supplier, if any, before permitting them on the site of the project. Otherwise, such insurance for Sub-subcontractors and Suppliers must be included within Subcontractor's insurance policies.

End of EXHIBIT C
(Draft 12/20/04)

EXHIBIT D

PAY APPLICATION REQUIREMENTS

**Project:**          Wal-Mart Sam's Club #4840-00
**Job #:**            360.01
**Location:**         Janesville, WI
**Pay Application Due Date:** 25th of the Month

1. A schedule of values (S.O.V.) must be pre-approved by the project manager prior to the first pay application being submitted. The schedule of values should be sent via email or mail and MUST include all suppliers and subcontractors that you will be using on the specific project. The schedule of values must be type written on AIA standard forms (page 2, continuation sheet). The schedule of values is due to the project manager no later than 2 weeks after contract award. A complete labor and equipment rate sheet must accompany the project schedule of values.

2. Submit the pay application to our main office no later than the date listed above. The pay applications must be type written on AIA standard documents with no exceptions. The dollar values must accurately reflect the work in place or the projected work in place at the end of the pay period. (typically, the last day of the month) Faxed pay applications are acceptable under the following conditions:
   a. It is your responsibility to confirm the pay application has been received and is accepted. Confirmation can be via phone or via email.
   b. An original hard copy must be mailed on the date the copy was faxed.
   c. Faxed copies must be legible.

3. Pay applications will not be accepted unless waivers have been received from the previous month's application. All waivers are to be mailed in with original signatures with three copies being provided for each pay period.

4. Pay applications will not be accepted unless a current certificate of insurance is on file for the referenced project.

5. Pay applications will not be accepted unless a fully executed contract is on file for the referenced project.

6. Only change orders in writing on William A. Randolph, Inc. letter head and executed can be included on the pay applications. Change orders included on the pay applications that have not been issued will result in the pay application being rejected.

7. Back Charges are not to appear on pay applications. All back charges that have been approved by the project manager are to be invoiced separately from the main contract. Back charges included on pay applications will result in the pay application being rejected.

8. No late pay applications will be accepted. If your application is not received by the specified due date, you will be included on the next month's pay application. No early payment will be considered, under any circumstances, due to pay applications not being properly submitted in a timely fashion.

9. The guidelines outlined above, if followed, will ensure that you are paid in a timely fashion and that properly prepared applications will not be delayed due to incomplete or late pay applications from other contractors.

10. If you have any questions, regarding the required forms, due date, approved change orders, they should be addressed at the weekly project coordination meetings or be directed to the project accountant.

End of Exhibit D

EXHIBIT E

## CHANE ORDER SUBMITTAL REQUIREMENTS

**Project:**   Wal-Mart Sam's Club #4840-00
**Job #:**     360.01
**Location:**  Janesville, WI

1. Change orders can be submitted for the following reasons:
   a. Drawing revision
   b. Field Condition / RFI response
   c. Owner Request
   d. City Request
   e. Scope of work not included in contract
2. Change orders must be submitted in a timely fashion. Any change order request/claim that is not submitted within the time frame requested or within 15 days from the date the work was completed, will not be considered for payment. All rights to extra cost and time are waived if proper documentation is not received within the established time frames.
3. Drawing revisions must be priced within 7 days of receipt. Any schedule and cost changes must be completely itemized. All drawing revisions must be acknowledged in writing even if there are no cost or schedule impacts.
4. Field changes must be approved prior to beginning work, must be verified by the project superintendent and all costs related to the field change must be submitted within 15 days of completing the work.
5. Chng ordrsnt includ      th bllowing breakn:
   a. Labor – (total number of hours x applicable rate) Labor costs must be listed separately for each specific change that has occurred. The labor rates should not included overhead and profit as this is to be included as a line item for each change. (Labor rate sheets must be agreed to and submitted within 2 weeks of contract) No lump sum labor prices will be accepted.
   b. Material – (material quantity x unit price) Material should be listed for each specific change that has occurred. When possible, include supplier back up (quotes or invoices) to substantiate the costs you are submitting. Tax should be included on all material. No lump sum material prices will be accepted.
   c. Equipment – (equipment hours x unit rate) Equipment should be listed for each specific change that has occurred. If trucking to and from the jobsite is necessary, list this as separate line items. If the equipment is already on the jobsite, no mobilization charges will be allowed.
   d. Subcontracts – If you have a subcontractor that is affected by the change, the subcontractors quote must be included with your change order request. The quotes must adhere to the same guidelines listed above or they will not be accepted.
   e. OH&P – Is to be included as the last line item of the quote and cannot exceed 10% of the total value of the change for all work.
6. Change order requests are to be sent via mail and faxed. It is your responsibility to confirm that the requests have been received.
7. All change orders must be approved in writing and issued on a William A. Randolph, Inc. change order prior to being billed.
8. A change order log, indicating approved, pending and rejected change orders, must be maintained and submitted on a monthly basis.

End of Exhibit E

EXHIBIT F

## CLOSE OUT DOCUMENTATION REQUIREMENTS

**Project:**  Wal-Mart Sam's Club #4840-00
**Job #:**  360.01
**Location:**  Janesville, WI
**Close Out Specification Section:** 01770 Contract Closeout
**Number of Copies Required:** Three (3)

1. All requirements of the above referenced specification sections and those sections applicable to your specific contract must be met.

2. Subcontractor warranty letters, manufacturer warranty letters, operation and maintenance instructions as related to your subcontracts scope of work and as build drawings as related to your subcontracts scope of work must be included in this final submittal.

3. Operations and Maintenance Manuals will generically contain the following items, consult individual project specification sections as listed above for more specific requirements:
   - A. List of Equipment
   - B. Parts List
   - C. Operating Instructions
   - D. Maintenance Instructions for Equipment
   - E. Maintenance Instructions for Finishes
   - F. Shop Drawings and Product Data

4. As Build Drawings should be maintained throughout the job and a clean copy of these must be included with the closeout submittals. The documents should be clearly labeled/corrected in a colored ink to define what if any changes were made to the design drawings during the construction process.

5. All close out material must be received within 30 days of subcontract completion. Late, incorrect and/or incomplete closeout submittals will be accessed a $250 per day late fee. This fee will not be waived for any reason.

6. 8-1/2" x 11" closeout documentation should be neatly organized; three hole punched, and unbound.

7. The failure to submit all required closeout documentation as detailed above and as listed in the contract documents will affect the ability to close this project out with the owner and will in turn affect everyone involved with this project. All parties involved appreciate the timely submittal of this subcontractor's closeout document.

End of Exhibit F

## EXHIBIT G

## PROJECT INFORMATION SUPPLEMENT

**Project:**    Wal-Mart Sam's Club #4840-00
**Job #:**      360.01
**Location:**   Janesville, WI

Congratulations on your recent award of contract and welcome to the project team for the above referenced project.  The contents and attachments to this supplement contain important information that should be reviewed with all members of your team and kept for future reference.

### Project Directory

The below contacts will be part of the William A. Randolph, Inc. team working on this project. Any questions you have may be directed to anyone of the following individuals.

**Contract Administrator:**    Bernadette Cook – Ext. 120
**Email Address:**             bernadette.cook@warandolph.com

The contract administrator is responsible for sending, receiving and processing contract documents, including but not limited to subcontracts, change orders and insurance certificates. All insurance certificates and/or questions related to insurance should be directed to the contract administrator.

**Project Accountant:**    Ed Smith – Ext. 101
**Email Address:**         ed.smith@warandolph.com

The project accountant is responsible for all matters related to the monthly draw preparation, draw payouts and payment waiver information.  Monthly pay applications should be sent to the attention of the project accountant.  Verification that your companies pay application and other draw related paperwork has been received should be made with the project accountant.

**Project Superintendents:**    Joe Adams                        TBD
**Mobile Phone:**               (224) 588-2264
**Email Address:**              joe.adams@warandolph.com
**Site Phone:**                 *TBD*
**Site Fax:**                   *TBD*

The project superintendent will perform all scheduling of trades, and will monitor the Safety program and the Drug and Alcohol policies. The main contract includes an aggressive schedule with several key milestone completion dates; it is imperative that your company's field personnel work closely with the project superintendent and other trades to ensure a safe, productive and successful work environment.

**Project Manager:**    Joseph B. Zutkis
**Mobile Phone:**       847-514-9343
**Email Address:**      joe.zutkis@warandolph.com

The project manager will be responsible for overseeing all aspects of the project including but not limited to writing subcontracts, reviewing change order requests, reviewing pay applications, processing submittals, schedule administration and reviewing and compiling close out documentation.

## Drug and Alcohol Policy

A copy of the William A. Randolph, Inc. Drug and Alcohol policy accompanies this contract. This is a zero tolerance policy and will be monitored by the project superintendent as well as all other members of William A. Randolph, Inc.

## Insurance

No subcontractors will be allowed on site without first filing an acceptable certificate of insurance as defined in section 8 and Exhibit C of this contract. A sample certificate is attached to this contract for your reference. Please contact the contract administrator if you have any questions related to insurance.

## Job Site Safety

A copy of the William A. Randolph, Inc. Health and Safety Manual accompanies this contract. It is important that all field personnel are familiar with safety practices required under the most current 29 CFR 1926 OSHA Construction Industry Regulations, the William A. Randolph, Inc. health and safety manual and individual subcontractor safety policies. It is imperative that all persons working on a William A. Randolph, Inc. site follow safety procedures at all times. If an unsafe condition is found or field personnel are unsure of what safety measures should be taken in any given situation the project superintendent must be notified immediately.

## Sexual Harassment Policy

Every individual has the right to work in an atmosphere that promotes equal opportunity and prohibits discriminatory practices, including sexual harassment. Sexual harassment, whether verbal, physical or environmental, is unlawful. It is unacceptable at William A. Randolph, Inc. and will not be tolerated. A complete copy of the William A Randolph, Inc. Sexual Harassment Policy is available upon request; contact the contractor administrator if a copy is desired.

## Subcontractor Labor Reports

An example of the Subcontractor Manpower Daily Report immediately follows this Exhibit. At the end of the work week, each subcontractor will turn in a completed copy of this report to the project superintendent. Anyone who is performing work on this site is to be accounted for on a manpower daily report, including second-tier contractors (contractors hired by your company).

EXHIBIT G



## SUBCONTRACTOR MANPOWER DAILY REPORT

Day of the Week _____        Project Name _____

Date _____                 Subcontractor _____

Project No. _____          Trade _____

| FIRST | MIDDLE | LAST | POSITION | M | T | W | T | F | S |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  | Foreman Initials |  |  |  |  |

**CERTIFICATION:** By initialing above and signing below, I certify that on the days listed above the names recorded represent those individuals who were present and performing work at the subject project in accordance with William A. Randolph, Inc. company policy and health & safety procedures.

WARI                         Subcontractor
Superintendent _____    Foreman _____
              Initials

                                        Signature

## WAIVER OF LIEN TO DATE

STATE OF         }
COUNTY OF        } SS

TO WHOM IT MAY CONCERN:

WHEREAS the undersigned has been employed by _____ William A. Randolph, Inc. _____

to furnish _____

for the premises known as _____ Wal-Mart Sam's Club Store #4840-00 _____

of which _____ Wal-Mart Stores, Inc. _____ is the Owner.

THE undersigned, for and in consideration of _____

_____ Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged,

do(es) hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of Illinois, erating to mechanics' liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other consideration due or to become due from the Owner, on account of all labor, services, material, fixtures, apparatus or machinery, furnished to this date by the undersigned for the above-described premises, INCLUDING EXTRAS.*

DATE _____            COMPANY NAME _____

                                   ADDRESS _____

SIGNATURE AND TITLE _____

*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT.

## CONTRACTOR'S AFFIDAVIT

STATE OF         }
COUNTY OF        } SS

TO WHOM IT MAY CONCERN:

THE undersigned (Name) _____

that he or she is (Position) _____ being duly sworn, deposes and that

of (Company Name) _____

a contractor furnishing _____ who is the

_____ work on the building

located at _____ Kettering Street and Rotamer Road, Janesville, WI 53545

owned by _____ Wal-Mart Stores, Inc. _____

that the total amount of the contract including extras* is on which he has received payment of    $ _____

on which he or she has received payment of    $ _____ prior to this payment. That all waivers are true, correct and genuine and delivered unconditionally and that there is no claim either legal or equitable to defeat the validity of said waivers. That the following are the names of all parties who have furnished material or labor, or both, for said work and all parties having contracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said work according to plans and specifications:

| NAMES | WHAT FOR | CONTRACT PRICE INCLDG EXTRAS* | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| TOTAL LABOR AND MATERIAL INCLUDING EXTRAS* |  |  |  |  |  |

that there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

SIGNED THIS _____ DAY OF _____

SIGNATURE _____

SUBSCRIBED AND SWORN
TO BEFORE ME THIS _____ DAY OF _____

SIGNATURE _____

*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT.

Notary Signature & Seal

FINAL WAIVER OF LIEN

TATE OF      }

OUNTY OF    } SS

O WHOM IT MAY CONCERN:

EREAS the undersigned has been employed by        William A. Randolph, Inc.

urnish

r the premises known as      Wal-Mart Sam's Club Store #4840-00

which      Wal-Mart Stores, Inc.      is the Owner.

HE undersigned, for and in consideration of

  $0.00        Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged,

)(es) hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of Illinois, erating to mechanics' liens, th respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery rnished, and on the moneys, funds or other consideration due or to become due from the Owner, on account of all labor, services, material, ctures, apparatus or machinery, heretofore furnished, or which may be furnished at any time hereafter, by or on behalf of the undersigned, for the bove-described premises. INCLUDING EXTRAS.*

ATE             COMPANY NAME

                              ADDRESS

SIGNATURE AND TITLE

XTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT.

## CONTRACTOR'S AFFIDAVIT

TATE OF      }

OUNTY OF    } SS

O WHOM IT MAY CONCERN:

HE undersigned (Name)      being duly sworn, deposes and that

e or she is (Position)

f (Company Name)      who is the

tractor furnishing      work on the building

cated at      Kettering Street and Rotamer Road, Janesville, WI 53545

wned by      Wal-Mart Stores, Inc.

That the total amount of the contract including extras* is on which he has received payment of      $

n which he or she has received payment of   $      prior to this payment. That all waivers are true, correct and enuine and delivered unconditionally and that there is no claim either legal or equitable to defeat the validity of said waivers. That the following re the names of all parties who have furnished material or labor, or both, for said work and all parties having contracts for specific portions of said vork or for material entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include all abor and material required to complete said work according to plans and specifications:

| NAMES | WHAT FOR | CONTRACT PRICE INCLDG EXTRAS* | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| TOTAL LABOR AND MATERIAL INCLUDING EXTRAS* |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

SIGNED THIS      DAY OF

                 SIGNATURE

UBSCRIBED AND SWORN

TO BEFORE ME THIS      DAY OF

**EXTRAS INCLUDE BUT ARE NOT LIMITED      SIGNATURE
TO CHANGE ORDERS, BOTH ORAL AND
WRITTEN, TO THE CONTRACT.          Notary Signature & Seal

CONTRACT EXHIBIT I - SCHEDULE

**WM. A. RANDOLPH, INC.**

builders ● contractors ● construction managers

**820 Lakeside Drive, Suite 3    Gurnee, Illinois 60031**
**Phone (847) 856-0123    Fax (847) 856-0696**
**www.warandolph.com**

Certified Mail No.: 7005 3110 0001 5818 5391

June 21, 2006

Bill Rickets
D&BR Building Systems, Inc.
8600 State Hwy 19
Edgewood, TX 75117
Faxed to 903-896-4304

08CV2257

JUDGE GOTTSCHALL

MAGISTRATE JUDGE SCHENKIER

Re:    Wal-Mart #1305-01 Janesville, WI (Job #360.00)
       48 Hour Contract Notice

NOTICE IS HEREBY GIVEN, pursuant to Section 13 of your subcontract, dated April 5, 2006,
for the above project that you are in default in the performance of your subcontract in that you
have:
- Refused or neglected to supply a sufficiency of skilled workmen, materials and/or
  equipment.   No work was performed on 6/20 or 6/21.
- Failed in the respect to complete the work with promptness per the project schedule.
- Caused by action or omission the stoppage or interference with the work of the General
  Contractor or other subcontractors.

YOU MUST CURE, OR MAKE REASONABLE PROGRESS TOWARD CURING, EACH OF
SAID DEFAULTS WITHIN FORTY-EIGHT (48) HOURS of the date of Service of this Notice
or we, as General Contractor, at our option, may terminate your subcontract in whole or in part.
A determination as to whether or not reasonable progress has been made shall be in the sole
judgment of the Contractor. If we terminate your subcontract, we will complete your contract or
hire others to do so. All costs and damages incurred in completing your subcontract will be
deducted from the unpaid balance of your subcontract. If costs of completion and damages
exceed the unpaid balance of your subcontract, you will be back-charged therefore.

Upon termination, you will not be entitled to receive any payment under your subcontract until
the project has been completed.

Sincerely,
**William A. Randolph, Inc.**

Anthony Riccardi
President

| SESSION | FUNCTION | NO. | | DESTINATION STATION | DATE | TIME | PAGE | DURATION | MODE | RESULT |
|---------|----------|-----|---|---------------------|------|------|------|----------|------|--------|
| 5775 | TX | 07 | 19038964304 | | JUN.21 | 17:03 | 001 | 00'01'36" | ECM | OK |

DATE:JUN.21'2006 17:04
TEL. :8478560696
NAME:WILLIAM A. RANDOLPH INC.

```
TX  RESULT  REPORT
```

**WM. A. RANDOLPH INC.**

builders • contractors • construction managers

820 Lakeside Drive, Suite 3    Gurnee, Illinois 60031
Phone (847) 856-0123    Fax (847) 856-0696
www.warandolph.com

Certified Mail No.:

June 21, 2006

Bill Rickets
D&BR Building Systems, Inc.
8600 State Hwy 19
Edgewood, TX 75117
Faxed to 903-896-4304

Re:    Wal-Mart #1305-01 Janesville, WI (Job #360.00)
       48 Hour Contract Notice

NOTICE IS HEREBY GIVEN, pursuant to Section 13 of your subcontract, dated April 5, 2006, for the above project that you are in default in the performance of your subcontract in that you have:

- Refused or neglected to supply a sufficiency of skilled workmen, materials and/or equipment. No work was performed on 6/20 or 6/21.
- Failed in the respect to complete the work with promptness per the project schedule.
- Caused by action or omission the stoppage or interference with the work of the General Contractor or other subcontractors.

YOU MUST CURE, OR MAKE REASONABLE PROGRESS TOWARD CURING, EACH OF SAID DEFAULTS WITHIN FORTY-EIGHT (48) HOURS of the date of Service of this Notice or we, as General Contractor, at our option, may terminate your subcontract in whole or in part. A determination as to whether or not reasonable progress has been made shall be in the sole judgment of the Contractor. If we terminate your subcontract, we will complete your contract or hire others to do so. All costs and damages incurred in completing your subcontract will be deducted from the unpaid balance of your subcontract. If costs of completion and damages exceed the unpaid balance of your subcontract, you will be back-charged therefore.

Upon termination, you will not be entitled to receive any payment under your subcontract until the project has been completed.

Sincerely,
William A. Randolph, Inc.

*Tony Riccardi*

Anthony Riccardi
President

WM. A. **RANDOLPH** INC.

builders ● contractors ● construction managers

**820 Lakeside Drive, Suite 3    Gurnee, Illinois 60031**
**Phone (847) 856-0123    Fax (847) 856-0696**
**www.warandolph.com**

Certified Mail No.: *7005  3110  0001 5818 5391*

June 21, 2006

Bill Rickets
D&BR Building Systems, Inc.
8600 State Hwy 19
Edgewood, TX 75117
Faxed to 903-896-4304

08CV2257

JUDGE GOTTSCHALL

MAGISTRATE JUDGE SCHENKIER

Re:   Sam's Club #4840-00 Janesville, WI (Job #360.01)
      48 Hour Contract Notice

NOTICE IS HEREBY GIVEN, pursuant to Section 13 of your subcontract, dated March 10, 2006, for the above project that you are in default in the performance of your subcontract in that you have:

- Refused or neglected to supply a sufficiency of skilled workmen, materials and/or equipment.   No work was performed on 6/20 or 6/21.
- Failed in the respect to complete the work with promptness per the project schedule.
- Caused by action or omission the stoppage or interference with the work of the General Contractor or other subcontractors.

YOU MUST CURE, OR MAKE REASONABLE PROGRESS TOWARD CURING, EACH OF SAID DEFAULTS WITHIN FORTY-EIGHT (48) HOURS of the date of Service of this Notice or we, as General Contractor, at our option, may terminate your subcontract in whole or in part. A determination as to whether or not reasonable progress has been made shall be in the sole judgment of the Contractor. If we terminate your subcontract, we will complete your contract or hire others to do so. All costs and damages incurred in completing your subcontract will be deducted from the unpaid balance of your subcontract. If costs of completion and damages exceed the unpaid balance of your subcontract, you will be back-charged therefore.

Upon termination, you will not be entitled to receive any payment under your subcontract until the project has been completed.

Sincerely,
**William A. Randolph, Inc.**

Anthony Riccardi
President

| SESSION | FUNCTION | NO. | | DESTINATION STATION | DATE | TIME | PAGE | DURATION | MODE | RESULT |
|---------|----------|-----|---|---------------------|------|------|------|----------|------|--------|
| 5775 | TX | 07 | | 19035896430A | JUN.21 | 17:02 | 001 | 00H00'36" | ECM | OK |

DATE:JUN.21 2006 17:03
TEL : 8478560696
NAME:WILLIAM A. RANDOLPH INC.

## TX RESULT REPORT

WM. A. **RANDOLPH** INC.
builders • contractors • construction managers

820 Lakeside Drive, Suite 3     Gurnee, Illinois 60031
Phone (847) 856-0123     Fax (847) 856-0696
www.warandolph.com

Certified Mail No.:

June 21, 2006

Bill Rickets
D&BR Building Systems, Inc.
8600 State Hwy 19
Edgewood, TX 75117
Faxed to 903-896-4304

Re:    Sam's Club #4840-00 Janesville, WI (Job #360.01)
        48 Hour Contract Notice

NOTICE IS HEREBY GIVEN, pursuant to Section 13 of your subcontract, dated March 10, 2006, for the above project that you are in default in the performance of your subcontract in that you have:

- Refused or neglected to supply a sufficiency of skilled workmen, materials and/or equipment. No work was performed on 6/20 or 6/21.
- Failed in the respect to complete the work with promptness per the project schedule.
- Caused by action or omission the stoppage or interference with the work of the General Contractor or other subcontractors.

YOU MUST CURE, OR MAKE REASONABLE PROGRESS TOWARD CURING, EACH OF SAID DEFAULTS WITHIN FORTY-EIGHT (48) HOURS of the date of Service of this Notice or we, as General Contractor, at our option, may terminate your subcontract in whole or in part. A determination as to whether or not reasonable progress has been made shall be in the sole judgment of the Contractor. If we terminate your subcontract, we will complete your contract or hire others to do so. All costs and damages incurred in completing your subcontract will be deducted from the unpaid balance of your subcontract. If costs of completion and damages exceed the unpaid balance of your subcontract, you will be back-charged therefore.

Upon termination, you will not be entitled to receive any payment under your subcontract until the project has been completed.

Sincerely,
William A. Randolph, Inc.

Anthony Riccardi
President

# WM. A. RANDOLPH INC.

builders • contractors • construction managers

820 Lakeside Drive, Suite 3    Gurnee, Illinois 60031
Phone (847) 856-0123    Fax (847) 856-0696
www.warandolph.com

June 27, 2006

Certified Mail No.:    08CV2257

JUDGE GOTTSCHALL

MAGISTRATE JUDGE SCHENKIER

Bill Rickets
D&BR Building Systems, Inc.
8600 State Hwy 19
Edgewood, TX 75117
Faxed to 903-896-4304

Re:    360.00 Wal-Mart #1305-01 Janesville
       Contract Termination

Dear Bill,

NOTICE IS HEREBY GIVEN, pursuant to Section 13 of your subcontract, dated Wednesday, April 5, 2006, for the above project that you are in default in the performance of your subcontract in that you have:

- Refused or neglected to supply a sufficiency of skilled workmen, materials and/or equipment…

- Failed in the respect to complete the work with promptness per the project schedule…

- Completed punch list items

Therefore, D & BR Building Systems, Inc. is hereby terminated from its contract. All costs and damages incurred in completing your subcontract will be deducted from the unpaid balance of your subcontract. If costs of completion and damages exceed the unpaid balance of your subcontract, you will be back-charged accordingly.

Upon termination, you will not be entitled to receive any payment under your subcontract until the project has been completed and total costs are determined.

Sincerely,

William A. Randolph, Inc.

Thomas J. Carrano
Senior Project Manager

# WM. A. RANDOLPH INC.

**builders • contractors • construction managers**

820 Lakeside Drive, Suite 3    Gurnee, Illinois 60031
Phone (847) 856-0123    Fax (847) 856-0696
www.warandolph.com

08CV2257
JUDGE GOTTSCHALL
MAGISTRATE JUDGE SCHENKII

June 27, 2006                          Certified Mail No.:

Bill Rickets
D&BR Building Systems, Inc.
8600 State Hwy 19
Edgewood, TX 75117
Faxed to 903-896-4304

Re:    360.01 Sam's Club #4840-00 Janesville
       Contract Termination

Dear Bill,

NOTICE IS HEREBY GIVEN, pursuant to Section 13 of your subcontract, dated Friday, March 10, 2006, for the above project that you are in default in the performance of your subcontract in that you have:

- Refused or neglected to supply a sufficiency of skilled workmen, materials and/or equipment...

- Failed in the respect to complete the work with promptness per the project schedule...

- Completed punch list items

Therefore, D & BR Building Systems, Inc. is hereby terminated from its contract. All costs and damages incurred in completing your subcontract will be deducted from the unpaid balance of your subcontract. If costs of completion and damages exceed the unpaid balance of your subcontract, you will be back-charged accordingly.

Upon termination, you will not be entitled to receive any payment under your subcontract until the project has been completed and total costs are determined.

Sincerely,

William A. Randolph, Inc.

Thomas J. Carrano
Senior Project Manager